UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CRIMINAL NO. H-92-177 |
| | § | |
| vs. | § | |
| | § | JUDGE SIM LAKE |
| PATRICIA LeBARON, | § | |
| Defendant. | § | |

RESPONSE OF UNITED STATES IN OPPOSITION
TO MOTION FOR "EXTRAORDINARY OR COMPELLING REASONS" UNDER THE
COMPASSIONATE RELEASE STATUTE 18 U.S.C. 3582(c)(1)(A)

The United States of America asks the Court to deny the
Defendant Patricia LeBARON's Motion for "Extraordinary or
Compelling Reasons" Under the Compassionate Release Statute 18
U.S.C. 3582(c)(1)(A) (Dkt. #743), for the reasons that follow.

**I. Factual Background**

The facts as cited by the Fifth Circuit Court of Appeals in
its decision denying Defendant's appeal in this case, *United States
v. Barlow, 41 F.3d 935* (1994), are as follows:

Patricia and Defendant-Appellants Douglas Barlow ("Barlow")
and William Heber LeBaron ("Heber"), were convicted on various
charges stemming from the assassination-style killings of Mark
Chynoweth ("Mark"), Edward Marston ("Ed"), Duane Chynoweth
("Duane"), and Duane's eight-year old daughter, Jenny Chynoweth
("Jenny"), which were carried out simultaneously on June 27,

1988. At the time of the slayings, the Defendants were all members of the Church. The adult victims, all former members of the Church, were killed for the sole reason that they had chosen to disassociate themselves and their families from the Church's teachings and membership.

A. THE CHURCH OF THE LAMB OF GOD

In the early 1950s-60s, Joel LeBaron ("Joel") founded a religious sect which he named the "Church of the First Born of the Fullness of Time." The religion practiced by Joel's organization was based on various distortions of early Mormon teachings and, according to Joel, "revelations from God." Joel's brother, Ervil, was a member of Joel's church, but in 1971, the theological differences which had developed between the two brothers led Ervil to leave Joel's sect and form his own, which Ervil named the "Church of the First Born of the Lamb of God." After that schism, Ervil and Joel engaged in a protracted power struggle to control the members and property of Joel's church; and in 1972, Ervil had Joel killed. Ervil died in Utah State Prison in 1981, by which time various members of his sect—the Church—had been associated with nine murders in Mexico, California, and Utah.

The beliefs of the Church are set out in several publications, the most notable of which—the *Book of the New Covenant*—Ervil wrote while incarcerated in Utah State Prison. According to these teachings, the leader of the Church, known as the "Great Grand

Patriarch" or "Patriarch," is empowered to brand disobedient members of the organization as "Sons or Daughters of Perdition," *i.e.,* those who are "unredeemable." Being marked unredeemable is tantamount to a death sentence, for the Church practices "blood atonement," an archaic religious doctrine which is purported to teach that unredeemable members of a religion can obtain eternal salvation only through the shedding of their own blood.

Once the Patriarch pronounces a punishment, other members of the Church are required to carry it out. The reward for carrying out the Patriarch's directives is to share in the leadership in the Kingdom of God; those who fail to do so, however, themselves become children of perdition.

B. THE ORDER TO KILL ED, MARK, AND DUANE

While Ervil was still in prison, Mark left Utah for Texas and then relocated in California, during which time, according to Ervil, Mark was living in "rebellion." Mark had begun to question some of Ervil's teachings, which led Ervil to pronounce:

There is a great controversy being caused by my servants Mark Chynoweth ... with the support of Ed Marston, and it is my will, that if these ... men will not repent immediately, that they should be destroyed immediately; because they are advantageous, and are seeking to destroy my little children, even the little children of

**Response to Compassionate-Release Motion – Page 3**

> my great and beloved Prophet, Seer, and Revelator....
> [I]f they will not repent ... I now declare them to be
> outlaws, and I will require any man who loves me, and
> who will have a crown at my right hand, to kill them
> upon sight...

Apparently neither Ed nor Mark "repented," so Ervil continued to proclaim that the two were Sons of Perdition, to be killed on sight. At some point, Ervil's wrath turned to Duane, prompting Ervil to decree that Ed could "be forgiven, only if he now shall kill king cobra [Duane] and Mark Chynoweth." After Ed, Mark, and Duane learned of Ervil's various pronouncements, in particular the one ordering Ed to kill Duane and Mark, these three decided to reject the teachings of both Ervil and the Church in toto.

Ervil's successor, Aaron, also denounced Ed, Mark, and Duane as "Sons of Perdition" because the three had chosen to disassociate themselves from the Church. Although at various times Church members openly discussed carrying out the Patriarchs' death sentences, Ervil's dictates remained unfulfilled until 1988. At that time, however, Aaron commanded that Ervil's prior edicts be enforced, and he ordered members to execute Ed, Mark, and Duane.

C. THE KILLING OF ED, MARK, DUANE, AND JENNY

In May 1988, Heber masterminded an elaborate scheme to carry out Ervil's and Aaron's directives. Heber planned to have the three Sons of Perdition slain simultaneously; no small feat given that

Ed lived in Dallas, and Mark and Duane in Houston. The plan included surveillance, disguises, communication equipment, and stolen vehicles. Four Church members were assigned the task of killing the three former members: Heber would kill Mark; Patricia and Richard would kill Duane; and Barlow would kill Ed. Other Church members, such as Natacia LeBaron ("Natacia") and Cynthia would assist. Heber had anticipated that one or more of the targeted former members might be accompanied, so he instructed the assassins to kill all witnesses "over four years old."

Ed, Mark, and Duane were all in the appliance repair business, each with his own company. Ed's and Duane's standard operating procedures were to go personally to their clients' homes to pick up appliances that needed servicing. Knowing this, Heber planned to telephone Ed and Duane and arrange for each intended victim to go to a different vacant house ostensibly to pick up an appliance needing repair. At each such location, a Church member would be waiting to kill the victim upon his arrival. In contrast, Mark had his employees pick up his clients' appliances, so Heber elected personally to kill Mark inside his own store.

Heber's plan was set in motion on the morning of June 27, 1988. Equipped with binoculars, Cynthia and Natacia parked in front of Mark's place of business in Houston. When they saw Mark arrive, they radioed Heber who was waiting by a telephone. Heber, who was in Houston, then called Duane (also in Houston) and Ed (in Dallas).

**Response to Compassionate-Release Motion – Page 5**

Heber arranged for each of them to pick up an appliance at a different vacant house at the same time later that same day.

At that appointed time, Heber positioned himself outside Mark's business in Houston, made sure that Mark was there, then radioed Cynthia (who was waiting in a car nearby) to "go for it." Heber, dressed in a business suit, then walked into Mark's store and shot him as he sat at his desk.

After receiving Heber's signal to "go for it," Cynthia called Barlow (who was waiting at a pay telephone in Dallas) and told him to execute the plan. Barlow proceeded to the vacant house in Dallas where Ed was scheduled to pick up an appliance, waited for Ed to arrive, and shot him when he did. A person who lived across the street from that vacant house saw the assailant, whom she later described as a young male in a "business-looking outfit."

Meanwhile, Patricia and Richard were in a black Silverado truck ("Silverado"), cruising around the Houston neighborhood in which was located the vacant house where Duane was to pick up an appliance. When Patricia and Richard spotted Duane's pickup truck in the driveway of that vacant house, they parked behind his truck. Richard then walked up to the cab of the truck and shot Duane several times. Observing that Jenny was in the cab of Duane's truck, Richard shot her too, in compliance with Heber's instructions. A person who lived directly across the street heard a gunshot, turned toward the sound, and saw Richard firing into

Duane's truck. That person described the killer as "well dressed in a business suit and tie," later confirming that the shooter's vehicle was similar to the Silverado pictured in one of the government's photographic exhibits.

After committing the four homicides, the perpetrators dismantled their firearms and disposed of them. The four active participants then reunited in Fort Worth, where they discussed the killings among themselves.

D. THE APPREHENSION, ARREST, AND PROSECUTION OF THE DEFENDANTS

On July 1, 1988 (four days after killing Ed, Mark, Jenny, and Duane), Heber, Patricia, and Barlow were arrested in Phoenix, Arizona at the King's Inn Motel ("Motel") and charged with automobile theft. A Phoenix officer had noticed the Silverado parked at the Motel and discovered that the number on its license plate matched the number of the license of a truck reported as stolen in Texas. The police checked with the clerk at the Motel to determine if anyone with Texas identification had registered at the Motel and learned that a "Christina Adams" (later identified as Cynthia) had registered for rooms 151 and 153 using a Texas driver's license. The police ran a check of that license and determined that it had not been issued to a Christina Adams.

The police watched rooms 151 and 153 and the stolen Silverado for the remainder of the day, developing information that constituted probable cause to arrest several of the Defendants,

**Response to Compassionate-Release Motion – Page 7**

including Richard and Patricia, as suspects in the theft of the Silverado. The police subsequently arrested the Defendants in room 150 of the Motel after chasing Patricia, who by then was already one of the suspects in the automobile theft, to the vicinity of room 150. Observing suspicious activity in that room, the police knocked on the door to ascertain whether Patricia had hidden there to avoid capture. Remaining outside the threshold of the room when the occupants opened the door to room 150, the police first observed Richard, whom the police previously had linked to the stolen Silverado. As Richard was a suspect in the automobile theft, the police thought that they also might find Patricia—who had just evaded apprehension and who also was linked to the stolen vehicle—in the same room as Richard. The police therefore entered room 150 without a warrant to look for Patricia, a fleeing suspected felon, whereupon they saw her emerge from the restroom.

After some preliminary questioning of the Defendants by the police and a brief search of the rooms and automobiles in which the Defendants had been observed by the police at various times, the Defendants were arrested and transported to the police station to be charged with automobile theft. When the police tried to question Patricia, she requested a lawyer.

The next morning, the police executed search warrants on rooms 150, 151, and 153 from which several items of physical evidence were obtained, including: three duplicate copies of the June 29,

1988 edition of the Dallas Times Herald in which the June 27, 1988 killings of Ed, Mark, Duane, and Jenny were reported; silicone sealant (similar to that used in the stolen Silverado); disguises; a list of scanner radio frequencies for the Dallas/Ft. Worth area; a listing of specific radio monitor frequencies for the Houston Police Department; a cache of weapons, including a holstered TARS .38 special revolver loaded with five rounds of ammunition; additional ammunition; speed loaders; shoulder holsters; gun pouches; and a cleaning kit for a rifle.

Later that same morning, Patricia, Cynthia, and Jacqueline were released from custody. Five days later, while still unaware of any connection between the persons that they arrested at the Motel and the homicides in Texas, the police released Heber and Barlow from custody.

It was not until almost a week after the release of Heber and Barlow that the police connected the suspects in the Arizona automobile theft with the Houston homicides. That occurred when a Houston homicide detective called the Phoenix police department asking if they knew whether a "Mary June Whitt" had been seen in the area. The Houston detective explained that Ms. Whitt was a suspect in some homicides in Houston and that the Houston police had reason to believe that she might then be in Phoenix.

One of the Phoenix detectives happened to recall the name "Mary June Whitt" from an automobile theft investigation that he

had conducted the previous December. He remembered that two women, "Pamela Monique Newman" and "Mary June Whitt," had been arrested in a stolen vehicle in Colorado and were subsequently extradited to Phoenix for prosecution. He had noticed that "Valerie Davis," one of the women arrested at the Motel, resembled Pamela Monique Newman. In a comparison of their fingerprints, the police confirmed that "Pamela Monique Newman" was in fact "Valerie Davis," one of Patricia's aliases.

Shortly thereafter the Defendants were charged by sealed federal indictment with nine counts, including murder for hire, witness tampering, and illegal use of a firearm in a violent crime. The indictment was unsealed about a week later, a short while after which the Defendants were transferred to federal custody. They appeared before a magistrate judge in connection with the instant offenses, and a few days later the magistrate judge denied pretrial release for all Defendants.

Approximately one month later a superseding indictment issued, charging all Defendants with fourteen counts. This indictment added counts charging obstruction of free exercise of religion and RICO violations.

A joint suppression hearing was held several weeks later, during which all evidence proffered by the government was determined to be admissible, with the exception of some spiral notebooks that had been obtained without a warrant from room 150

**Response to Compassionate-Release Motion – Page 10**

at the time the Defendants were arrested at the Motel. In addition, the district court found admissible an oral confession made by Patricia to Houston Homicide Detective John Burmester (the scene investigator for the murders of Duane and Jenny) at Arizona's Perryville State Prison ("Perryville"). At the time of their interview, Patricia was incarcerated at Perryville serving a nine-year sentence for automobile theft as a result of her arrest at the Motel.

The Defendants were tried before a district court jury early in January 1993. During that trial, Cynthia testified for the prosecution in exchange for the government's grant of immunity. At the close of the government's case, the Defendants made a motion for judgments of acquittal, which the trial court denied. The Defendants re-urged their motion at the close of all of the evidence. Ultimately, the jury returned guilty verdicts against all Defendants on all counts except Count 7 (aiding and abetting Patricia in her use and carrying of a firearm). The court then granted Defendants' motion for judgment of acquittal on the murder for hire counts (Counts 1-4), concluding that the Defendants obtained no pecuniary remuneration in consideration for the killings. Each Defendant was sentenced to, inter alia, two 5-year terms, two 20-year terms, and four life-terms, all to run concurrently, plus five years supervised release. *United States v. Barlow*, 41 F.3d 937-941 (5th Cir. 1994)

**II.  Defendant's Stated Grounds for Compassionate Release**

In her motion for compassionate release (Dkt. #743), LeBARON requested that she be granted compassionate release from prison pursuant to Title 18, United States Code, Section 3582(c)(1)(A). LeBARON raised four issues in that pleading, several of which combine for the purposes of this response.

First, LeBARON asserts that the First Step Act decreased mandatory minimum sentences for persons who committed the crimes that she committed.

Second, LeBARON asserts that "the severity of her sentence relative to others who commit similar crimes." (Dkt. # 734 p.3). For purposes of this response, it will be assumed that defendant is arguing that her sentence was disproportionate when compared to other similarly situated defendants and that this ground will combine with her first stated ground for relief.

Third, LeBARON asserts that, "defendant's age and ignorance to the law, at the times she committed her crimes." (Dkt. # 734 p.3). For purpose of this response, it will be assumed that defendant is arguing that her youth and ignorance of the law at the time of her offenses entitle her to consideration for compassionate release.

**Response to Compassionate-Release Motion – Page 12**

Fourth, LeBARON asserts that, "Congress' ratification and implementations of the First Step Act being applied constitutionally abroad May 22, 2022." (Dkt. # 734 p.3). For purposes of this response, it will be assumed that defendant is restating the argument from her first and second arguments above for the purposes of this response.

In an unenumerated issue, LeBARON argued that her health concerns qualified as an extraordinary and compelling reason for her claim to compassionate release.

For the following reasons, none of defendant's arguments are persuasive.

## III. Legal Authorities

The First Step Act as applied through Title 18, United States Code, §3582(c)(l)(A)(i), grants to this court the authority to reduce a sentence if warranted by the statutory factors set forth in Title 18, United States Code, § 3553(a). *United States v. Shkambi*, 993 F.3d 388 (5th Cir. 2021). However, the First Step Act did not alter the requirements of § 3582(c)(1)(A)(i) or change the fact that a defendant still has the burden to show circumstances justifying compassionate release. *United States v. Stowe*, 2019 WL 4673725, at *2 (S.D. Tex. Sept. 25, 2019); cited *United States v. Hudec*, No. CR 4:91-1-1, 2020 WL 4925675, at 3 (S.D. Tex. Aug. 19, 2020). Defendants must demonstrate extraordinary and compelling reasons justifying

**Response to Compassionate-Release Motion – Page 13**

early release. They must convince the district judge to exercise discretion to grant the motion after considering the § 3553(a) factors, *Shkambi*, at 393.

Included in the § 3553(a) statutory factors relevant to LeBARON's case are the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, the need to deter criminal conduct and protect the public from further crimes of the defendant. Title 18, United States Code §§ 3553(a)(1) *et seq.* It is worth noting that it remains the law that rehabilitation standing alone cannot qualify as "extraordinary and compelling reasons to warrant a reduction" for compassionate reasons under Title 18, United States Code, § 3582(c)(1)(A)(i), (*See* Title 28 United States Code § 994(t)).

## IV.  Argument

### The First Step Act did not decrease mandatory minimum sentences for persons who committed crimes she (LeBARON) committed.

At sentencing, having been convicted of complicity in the murders of four people, including one eight-year-old girl cut down in the prime of her innocence, as well as the related charges, the court ordered LeBARON to serve:

Superseding Count 5: Conspiracy to Tamper with a Witness, **5-year** term of imprisonment;

Superseding Count 6: Tampering with a Witness, **life** in prison;

Superseding Count 8: Title 18, United States Code, § 924(c), **5-year** term of imprisonment;

Superseding Count 9: Conspiracy to Obstruct Religious Views, **5-year** term of imprisonment;

Superseding Count 10: Obstruction of Religious Views, **life** in prison;

Superseding Count 11: Obstruction of Religious Views, **life** in prison;

Superseding Count 12: Obstruction of Religious Views, **life** in prison;

Superseding Count 13: RICO, **20-year** term of imprisonment; and,

Superseding Count 14: RICO, **20-year** term of imprisonment. All sentences were ordered to run concurrently. (Judgment, Dkt. #255).

Other than the assertion that the First Step Act decreased mandatory minimum sentences for people who had committed crimes similar to those committed by LeBARON, she offers no argument or authority for her claim that she is entitled to compassionate release as a result of her sentence. That may be because no such authority exists. LeBARON and her co-conspirators traveled all the way from northwest Mexico to Texas where she and her relatives first planned and then killed three men and one little girl. It is

unlikely that a precedent to this crime exists, so horrible was it in its planning and execution. Instances where similar crimes were committed don't exist. Moreover, in those cases in which murder, attempted murder or conspiracy to commit murder, RICO or conspiracy to commit RICO are at the heart of the convictions, courts have not been sympathetic to motions for reduction under the First Step Act.

In *United States v. Thompson*, No. 4:98-CR-64-SDJ, 2022 WL 2195204, at *8 (E.D. Tex. June 17, 2022) Thompson sought compassionate release after being, "convicted on a variety of conspiracy and substantive offenses arising out of a multi-state cocaine distribution and money laundering enterprise that engaged in acts of violence, including murder, robbery, and obstruction of justice." *Thompson*, 253 F.3d at *1. Thompson entered the conspiracy as a drug courier but he eventually became the "right-hand man" to Mark Barney, the leader of the enterprise, and "served as a liaison between Barney and other major distributors." *Id.* Thompson was present when Barney "stated that something had to be done with Frankie Dunham, an employee of the enterprise who was cooperating with police." *Id.* at *2. Dunham was murdered "one week before she was to testify against [Barney] in a state court proceeding." *Id.* Despite Thompson's participation in programs and holding steady employment while incarcerated, the court ruled that, "Thompson fails to show how his release reflects

the seriousness of his offense, promotes respect for the law, and provides just punishment. Considering all the relevant factors, the Court concludes that the sentence originally imposed remains sufficient, but not greater than necessary, to comply with the purposes of Section 3553(a)." *id*

In *United States v. Jones*, No. 21-1743, 2021 WL 5399866, at *1 (7th Cir. Nov. 18, 2021), Jones was convicted in 2003 of conspiring to distribute over 50 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846, and of selling a firearm to a known felon, in violation of 18 U.S.C. § 922(d)(1). Jones committed these offenses while serving a sentence for murder at Illinois' Menard Correctional Center. The presentence investigation report found that Jones had an offense level of 42 and a criminal history category of VI, resulting in sentencing ranges of 360 months to life on the conspiracy count and 120 months on the firearm-sale count. The district court sentenced Jones to 360 months on the first count and 120 months on the second, running concurrently. The district court subsequently denied Jones' motion for sentence reduction under the First Step Act. The district court explained why the § 3553(a) factors weigh against a sentence reduction: Jones committed a serious offense by leading a drug-trafficking conspiracy while already incarcerated, and he had an extensive criminal history including a conviction for first-degree murder. Although the court acknowledged Jones's

apology for his actions and the likely influence of his "especially troubling upbringing," it concluded that the need to deter Jones and others from committing further crimes and to protect the public justified a denial of a sentence reduction. *Id.*

In *United States v. Ortiz*, No. 4:07-CR-37-11, 2022 WL 1125767, at *1 (S.D. Tex. Apr. 14, 2022), Ortiz, a high-ranking member of the Houston Chapter of the Texas Syndicate gang, pled guilty to a RICO conspiracy charge. The case involved Ortiz issuing orders to murder several people, including members of the rival Tango Blast gang. After being sentenced to twenty-years incarceration, Ortiz filed a motion for compassionate release under the First Step Act. Ortiz argued that there has been a trend away from harsh sentencing laws. The court rejected this argument, stating that, "Ortiz points to no authority supporting his implicit claim that a 20-year sentence is unduly harsh for a RICO conspiracy that plotted several murders." *Id.*

In *United States v. Samuels*, No. CR 09-123, 2022 WL 2116918, at *1 (E.D. La. June 13, 2022), Defendant Samuels purchased a life insurance policy covering the life of his cousin and an automobile policy on his own van. He then hired a hitman to kill his cousin and attempted to claim the life insurance proceeds. He also burned the van, which had been used in the murder, and claimed insurance proceeds for it. Following a trial by jury, defendant was convicted in January 2011 of fifteen counts, which included conspiracy to

commit mail fraud, wire fraud, use of fire to commit mail fraud, making a false statement, and aiding and abetting. Samuels was sentenced to serve 900 months in the custody of the Bureau of Prisons. After defendant succeeded in having his conviction on two counts reversed on direct appeal, his sentence was reduced to 660 months imprisonment. Samuels filed a motion for compassionate release pursuant to the First Step Act. In denying that motion, the court stated, "Defendant murdered his cousin in order to collect on the proceeds of a fraudulently obtained insurance policy. The nature and circumstances of the offense do not support a reduction." *Id.*

LeBARON was convicted in the commission of four murders. Those murders were meticulously planned and carried out in multiple cities hundreds of miles apart at the exact same time. The depravity associated with such an action demonstrates clearly that LeBARON has earned her sentence of life in prison four times over. On this alone, her motion for compassionate release should be denied.

### There is no disparate treatment between the sentence received by LeBARON and the sentence received by others who commit similar crimes.

LeBARON offers no facts or arguments in support of this proposition. However, from the cases above, it is clear that there has been no disparate treatment. As such, her motion for compassionate release should be denied.

**Response to Compassionate-Release Motion – Page 19**

**Defendant's claim that her age and ignorance to the law at the times she committed her crimes cannot be established and in any event would not insulate her from responsibility for those crimes.**

It has long been a maxim in the law that ignorance of the law is not an excuse. *Cheek v. United States*, 498 U.S. 192, 199, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), as cited in *Rehaif v. United States*, 139 S. Ct. 2191, 2198, 204 L. Ed. 2d 594 (2019). While there are certain limited exceptions to this rule[1], those exceptions do not apply to LeBARON's case.

Proof of her understanding of the illegality of her actions is reflected by the intricacies involved in the plan for the commission of these murders. The plan was to murder Mark, Duane and Ed at the same time, a plan complicated by the fact that Mark and Duane lived in Houston and Ed lived in Dallas. To accomplish their illegal goals, LeBARON and her family members conducted surveillance of their intended victims prior to the murders to learn their victims' habits and patterns. They also obtained disguises to mask their true identities during the commission of the murders. In order to facilitate communicate between the co-

---

[1] (*Bryan v. United States*, 524 U.S. 184, 194, 118 S. Ct. 1939, 1946, (1998)(In certain cases involving willful violations of the tax laws, we have concluded that the jury must find that the defendant was aware of the specific provision of the tax code that he was charged with violating. See, e.g., *Cheek*, *id* 201; *Ratzlaf v. United States,* 510 U.S. 135, 138, 114 S.Ct. 655, 657–658 (1994)( in order to satisfy a willful violation in Ratzlaf, we concluded that the jury had to find that the defendant knew that his structuring of cash transactions to avoid a reporting requirement was unlawful. See 510 U.S., at 138, 149, 114 S.Ct., at 657–658, 663); both cited in Rehaif v. United States, 139 S. Ct. 2191, 2198, 204 L. Ed. 2d 594 (2019)

conspirators, radios were obtained. Pay phones were identified and used by the co-conspirators to avoid police identification through means of phone records. Vehicles were stolen and utilized in the commission of the murders as a means to further frustrate any efforts by law enforcement to identify them as the killers. To avoid identification by persons accompanying their intended victims, it was agreed that any witnesses over the age of four would be killed as well. Upon her arrest in Arizona for auto theft under one of her many assumed identities, Patricia responded to police questioning by requesting legal representation. All of these preparations demonstrate that LeBARON knew and understood the illegality of her actions in the murders of Ed, Mark, Duane and Jenny. Any argument to the contrary is founded solely upon LeBARON's own wishful thinking and regret at being caught and held responsible for her actions. There are no facts which would support LeBARON's claim of ignorance of the law and as such, her motion must be denied.

## § 3553(a) Factors Weigh Against Compassionate Release

Title 18, United States Code, § 3582(c)(1)(A) provides a pathway to sentence reduction if LeBARON can present extraordinary and compelling reasons for such reduction. However, in weighing the merits of LeBARON's motion, the court must consider the factors

set forth in Title 18, United States Code, § 3553(a), which are case sensitive.

Contrary to LeBARON's claim that her sentence has resulted in cruel and unusual punishment, the sentence represents an individualized weighing of the facts of the offenses for which she was convicted and the factors for consideration by the court under § 3553. The sentence which LeBARON claims resulted in cruel and unusual punishment entitling her to compassionate release is no more than a rational calculation based upon the crimes for which she has been convicted.

The sentences imposed reflect the seriousness of the offenses committed by LeBARON, promote respect for the law, and provide just punishment. The sentences imposed afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. Title 18, United States Code, § 3553(a). Any reduction in that sentence now would be contrary to the law and the facts of this case.

**A generalized fear of COVID is not an extraordinary and compelling reason justifying compassionate release.**

Finally, in addition to the enumerated grounds for relief, LeBARON argues that her diagnosis of type 2 diabetes, asthma, high cholesterol, sarcodosis[2] (*sic sarcoidosis*), a family history of

---

[2] "Sarcoidosis is a disease characterized by the growth of tiny collections of inflammatory cells (granulomas) in any part of your body – most commonly the lungs and lymph nodes. But it can also affect the eyes, skin, heart and other organs. The cause of sarcoidosis is unknown, but experts think it results from

ovarian cancer, and a breast implant that needs replacement result in an extraordinary and compelling reason justifying the granting of compassionate release. LeBARON does not argue that her medical condition is not well controlled by the medications provided her at FCI Aliceville, but instead sets forth unrealized fears of greater susceptibility to COVID-19 due to her condition.

At the outset, it should be noted that, contrary to Defendant's unsupported conclusion, the Bureau of Prisons is not struggling to implement adequate policies and procedures to address the threat of COVID-19. As of August 19, 2022, the BOP has **141,3602** federal inmates. The BOP staff complement is approximately **36,000**. There are **613 federal inmates** and **651 BOP staff** who have confirmed positive test results for COVID-19 nationwide. Currently, **49,267** inmates and **13,533** staff have recovered. There have been **306** federal inmate deaths and **7** BOP staff member deaths attributed to COVID-19. Of the inmate deaths, **11** occurred while on home confinement.

As of August 19, 2022, FCI Aliceville, where Defendant is housed, houses a total of 1,599 inmates, 190 of whom are housed in

---

the body's immune system responding to an unknown substance. Some research suggests that infectious chemicals, dust and a potential abnormal reaction to the body's own proteins (self-proteins) could be responsible for the formation of granulomas in people who are genetically predisposed. There is no cure for sarcoidosis, but most people do very well with no treatment or only modest treatment. In some cases, sarcoidosis goes away on its own. However, sarcoidosis may last for years and may cause organ damage." - MayoClinic.org

the minimum security camp adjacent to FCI Aliceville.  Of the 1,599
inmates, there are no inmates who have tested positive for Covid-
19, and 1 staff member who has tested positive.
(www.bop.gov/coronavirus).  To insure continued success in
preventing a wide-spread out-break of the pandemic in FCI
Aliceville, the following policies and procedures have been
adopted by the BOP:

> **INMATE CLOTH FACE COVERING:** Follow the full COVID-19
> Pandemic Plan including facility-wide use of face
> coverings, surgical or N95 masks as indicated.

> **SOCIAL DISTANCING:** All areas.

> **STAFF CLOTH FACE COVERING:** Follow the full COVID-19
> Pandemic Plan including facility-wide use of face
> coverings, surgical or N95 masks as indicated.

> **STAFF SYMPTOM SCREENING:** Implement daily COVID-19
> symptom screen and temp check prior to entry into the
> institution (enhanced screening).

These, in addition to many other general modifications, have
resulted in the success FCI Aliceville is experiencing in its
efforts to eliminate COVID infections within the facility. BOP
professionals will continue to monitor this situation and adjust
its practices as necessary to maintain the safety of prison staff
and inmates while also fulfilling its mandate of incarcerating all
persons sentenced or detained based on judicial orders.

Given all of the above, judicial action is unnecessary, and
in fact would be detrimental to this process as it would inevitably
result in scattershot treatment of inmates in contravention to the

**Response to Compassionate-Release Motion – Page 24**

BOP's organized and comprehensive approach. The BOP is employing practices to keep the prison population at low risk for COVID-19 spread and succeeding in that goal. Accordingly, the government opposes judicial action in individual cases such as this.

Moreover, the Fifth Circuit Court of Appeals has made it clear that a generalized fear of COVID does not constitute an extraordinary and compelling reason sufficient to merit a reduction. *United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021). Thompson, 43-years of age, sought compassionate release based upon his fears that his medical history, which included a stroke 10 years earlier, hypertension, and high cholesterol, would make him more susceptible to COVID in a prison setting. The court denied Thompson's appeal, stating, "Fear of COVID doesn't automatically entitle a prisoner to release. Thompson can point to no case in which a court, on account of the pandemic, has granted compassionate release to an otherwise healthy defendant with two, well-controlled, chronic medical conditions and who had completed less than half of his sentence." *Id.,* 431. but may be considered as a factor in evaluating "extraordinary and compelling reasons." *See United States v. Brooker*, 976 F.3d 228, 232 (2d Cir. 2020). *Brooker*, 976 F.3d at 237-38; *United States v. Hudec*, No. 4:91-1-1, 2020 WL 4925675, at *5 (S.D. Tex. Aug. 20, 2020).

*Thompson* makes it clear that this claim does not represent an extraordinary and compelling reason under § 3582(c)(1)(A)(i) for granting LeBARON's motion. *See Thompson, id.*

### Conclusion

For the above reasons, this Court should deny the defendant's compassionate-release motion.

Respectfully submitted,

JENNIFER B. LOWERY
United States Attorney

*Richard D. Hanes*

RICHARD D. HANES
Assistant United States Attorney
713/817-4642
richard.hanes@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on or before the date of filing, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court.  I also mailed a paper copy by certified mail to:

         Patricia LeBaron
         Registration Number 60090-079
         FCI Aliceville
         Federal Correctional Institution
         P.O. Box 4000
         Aliceville, AL 35442

                           *Richard D. Hanes*
                           _____
                           RICHARD D. HANES
                           Assistant United States Attorney