No. 4:92-cr-0177-05

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA
Plaintiff

V.

PATRICIA LEBARON
Defendant

SUPPLEMENT TO MOTION FOR REDUCTION IN SENTENCE
UNDER 18 U.S.C. § 3582(c)(1)(A)(i)

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas No. 3233
Texas State Bar No. 14003750

MICHAEL HERMAN
First Assistant Federal Public Defender
Texas State Bar No. 24015128
Southern District of Texas No. 25087
Attorneys for Defendant
440 Louisiana, Suite 1350
Houston, Texas 77002-1056
Telephone: 713.718.4600
Fax: 713.718.4610

# TABLE OF CONTENTS

**Page**

Table of Contents ...................................................................................... ii

Table of Citations ......................................................................................v

Table of Exhibits ....................................................................................xvi

Supplement To Motion For Reduction In Sentence
  Under 18 U.S.C. § 3582(c)(1)(A)(i) ...................................................1

    I.  Statement Of Facts ...................................................................2

        A. The Crimes and Convictions ................................................2

        B. The making of Patricia LeBaron ........................................3

    II.  Argument ...............................................................................14

        A. This Court has the authority to reduce life sentences ........16

        B. Extraordinary and compelling reason: Thirty years of scientific development now prove the immense limitations of cognition, judgment, independent thought, and emotional control that afflicted Ms. LeBaron at the time of the crimes and trial, making the life sentences unreasonably long and excessive. ........................21

            1. What the scientific developments of the last thirty years establish about cases like Ms. LeBaron's. ..................22

            2. Other courts have found similar constellations of circumstances to constitute "extraordinary and compelling" reasons to justify a reduction under this statute in similar cases. ..........................................................37

        C. Extraordinary and compelling reason: Over the past thirty years the Supreme Court has interpreted the Constitution and the statute of conviction in ways that call into question whether mandatory life sentences were ever required in this case. ...............43

# TABLE OF CONTENTS – (cont'd)

**Page**

1. Under *Apprendi*, *Alleyne* and *Booker*, the Court was not required to impose a mandatory life sentence. ...........................43

2. This Court should have authority to consider these changes in the Supreme Court's interpretation of the Constitution as "extraordinary and compelling" even after *Escajeda* because Ms. LeBaron could not pursue post-conviction relief on the basis of these decisions. ...............................................................49

3. The Supreme Court's decision in *Fowler* calls into question whether there was an error at trial in the jury instruction and in the sufficiency of the evidence that would invalidate Ms. LeBaron's conviction (foreclosed issue). ...........................52

D. Section 3553(a) factors favor reduction. ...........................................55

   1. The proposed 30-year sentence reflects the nature and circumstances of the offense and the history and characteristics of this defendant under 18 U.S.C. § 3553(a)(1) and reflects the seriousness of the offense, promotes respect for the law and provides just punishment for the offense, as required under Section 3553(a)(2)(A). ..........56

   2. A 30-year sentence provides just punishment for the offense, as required under Section 3553(a)(2)(A), serves as an adequate deterrent to criminal conduct, as required under Section 3553(a)(2)(B) and protects the public, in accordance with Section 3553(a)(2)(C). ........................................................62

   3. The proposed sentence would better meet the need to provide Ms. LeBaron with appropriate correctional treatment, as required under Sections 3553(a)(2)(D). ........................................66

   4. The 30-year sentence that Ms. LeBaron seeks would "avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct," as required under Section 3553(a)(6). ..............................................67

**TABLE OF CONTENTS – (cont'd)**

**Page**

E.   The reduction in sentence is consistent with the newly-proposed USSG § 1B1.13. .................................................................70

Conclusion .......................................................................................73

Certificate of Service ......................................................................75

Exhibits .............................................................................................76

Appendix ...................................................................................... Tab 1

# TABLE OF CITATIONS

**Page**

*Alleyne v. United States*, 570 U.S. 99 (2013) ................................................. *passim*

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) .............................................. *passim*

*Barlow v. Daniels*, 765 Fed. Appx. 72
  (5th Cir. 2019) (unpublished) ................................................................. 55

*Fowler v. United States*, 563 U.S. 668 (2011) .............................................. *passim*

*Garcia v. United States*, 588 Fed. Appx. 851
  (11th Cir. 2014) ....................................................................................... 50

*Graham v. Florida*, 560 U.S. 48 (2010) ......................................................... 23, 62

*Jackman v. Shartle*, 535 Fed. Appx. 87
  (3d Cir. 2013) .......................................................................................... 51

*Jones v. United States*, 526 U.S. 227 (1999) ................................................. 44-45

*Miller v. Alabama*, 567 U.S. 460 (2012) ....................................................... 23, 41

*Roper v. Simmons*, 543 U.S. 551 (2005) ....................................................... 23

*Thompson v. Oklahoma*, 487 U.S. 815 (1988) .............................................. 23

*United States v. Booker*, 543 U.S. 220 (2005) .............................................. *passim*

*United States v. Bryant*, 996 F.3d 1243
  (11th Cir. 2021) ....................................................................................... 15

*United States v. Cano*, No. 95-00481-CR, 2020 WL 7415833
  (S.D. Fla. Dec. 16, 2020) ....................................................................... 20, 48

*United States v. Causey*, 185 F.3d 407
  (5th Cir. 1999) ......................................................................................... 53-54

# TABLE OF CITATIONS – (cont'd)

**Page**

## CASES – (cont'd)

*United States v. Chen*, 48 F.4th 1092
 (9th Cir. 2022) ................................................................... 19

*United States v. Chen*, No. 02-CR-271 (LAP), 2022 WLO 2533287
 (S.D.N.Y. July 7, 2022)...................................................... 68

*United States v. Cooper*, 996 F.3d 283
 (5th Cir. 2021) ................................................................... 15

*United States v. Cruz*, No. 3:94-cr-112 (JCH), 2021 WL 1326851
 (D. Conn. Apr. 9, 2021) ................................................ 38-39, 57, 62

*United States v. Davis*, 139 S. Ct. 2319 (2019) ...................................... 51

*United States v. Escajeda*, 58 F.4th 184
 (5th Cir. 2023) .......................................................... *passim*

*United States v. Espino*, No. 03-20051-08-JWL, 2022 WL 4465096
 (D. Kan. Sept. 26, 2022) ............................................... 41, 58

*United States v. Fenner*, No. CR RDB-05-095, 2022 WL 1062021
 (D. Md. Apr. 8, 2022) ....................................................... 48

*United States v. Fine*, 982 F.3d 1117
 (8th Cir. 2020) ................................................................... 51

*United States v. Gentry*, 432 F.3d 600
 (5th Cir 2005) ................................................................... 49

*United States v. Gurrola*, 898 F.3d 524
 (5th Cir. 2018) ................................................................... 47

*United States v. Hall*, No. CR 06-20162-01-KHV, 2023 WL 2140154
 (D. Kan. Feb. 21, 2023) ..................................................... 50

# TABLE OF CITATIONS – (cont'd)

Page

## CASES – (cont'd)

*United States v. Halvon*, 26 F.4th 566
(2d Cir. 2022) .............................................................. 17, 19

*United States v. Hicks*, 663 Fed. Appx. 299
(5th Cir. 2016) (unpublished) ..................................... 51

*United States v. Hope*, No. 90-cr-06108-KMW-2, 2020 WL 2477523
(S.D. Fla. Apr. 10, 2020) ............................................ 20

*United States v. Hunter*, 12 F.4th 555
(6th Cir. 2021) ............................................................ 42

*United States v. Ingram*, No. 3:00-783-JFA, 2022 WL 3030748
(D.S.C. Aug. 1, 2022) ................................................. 48

*United States v. Lara*, __ F.Supp.3d __, 2023 WL 2305938
(D.R.I. Mar. 1, 2023) .................................................. 39

*United States v. Lii*, 528 F.Supp.3d 1153
(D. Haw. 2021) ........................................................... 19

*United States v. Long*, 997 F.3d 342
(D.C. Cir. 2021) .......................................................... 15

*United States v. Lugo*, No. 01-cr-922 (NG), 2022 WL 732153
(E.D. N.Y. Mar. 11, 2022) .......................................... 19

*United States v. McCoy*, 981 F.3d 271
(4th Cir. 2020) ............................................................ 19

*United States v. McMaryion*, 64 F.4th 257, 2023 WL 2658434
(5th Cir. 2023) ................................................... 15, 19, 51

*United States v. Millan*, No. 91-cr-685 (LAP), 2020 WL 1674058
(S.D.N.Y. Apr. 6, 2020) .............................................. 20

# TABLE OF CITATIONS – (cont'd)

**Page**

### CASES – (cont'd)

*United States v. Morris*, 602 F.Supp.3d 881
  (E.D. Va. 2022) ..................................................... 50

*United States v. Morris*, No. 3:99-cr-264-17 (VAB), 2022 WL 3703201
  (D. Conn. Aug. 26, 2022) ...................................................... 19, 42, 68

*United States v. Olvera*, 775 .2d 726
  (5th Cir. 2015) ..................................................... 49

*United States v. Perez*, No. 3:02-Cr-7, 2021 WL 837425
  (D. Conn. Mar. 4, 2021) .................................................. 20, 66

*United States v. Piggott*, No. 94-cr-417, 2022 WL 118632
  (S.D.N.Y. Jan. 12, 2022) ..................................................... 19

*United States v. Qadar*, No. 00-CR-603, 2021 WL 3087956
  (E.D.N.Y. July 22, 2021) .................................................. 62-63

*United States v. Ramsay*, 538 F.Supp.3d 407
  (S.D.N.Y. 2021) ........................................................... *passim*

*United States v. Rios*, No. 3:94CR112 (JBA), 2020 WL 7246440
  (D. Conn. Dec. 8, 2020) ................................................... 59, 63

*United States v. Rodriguez*, 492 F.Supp.3d 306
  (S.D.N.Y. 2020) ..................................................... 20, 59, 66

*United States v. Russo*, __ F.Supp.3d __, 2022 WL 17247005
  (E.D.N.Y. Nov. 28, 2022) ................................................. 60, 62, 67-68

*United States v. Ruvalcaba*, 26 F. 4th 14
  (1st Cir. 2022) ..................................................... 18

*United States v. Shaw*, 701 F.2d 367
  (5th Cir. 1983) ..................................................... 47

# TABLE OF CITATIONS – (cont'd)

**Page**

## CASES – (cont'd)

*United States v. Shkambi*, 993 F.3d 388
   (5th Cir. 2021) ................................................................ 15

*United States v. Sims*, No. 3:98-Cr-45, 2021 WL 1603959
   (E.D. Va. Apr. 23, 2021) ......................................... 20, 40-41

*United States v. Smith*, 723 F.3d 510
   (4th Cir. 2013) ................................................................ 54

*United States v. Solomon*, No. 3:14-cr-00340-K-5, 2023 WL 2920945
   (N.D. Tex. Apr. 11, 2023) ................................................ 51

*United States v. Sterling*, No. 2:05-CR-20061-01, 2021 WL 865227
   (W.D. La. Mar. 5, 2021) .................................................. 48

*United States v. Tellier*, No. 92-CR-869, 2022 WL 1468381
   (S.D.N.Y. May 10, 2022) ................................................ 62

*United States v. Trenkler*, 47 F.4th 42
   (1st Cir. 2022) ................................................................ 52

*United States v. White*, No. 96-cr-1123 (SHS), 2022 WL 18276933
   (S.D.N.Y. Dec. 8, 2022) .................................................. 69

*United States v. Weissinger*, 542 F.Supp.32 882
   (E.D. Mo. 2021) .............................................................. 49

*United States v. Williams*, No. CR 91-559-6 (TFH), 2021 WL 5206206
   (D.D.C. Nov. 9, 2021) ................................................ 19, 48

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ................................................................ 44

## TABLE OF CITATIONS – (cont'd)

**Page**

## CONSTITUTIONAL PROVISIONS – (cont'd)

U.S. Const. amend. VI ................................................................. *passim*

U.S. Const. amend. XIV ...................................................................... 44

## STATUTES AND RULES

18 U.S.C. § 2 ...................................................................... 3, 16

18 U.S.C. § 247 ............................................................... 3, 16, 43

18 U.S.C. § 371 ........................................................................... 3

18 U.S.C. § 924(c) ................................................................. *passim*

18 U.S.C. § 1111 ....................................................................... 46

18 U.S.C. § 1111(a) (1988) .......................................................... 46-47

18 U.S.C. § 1111(b) (1988) ............................................................ 46

18 U.S.C. § 1112 ....................................................................... 46

18 U.S.C. § 1512 ....................................................................... 16

18 U.S.C. § 1512(a)(1)(C) (1988) ......................................... 3, 16, 43, 46

18 U.S.C. § 1512(a)(2)(A) ............................................................. 16

18 U.S.C. § 1959 ....................................................................... 19

18 U.S.C. § 1959(a)(1) ............................................................. 19, 42

18 U.S.C. § 1959(2) .................................................................... 19

# TABLE OF CITATIONS – (cont'd)

**Page**

## STATUTES AND RULES – (cont'd)

18 U.S.C. § 2113(e) ............................................................ 20

18 U.S.C. § 3553 ............................................................... 62

18 U.S.C. § 3553(a) ..................................................... *passim*

18 U.S.C. § 3553(a)(1) ................................................ iii, 56

18 U.S.C. § 3553(a)(2)(A) ........................................ iii, 56, 62

18 U.S.C. § 3553(a)(2)(B) ............................................ iii, 62

18 U.S.C. § 3553(a)(2)(C) ............................................ iii, 62

18 U.S.C. § 3553(a)(2)(D) ............................................ iii, 66

18 U.S.C. § 3553(a)(6) ................................................ iii, 67

18 U.S.C. § 3582 ........................................................ *passim*

18 U.S.C. § 3582(c) .................................................... 49, 55

18 U.S.C. § 3582(c)(1)(A) ........................................... *passim*

18 U.S.C. § 3582(c)(1)(A)(i) .......................................... ii, 1

18 U.S.C. § 3582(c)(2) ..................................................... 51

19 U.S.C. § 1962(c) ......................................................... 3

19 U.S.C. § 1962(d) ......................................................... 3

21 U.S.C. § 841 ............................................................ 19

21 U.S.C. § 848 ............................................................ 48

# TABLE OF CITATIONS – (cont'd)

**Page**

## STATUTES AND RULES – (cont'd)

21 U.S.C. § 848(b) ........................................................... 19-20

21 U.S.C. § 848(e)(1)(A) ...................................................... 20

21 U.S.C. § 851 ............................................................. 19-20

28 U.S.C. § 2255 .......................................................... *passim*

28 U.S.C. § 2255(e) ........................................................... 55

28 U.S.C. § 2255(f)(3) ........................................................ 54

28 U.S.C. § 2255(h)(2) ........................................................ 55

## SENTENCING GUIDELINES

USSG § 1B1.13 ......................................................... iii, 15, 70

USSG § 1B1.13(b)(5) ........................................................ 70

USSG § 1B1.13(b)(6) ........................................................ 71

USSG § 5K2.12 ............................................................. 43

## MISCELLANEOUS

Allen, A.,
  *Impact on Children of Being Born Into/Raised in a Cultic Group*,
  ICSA Today, *7*(1), (2016) ................................................. 29

Ben Bradlee, Jr. & Dale Van Atta,
  *Prophet of Blood*
  (G.P. Putnam's Sons 1981) ........................................... *passim*

# TABLE OF CITATIONS

Page

## MISCELLANEOUS – (cont'd)

Rena Chynoweth & Dean M. Shapiro,
*The Blood Covenant*
(Diamond Books 1990) .................................................................. *passim*

Cloitre, M., Hyland, P., Bisson, J. I., Brewin, C. R., Roberts, N. P., Karatzias, T.,
& Shevlin, M.,
*ICD-11 Posttraumatic Stress Disorder and Complex Posttraumatic Stress*
*Disorder In The United States: A Population-Based study*,
Journal of Traumatic Stress, 32(6), (2019) ........................................... 34

D'Andrea, W., Ford, J. D., Stolbach, B., Spinazzola, J., & van der Kolk, B. A.,
*Understanding interpersonal trauma in children:*
*Why we need a developmentally appropriate trauma diagnosis*
American Journal of Orthopsychiatry 82(2), (2012). ........................................ 32

Dierkhising, C. B., Ford, J. D., Branson, C., Grasso, D. J., & Lee, R.,
*Developmental Timing of Polyvictimization: Continuity,*
*Change, and Association With Adverse Outcomes in Adolescence*,
Child Abuse & Neglect 87, (2019) ....................................................... 32

Duke, N. N., Pettingell, S. L., McMorris, B. J., & Borowsky, I. W
*Adolescent Violence Perpetration: Associations With Multiple*
*Types of Adverse Childhood Experiences*,
125 Pediatrics 4 (2010) ................................................................. 25-26

Ford, J. D., & Delker, B. C.,
*Polyvictimization in Childhood and its Adverse Impacts Across the Lifespan:*
*Introduction to the Special Issue*,
Journal of Trauma & Dissociation 19(3), (2018) ........................................ 32-33

Furnari, L.,
*Born or Raised in High-Demand Groups: Developmental Considerations*,
ICSA E-newsletter, (2005) ................................................................ 27

## TABLE OF CITATIONS

Page

### MISCELLANEOUS – (cont'd)

Gardner, Martin R.,
*Illicit Legislative Motivation as a Sufficient Condition for*
*Unconstitutionality Under the Establishment Clause – A*
*Case for Consideration: The Utah Firing Squad*,
1979 Wash. U. L. W. 435, ...................................................................... 8

Goldberg, L.,
*Raised in Cultic Groups: The Impact on The Development of*
*Certain Aspects of Character*,
Cultic Studies Review 5(1) (2006). ....................................................... 28

Grasso, D. J., Dierkhising, C. B., Branson, C. E., Ford, J. D., & Lee, R.
*Developmental Patterns of Adverse Childhood Experiences*
*and Current Symptoms and Impairment in Youth Referred*
*for Trauma-Specific Services*.
44 Journal of Abnormal Child Psychology 5 (2016). .......................... 27

Herman, J. L.,
*Complex PTSD: A Syndrome in Survivors of*
*Prolonged and Repeated Trauma*.
Journal of Traumatic Stress, 5(3), (1992). ........................................... 33

Herman, J.,
*Trauma and Recovery: The Aftermath of Violence From Domestic Abuse to*
*Political Terror*
96 (Basic Books 1997). .......................................................................... 30

LeBaron, Verlan M.,
*The LeBaron Story*
(Keels & Co., Inc. 1981) ......................................................................... 5

Matthews, C. H., & Salazar, C. F.,
*Second-generation adult former cult group members'*
*recovery experiences: Implications for counseling*.
International Journal for the Advancement of Counselling, (2014) ................... 27

# TABLE OF CITATIONS

Page

## MISCELLANEOUS – (cont'd)

*Preliminary Amendments to the Sentencing Guidelines*
  Currently published at https://www.ussc.gov/sites/default/files/pdf/amendment-
  process/reader-friendly-amendments/20230405_prelim-RF.pdf. ...................... 16

S. Rep. No. 98-225 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182 ...............  17-18

Stein, A., & Russell, M.,
  *Attachment Theory and Post-Cult Recovery*,
  Therapy Today, 27(7), (2016) ............................................................. 30

U.S. Sentencing Commission,
  *Sourcebook of Federal Sentencing Statistics*, (2022) ......................... 63

U.S. Sentencing Commission,
  *Statistical Information Packet*,
  Fiscal Year 2021, Fifth Circuit, tbl. 7 (2021) ...................................... 63

# TABLE OF EXHIBITS

**Page**

## EXHIBITS

A -- Estephania LeBaron  ........................................................................ 5, 9-10, 12

B -- Rena Chynoweth ........................................................................... 6, 64-65

C -- Joshua Chynoweth ................................................................................8

D -- Celia LeBaron ................................................................................8, 64

E -- Jennifer LeBaron ............................................................................12, 64

F -- Jared LeBaron  ...............................................................................11, 64

G -- RIS REQUEST .....................................................................................14

H – Expert CV April 2023 ...........................................................................21

I -- Expert Report .....................................22, 24-25, 27-28, 31-33, 66-67

J -- Anna LeBaron.................................................................................. 63-64

K -- Troy Papanicolaou .................................................................................65

L -- Individual Needs Plan Program Review Redacted.................................65

M -- BOP certificates .....................................................................................65

N -- Summary Reentry Plan Progress Report....................................65, 67

O -- College Hours completed .......................................................................66

P -- Risk assessment.......................................................................................66

Q -- Fellow inmate support letters ...............................................................66

R -- Inmate Profile_Redacted ................................................................ 66-67

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                     **No. 4:92-cr-0177-05**

**PATRICIA LEBARON**

### SUPPLEMENT TO MOTION FOR REDUCTION IN SENTENCE
### UNDER 18 U.S.C. § 3582(c)(1)(A)(i)

Patricia LeBaron requested that the Court grant a reduction under 18 U.S.C. § 3582(c)(1)(A)(i) of her life sentences. This supplement presents additional arguments. In summary, the reduction is justified because of a combination of "extraordinary and compelling reasons:" (1) the advances over the past thirty years in neuroscience and psychology that now provide the Court with insight into the cognitive and emotional limitations that conditioned Ms. LeBaron's actions at the time of the murder and at trial, and (2) changes over the past three decades in case law, not now cognizable under 28 U.S.C. § 2255 or other habeas mechanisms, that would call into question whether she was subject to a mandatory life sentence. Ms. LeBaron requests that the Court reduce that all the life sentences imposed to a 360-month sentence.

# I.

## STATEMENT OF FACTS

The Court presided over the trial of this case and has indicated that the Court is aware of the facts.  Counsel therefore abbreviates this discussion.

### A. The Crimes and Convictions

In May 1988, Patricia LeBaron was one of a group of young people, mostly brothers and sisters related by having Ervil LeBaron as their father, part of the remnants of the Church of the Lamb of God, who planned and in the next month carried out the murders of three former church members and the eight-year-old daughter of one of those men: Ed Marston, Mark Chynoweth, Duane Chynoweth, and his daughter, Jennifer. The group was led by William Heber LeBaron, a leader within the church ranking below the Patriarch, Aaron, who gave the orders for the killings in accordance with Ervil's teachings and command that the three former church members be "blood atoned." Patricia LeBaron helped plan the scheme and, in particular, took part in the murder of Duane Chynoweth and his daughter, by driving to the location, identifying the adult victim, and encouraging her half-brother, Richard, who pulled the trigger to kill both the father and daughter.

The jury found Patricia LeBaron and all the other defendants who proceeded to trial guilty of multiple counts. After this Court granted a judgment of acquittal on several counts of conviction, the Court ultimately sentenced Patricia LeBaron for the

following offenses:

| | |
|---|---|
| Count 5: | 5 years: Conspiracy to tamper with a witness; 18 U.S.C. § 371 |
| Count 6: | **Statutory Mandatory Life**: Tampering with a witness by murder, 18 U.S.C. § 1512(a)(1)(C) and 18 U.S.C. § 2 |
| Count 8: | 5 years consecutive to all other counts of conviction: Carrying a firearm in relation to a crime of violence, 18 U.S.C. § 924(c) and 18 U.S.C. § 2 |
| Count 9: | 5 years: Conspiracy to obstruct the free exercise of religious beliefs, 18 U.S.C. § 371 |
| Counts 10, 11, 12: | **Mandatory Sentencing Guidelines Life**: Obstruction of free exercise of religious beliefs resulting in death, 18 U.S.C. § 247 and 18 U.S.C. § 2 |
| Counts 13-14: | 20 years: RICO conspiracy, 19 U.S.C. § 1962(c) & (d). |

## B. The making of Patricia LeBaron

The Pre-Sentence Investigation Report ("PSR") provided a thorough summary of the historical background of the murders and their genesis in the splintering of various sects from the Church of Jesus Christ of Latter-Day Saints, including that of the LeBaron family, and the family's refuge in Mexico to practice a form of polygamy they believed to be the true faith. That same background has received extensive media attention, and the LeBaron family history has been recounted in many books and articles. In connection with this motion, documents attached include first-hand accounts of that experience in the form of letters from various LeBaron family members describing their lives in the church and family as

3

they witnessed what Patricia LeBaron experienced. Also attached is the expert report of Dr. Adeyinka Akinsulure-Smith, a Professor of Psychology at The City University of New York and a Senior Supervising Psychologist at the Bellevue Program for Survivors of Torture, which recounts Patricia LeBaron's description of her life from childhood to the time of the murders. Counsel in this section highlights key facts.

By the time Patricia LeBaron was born in 1965 in Mexico, the daughter of a Mexican national whom Ervil LeBaron married as one of numerous wives, the LeBaron family had already established itself as an isolated sect where faith and family fused as one. Although polygamy was the principle based on which adherents splintered from the main church,[1] it was church doctrines on the relationship of the family to God and the enforcement of holy laws to safeguard that relationship that formed the social, intellectual, moral and emotional context of the killings.[2] These doctrines were already established before Patricia LeBaron was born.

As related in the book *The LeBaron Story* by Verlan M. LeBaron, Ervil's brother, the LeBaron family founded their church based on their ancestor's claim to a "mantle," or a divinely bestowed priesthood inherited within the

---

[1] See Ben Bradlee, Jr. & Dale Van Atta, PROPHET OF BLOOD 24 et seq. (G.P. Putnam's Sons 1981), for the history of the breakaway of polygamist sects in the early 20th century.

[2] *Id.* at 38-39 (describing claims by patriarch Alma Dayer LeBaron to divine appointment to rule over the earth).

family that connected the person on whom it was bestowed as a "prophet" in direct communication with God.[3] This claim to rule for God on earth was well-established among polygamist sects from the 1920's, and it took particular form in a messianic belief common among polygamist sects in "one mighty and strong" who would set the church and world in order.[4] That fusion of family and faith, and the apparently sincere belief in direct divine revelation to chosen family members, are reflected in the numerous letters from Ervil's mother, reported in Verlan's account, discussing the mantle, the violent conflicts over it and even her claims of visitations and other divine communications to support one or another's position.[5] As family members put it in their description, the man who assumed the leadership role as prophet enjoyed authority directly from God and that man was, ultimately, the father of those who participated in this crime.[6]

The shared concepts of divine revelation and priesthood status for one man inculcated an overbearing culture of obedience. Ervil's early preaching in 1960

---

[3] Verlan M. LeBaron, THE LEBARON STORY 4-5 (Keels & Co., Inc. 1981); *see also* PROPHET OF BLOOD at 38 (describing violent conflict among sons of Dayer over the mantle); 60-61 (describing *Priesthood Expounded*, as written by Ervil LeBaron, holding that "priesthood authority – the right of the Firstborn – must follow the lineage of a chosen family and be passed by the holder to a successor he designates.")

[4] PROPHET OF BLOOD at 26 (In 1929, a polygamist leader "first asserted the right to govern for the Lord on earth"); 32-33 (discussing "one mighty and strong").

[5] THE LEBARON STORY at 204-208.

[6] Letter of Estephania LeBaron, Exhibit A at 1.

foreshadowed "divine revelation" emphasizing obedience and punishment, and he used his adherents' belief in his divine connection to gain obedience.[7] He developed a concept of "Civil Law" in 1960 to impose strict discipline, with many infractions punished by death.[8] Implementation of this Civil Law was at God's command and was to reach all the earth, but under the divine rulership of the LeBaron family.[9] To ensure obedience, Ervil isolated his adherents, eliminated outside influences and preached to instill fear of that outside world.[10] He assumed all form of titles meant to instill religious obedience, including "the Lord Anointed," and his followers were blindingly convinced.[11]

To back up obedience, the threat of violence and death became common discourse in the community. As early as the 1950's, when Joel LeBaron established his breakaway church claiming the mantle, the LeBarons and their followers issued

---

[7] PROPHET OF BLOOD at 82, 92-94; *see also* Letter of Rena Chynoweth Mortensen, Exhibit B at 1 (describing how Patricia LeBaron was raised in their culture of obedience to men, especially Ervil, as a divine duty).

[8] PROPHET OF BLOOD at 114-15; *see also* Rena Chynoweth & Dean M. Shapiro, THE BLOOD COVENANT 55-59 (Diamond Books 1990) (describing Civil Law and Ervil LeBaron's preaching that "blood will run" to implement the Law).

[9] *Id.* at 115-17.

[10] *Id.* at 103.

[11] *Id.* 152-53, 155 (describing statements of two of Ervil's wives attributing absolute authority under God to Ervil).

"revelations" and other warnings with veiled threats of violence.[12] Threats of violence exploded into reality in 1972 with Ervil's killing of Joel for divine leadership of what was both the family and the church.[13] However, even in the early 1960's, Ervil preached to a cadre of female followers about killing the enemies of his preaching.[14] Using the concept of Civil Law, he pronounced death sentences against other polygamist leaders who denied the LeBaron claim to the mantle.[15] He formed a paramilitary unit of young teenage boys and willing adults trained to carry out their divine mission at Ervil's command, including the killing of apostates.[16] He published treatises, such as *Message to a Covenant People*, promising violence on God's enemies as he, Ervil, determined.[17] After killing Joel, Ervil – God's prophet on earth – organized his family and followers into hit squads instructed on how to murder without leaving evidence behind.[18] All of this occurred while

---

[12] PROPHET OF BLOOD at 56, 59; 81-82 (Ervil begins preaching messianic visions with threats of biblical violence against enemies).

[13] *Id.* at 123-33, 135-36, 138-41.

[14] *Id.* at 99, 116.

[15] *Id.* at 115.

[16] *Id.* at 119-20.

[17] *Id.* at 138; 178-79 (publication of statements in 1975 threatening nonconforming polygamist sects with death under the Civil Law).

[18] PROPHET OF BLOOD at 151-52; 155-56 (describing Ervil's move toward executions of disobedient followers after his release from prison in 1974).

Patricia LeBaron was still a child under ten years old, but, while Ervil lived, the killing under his command never stopped.[19] Even after Ervil's death, the indoctrination of the children and teenagers who had grown up in his church conditioned their thinking so profoundly that disobedience was inconceivable:

> In spite of the trauma I experienced and witnessed as a child [multiple murders and the murder of his own mother], I am lucky because of my age, as I was not called upon to do my duty before God, as we understood it then because I was too young. Most of the adults who were more than six years older than me and were raised the way I was raised are either dead or in prison, or at least have served time. I was a complete believer when I was 12 and 13 years old and would have done what I believed was my duty (but in reality, was criminal) had I been called upon. My ability to overcome the religious indoctrination came about because my circumstances changed.[20]

Blood atonement – the shedding of blood for remission of sin – was a cornerstone concept of Ervil LeBaron's divine justice,[21] with deep roots in LDS religious thought from the founding of the church.[22] As early as 1975,

---

[19] *Id.* at 181-91 (describing Ervil's orders to kill a rival prophet who denied his authority); 192 ("As a prophet of God, Ervil's command alone was considered reason enough for devoted followers to commit murder."); *see also* THE BLOOD COVENANT at 142-49 (describing 1975, when Patricia LeBaron was 10 years old, as "when things really started getting vicious," with several murders carried out at Ervil LeBaron's command for apostasy and failing to submit to his authority).

[20] Letter of Joshua Chynoweth, Exhibit C at 1.

[21] Letter of Celia LeBaron, Exhibit D at 1 (describing doctrine).

[22] *See* Martin R. Gardner, *Illicit Legislative Motivation as a Sufficient Condition for Unconstitutionality under the Establishment Clause – A Case for Consideration: The Utah Firing Squad*, 1979 Wash. U. L. W. 435, 441-48 (discussing the historical development of "blood atonement" as a religious doctrine in early LDS faith).

Ervil pronounced "blood atonement" for one who was leaving the church or informing police of its activities.[23] Law enforcement investigating one specific act of blood atonement understood the powerful control over the mind of the person committing the act. Attributing to her religious beliefs the lack of emotion and fear the arrested killer showed when interrogated, the investigator stated:

> I came away with the opinion that the followers of Ervil LeBaron would readily die for him. They don't fear any other type of authority, because he's the ultimate authority, as far as they're concerned. He's the ladder to heaven. The more honors they do, the closer they'll sit to his side.[24]

Followers were so convinced of the divine nature of their duty to obey that they even begged each other, as children and teenagers, to "blood atone" each other if they strayed.[25]

The culture of divine violence in which Patricia LeBaron and all other members of her family were raised was both the result of and caused by an extreme paranoia of all outsiders, which included other Mormons who rejected either polygamy or the family's claim to the "mantle," as well as secular legal authorities. That paranoia was not completely an illusion, but rooted in the historical experience of polygamist sects from the beginning, with raids by secular authorities that sought

---

[23] PROHPHET OF BLOOD at 195 (describing blood atonement).

[24] *Id.* at 200.

[25] Letter of Estephania LeBaron, Exhibit A at 3 and Letter of Jennifer LeBaron, Exhibit E at 2 (describing how sisters would implore each other to "blood atone" one another if a sister strayed in order to assure her place in heaven).

to incarcerate the prophets and break up the family.[26] The patriarch of the LeBaron clan fled to Mexico in the 1920's under the same threat of violence, an impending lynching by fellow Mormons based on his marriage to a second wife, and even in Mexico the family lived as outcasts, persecuted by fellow Mormons.[27] That persecution complex existed for all the existence of Ervil's church.[28] The paranoia seemed justified by police pursuit of the LeBaron family members,[29] and even children meant to be saved by law enforcement feared and mistrusted the police as the raids appeared to make true all the adults' preaching about their enemies.[30] The paranoia engendered its counterpart reaction of disobedience to secular law or communities.[31] The children, including Patricia, were inculcated with

---

[26] *See* PROPHET OF BLOOD at 27-28 (describing early state raids on polygamist compounds).

[27] *Id.* at 35-36, 40-41.

[28] *Id.* at 86-88 (discussing 1959 incident involving Ervil fleeing Mexico for persecution by "the Mafia, Catholics and the Knights of Columbus," and his hiding with guns drawn in El Paso on visit by LDS elders, subsequent incidents of "hiding" from enemies even in LeBaron community, and commands to arm his followers).

[29] Letter of Estephania LeBaron, Exhibit A at 5-6 (describing as children they "were taught to believe that the police, armed forces and such we all the devil's handmaids. They were against God's kingdom being established on earth," a view that was reinforced by her own detention at 16 in Chicago and her transport along with her brothers and sisters in chains to Utah).

[30] PROPHET OF BLOOD at 264 (describing reactions of Pablo and Isaac LeBaron, approximately the same age as Patricia LeBaron, when police came to remove them from the custody of church members and reunite them with their mother, in 1977).

[31] *Id.* at 113-14 (quoting Ervil as justifying a fraud scheme because "the Bible says we should steal from our brothers or neighbors. These are Gentiles; they no good anyway. They aren't our brothers, and neighbors are only those who have the same beliefs as us."); *see also* THE

this paranoia by their own experience, caring for themselves as children in extreme poverty and arming themselves to defend each other when abandoned by the adults.[32]

That paranoia, however, extended even to family, whom the children were taught to love and respect but later found would turn on them. From before Patricia's birth, the founder of the LeBaron movement taught that the "Lamanites" (which included Mexicans of mixed ancestry as well as indigenous people) were there to be saved, and Ervil's Mexican wives and their children were treated as less worthy than the American wives and their children.[33] Everyone lived in dire poverty,[34] without modern facilities or education, but the children of Mexican mothers, like Patricia, often fared far worse.[35] At the same time, those same children could be taken in by the Anglo women and treated as "the elite of the colony."[36] Or

---

BLOOD COVENANT at 46 (describing welfare fraud schemes as justified taking of riches from "Gentiles.")

[32] Letter of Jared LeBaron, Exhibit F at 1-2 (describing Patricia as older sibling trying to care for children living alone on isolated ranch, "starving, going months of eating little or no food," and arming themselves to fight off attackers and kidnappers).

[33] PROPHET OF BLOOD at 60-61 (describing gathering of Lamanites); 71 (describing Ervil's desire for an Anglo wife to "bring up the standards of the Mexican women."); 78-79, 85-86 (describing anti-Mexican sentiment common in LeBaron community); 83 (describing "curse of the skin" and promise that LeBaron bloodline would remain "pure" by marriage to other, white wives); 84-85 (describing preferential treatment of Anglo wives and physical abuse of Mexican wives).

[34] *Id.* at 75 (describing conditions in LeBaron community in Mexico).

[35] *Id.* at 101 (describing severe poverty for Mexican wives and children while all food and money dedicated to Ervil); 154 (describing Patricia's mother as having to beg for food and clothing while Ervil ignored her and her family).

[36] *Id.* at 101 (some children taken in by Ervil's mother).

they could be treated as indentured servants[37] or, if female, married off to far older church members.[38] Or they could be killed, all by these same family members.[39] Killing was the ultimate form of discipline meted out even to disobedient children, even at their own parents' hands.[40] All of this violence was, in the LeBaron followers' minds, the direct will of God.[41]

Rena Chynoweth, Ervil LeBaron's youngest wife, who wrote a confessional book describing her life from early teenage years to adulthood in the church and the

---

[37] *Id.* at 204-05 (describing sweatshop conditions at LeBaron community factory in Colorado where children, including Patricia, were sent, and where food was often scavenged from garbage dumpsters).

[38] Letter of Estephania LeBaron, Exhibit A at 2 (describing obligation at age twelve to marry older man at the family's command and, later, commanded to marry half-brother, Heber); *see also* Letter of Jennifer LeBaron, Exhibit E at 1 (describing sexual abuse she suffered as a young child in the group home while adults worked at the church's business).

[39] PROPHET OF BLOOD 160-65 (describing massacre at Los Molinos of LeBaron family members who denied Ervil's priesthood by other members of Ervil's line of the LeBaron family, including teenagers and children); 174 (describing kidnapping and murder of one church follower by three of Ervil's wives); 228-31 (describing the blood atonement/murder of Ervil's daughter, Rebecca, at his orders and at the hands of her half-brother, Eddie Marston, and Duane Chynoweth); 266, 279 (describing fear Isaac LeBaron felt that he would be hunted down and killed by his father for having provided testimony to state on the group's preparations for killings); *see also* Letter of Jared LeBaron, Exhibit F at 2 (describing intra-family nature of killings).

[40] PROPHET OF BLOOD at 194 (describing statements of Ervil's wife, Vonda White, on duty of parent to kill disobedient child if ordered by the priesthood).

[41] Letter of Estephania LeBaron, Exhibit A at 1-2 (witness as a twelve-year-old to the killing of her brother, Arthur, by other group members, and describing belief that "death and killing happened for God's will."); *id.* at 4 (describing how as teenager she encouraged a brother to complete a blood-atonement mission to "do God's will" and avoid eternal damnation.) *See also* THE BLOOD COVENANT at 117-20 (describing participation in attack on rival faction's town, resulting in deaths of two fellow church members, but feeling no remorse "because Ervil had us convinced that it was the Lord's work being done.")

crimes she committed, provides an example of the emotional, moral and cognitive confusion that church members experienced in committing all of this violence. Describing the murder of a beloved church member at the hands of another of Ervil LeBaron's wives, she stated:

> I have always had a great deal of difficulty reconciling my feelings toward this tragedy. Here was a situation involving two people to whom I have been very close. I had loved Dean very much, and had been very close to Vonda as well. In fact, I still am. I write to her occasionally in prison, where she was finally sent after being found guilty of Dean's murder, five years later. All I can say is, like the rest of us at the time, I must have felt as if it was God's will and His work being done. It wasn't Ervil's decree; it was God's decree, speaking through Ervil. God had commanded Ervil to bump someone off, and Ervil had commanded one of his Lambs to go out and do God's work in order to be worthy of His great celestial blessings. Vonda was merely an agent of God's will, according to Ervil, and he was proud of her for carrying it out. To this day, I can't attribute the killing to Vonda, even though she actually pulled the trigger. It was Ervil's finger on that trigger, not hers. That's the way it was with all the murders he ordered.[42]

It was in this context, of the ties of loyalty and love in a family bound by obedience, isolation, indoctrination and physical and sexual abuse, combined with the messianic view of their own male family members as prophets of God who could do no wrong, that Patricia LeBaron suffered from her earliest childhood the abuse that she and others recount in the attached letters and expert report and in which she committed her crimes.

---

[42] THE BLOOD COVENANT at 149.

## II. ARGUMENT

This Court has the authority under 18 U.S.C. § 3582(c)(1)(A) to reduce the prison sentences imposed on Ms. LeBaron if (i) extraordinary and compelling reasons warrant the reduction, (ii) such reduction fulfills the factors set forth in 18 U.S.C. § 3553(a), (iii) the reduction is consistent with the Sentencing Commission's applicable policy statements, and (iv) the defendant's motion for such reduction is filed with the court after a lapse of 30 days after the defendant submitted her motion to the warden of the facility in which she is incarcerated.

Ms. LeBaron submitted her original motion to this Court on July 22, 2022, Docket No. 734, more than 30 days after she submitted her request for such a motion to the warden of the facility in which she was a prisoner on June 8, 2022. Exhibit G. The Government has stated to counsel that it agrees that her motion has fulfilled this requirement.

As for extraordinary and compelling circumstances, the Fifth Circuit, joining almost all of its sister circuits, held that, in the absence of new guidance from the Sentencing Commission to take into account First Step Act of 2018 changes, district courts have authority to define more broadly the "extraordinary and compelling" reasons that could justify reduction of sentence under Section 3582(c)(1)(A) than

those found in the current Sentencing Commission policy statements.[43] The appellate court decisions affirmed the authority of district courts around the country to reduce sentences when the district court finds other reasons not specifically found in the policy statements to support such a reduction.[44]

Two recent developments must be considered about this Court's broad authority under those cases. First, the Fifth Circuit has excluded from the ambit of "extraordinary and compelling circumstances" both (i) non-retroactive changes in the statutes of conviction and sentence[45] and (ii) any factual or legal challenge to conviction or sentence that would be cognizable under 28 U.S.C. § 2255.[46] Second, the Sentencing Commission on April 5, 2023, adopted Preliminary Amendments to the Sentencing Guidelines, including to USSG § 1B1.13 governing motions for reduction of sentence under 18 U.S.C. § 3582, which, if approved by

---

[43] *See United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021) (recognizing that the definition of "extraordinary and compelling circumstances" was not limited to pre-First Step Act guidelines of USSG § 1B1.13); *see also United States v. Cooper*, 996 F.3d 283, 288-89 (5th Cir. 2021) (remanding to allow consideration of First Step Act's non-retroactive, substantive changes to mandatory penalty provisions of 18 U.S.C. § 924(c) constituted extraordinary and compelling reasons justifying relief under 18 U.S.C. § 3582(c)(1)(A)).

[44] *See Cooper*, 996 F.3d at 287 n.4 (collecting cases holding the same for six other circuits). Since that time, the District of Columbia has joined these circuits in holding that the district court's discretion is not limited by the USSG § 1B1.13 policy statement. *See United States v. Long*, 997 F.3d 342, 355-57 (D.C. Cir. 2021). The Eleventh Circuit has held otherwise. *See United States v. Bryant*, 996 F.3d 1243, 1262-65 (11th Cir.), *cert. denied*, 142 S. Ct. 583 (2021).

[45] *United States v. McMaryion*, 64 F.4th 257, 2023 WL 2658434 *1(5th Cir. 2023).

[46] *United States v. Escajeda*, 58 F.4th 184, 187-88 (5th Cir. 2023).

Congress, will be effective in November 2023.[47]

In the following sections, Ms. LeBaron will set out the two "extraordinary and compelling circumstances" she adds to her previously filed motion, explain why those circumstances continue to serve as basis for the reduction sought, justify the reduction in sentence in terms of the Section 3553(a) factors, and further explain why, if the Guideline amendments take effect before the reduction is granted, the reduction would be consistent with the newly proposed amendments. Finally, Ms. LeBaron attaches as an Appendix her plan for release if her motion is granted.

## A. This Court has the authority to reduce life sentences

Ms. LeBaron received four life sentences, one each for each person murdered. The sentences for Counts Ten through Twelve were imposed under 18 U.S.C. §§ 2 and 247, which mandated a term of imprisonment of any term of years up to life. The life sentences were imposed as the then-mandatory Sentencing Guideline sentence. PSR ¶¶ 188, 192. The sentence for Count 6, imposed under 18 U.S.C. § 1512, was determined to be a mandatory life sentence in accordance with § 1512(a)(1)(C) and (a)(2)(A). *See* Docket No. 293-1, Transcript of Sentencing at 4-5 (noting that Sentencing Guidelines required life sentences and that availability of downward departure under the Guidelines had no effect on Count 6 sentence,

---

[47] Currently published at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.

from which court had no authority to depart).

Section 3582 provides the Court authority to reduce all of the life sentences in this case. In *United States v. Halvon*, 26 F.4th 566 (2d Cir. 2022), the Second Circuit explicitly confronted the issue of "whether a district court is barred from reducing a sentence pursuant to a compassionate release motion when a defendant received a mandatory minimum sentence." *Id.* at 569. Discussing how multiple circuits have implicitly recognized that district courts have such authority, the Second Circuit "explicitly h[e]ld that a mandatory minimum sentence does not preclude a district court from reducing a term of imprisonment on a motion for compassionate release." *Id.* at 570. The Court found that this "conclusion . . . follows from the language of § 3582(c)(1)(A)," because "there is no indication in the statutory text that compassionate release is not available to inmates sentenced to mandatory minimum terms." *Id.* The Court also reasoned that the "broad language" of this statute justifying the Court's holding "reflects the intention behind the compassionate release mechanism," citing the Senate Judiciary Committee report's description of this statute as providing authority for district courts to address "unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances." *Id.* (citing S. Rep. No. 98-225, 1984 *reprinted in* U.S.C.C.A.N. 3182, 3238-39).

The Senate Report confirms the *Halvon* court's analysis. The drafters of the

legislation described § 3582(c)(1)(A) as providing a "safety valve" that applies "regardless of the length of sentence, to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." S. Rep. No. 98-225, 1984 U.S.C.C.A.N. at 3304. The report also confirms that Congress intended for courts to have this power of review, when the drafters stated, *id.*,

> The value of the forms of 'safety valves' contained in this subsection lies in the fact that they assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons' and to respond to changes in the Guidelines. The approach taken keeps the sentencing power in the judiciary where it belongs yet permits later review of sentences in particularly compelling situations.

Other circuit courts of appeal have held district courts to have this same broad authority under § 3582, citing the same Senate Report, particularly the sentence immediately following the Senate's reference to changed circumstances: "These would include . . . cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence. . . ." *Id.* The First Circuit held that district courts may consider non-retroactive changes to mandatory minimum sentences in *United States v. Ruvalcaba*, 26 F. 4th 14, 26 (1st Cir. 2022). The Court cited the same section of the Senate Report, stating that the broad authority the Court recognized "fits seamlessly with the history and purpose of the compassionate-release statute," because, in "abolishing federal parole, Congress recognized the need for a 'safety valve' with respect to situations in which a defendant's

circumstances had changed such that the length of continued incarceration no longer remained equitable." *Id*.; *see also United States v. Chen*, 48 F.4th 1092, 1098-99 (9th Cir. 2022) (same in context of 18 U.S.C. § 924(c) mandatory minimum); *United States v. McCoy*, 981 F.3d 271, 285-88 n.8 (4th Cir. 2020) (same). Although the Fifth Circuit has joined the other side of the circuit split from these circuits in terms of non-retroactive legislative changes, the Court did not otherwise restrict the district court's authority as recognized in *Halvon*. *See McMaryion*, 64 F.4th 257, 2023 WL 2658434 at *1.

Other district courts, using this broad authority, have granted reductions of sentence in similar circumstances as here: statutorily mandatory life sentences. *See United States v, Morris*, No. 3:99-cr-264-17 (VAB), 2022 WL 3703201, at *7, *11-*12 (D. Conn. Aug. 26, 2022) (Bolden, J.) (reducing mandatory life sentence under 18 U.S.C. § 1959 (a)(1) and (2)); *United States v. Lugo*, No. 01-cr-922 (NG), 2022 WL 732153 (E.D. N.Y. Mar. 11, 2022) (Gershon, J.) (reducing mandatory life sentence under 18 U.S.C. § 1959 involving murder); *United States v. Piggott*, No. 94-cr-417, 2022 WL 118632 (S.D.N.Y. Jan. 12, 2022) (Stein, J.) (reducing statutory life sentence under 21 U.S.C. § 848(b)); *United States v. Lii*, 528 F.Supp.3d 1153 (D. Haw. 2021) (Seabright, J.) (reducing mandatory life sentence under 21 U.S.C. §§ 841, 851); *United States v. Williams*, No. 91-559-6 (TFH), 2021 WL 5206206 (D.D.C. Nov. 9, 2021) (granting reduction of then-mandatory statutory

19

life sentence); *United States v. Sims*, No. 3:98-Cr-45, 2021 WL 1603959 (E.D. Va. Apr. 23, 2021) (Hilton, J.)) (reducing mandatory life sentence for aiding and abetting bank robbery resulting in death, under 18 U.S.C. § 2113(e)); *United States v. Perez*, No. 3:02-Cr-7, 2021 WL 837425 (D. Conn. Mar. 4, 2021) (Bond Arterton, J.) (reducing jury sentence of mandatory life imprisonment rather than death); *United States v. Rodriguez*, 492 F.Supp.3d 306, 309, 313 (S.D.N.Y. 2020) (Rakoff, J.) (reducing jury sentence of life imprisonment instead of death under 21 U.S.C. § 848(e)(1)(A) for murder involving torture); *United States v. Cano*, No. 95-00481-CR, 2020 WL 7415833 (S.D. Fla. Dec. 16, 2020) (Altonaga, J.) (mandatory life sentence under 21 U.S.C. § 848(b)); *United States v. Hope*, No. 90-cr-06108-KMW-2, 2020 WL 2477523 (S.D. Fla. Apr. 10, 2020) (Williams, J.) (granting reduction when sentenced to life due to 21 U.S.C. § 851 filing); *United States v. Millan*, No. 91-cr-685 (LAP), 2020 WL 1674058 (S.D.N.Y. Apr. 6, 2020) (Preska, J.) (mandatory life sentence under 21 U.S.C. § 848(b)).

This Court should use its discretion under that broad authority granted by § 3582(c)(1)(A) to reduce all four of Ms. LeBaron's life sentences to 360 months based on the following two "extraordinary and compelling circumstances" and because such a reduction comports with the purposes of 18 U.S.C. § 3553(a).

**B. Extraordinary and compelling reason: Thirty years of scientific development now prove the immense limitations of cognition, judgment, independent thought, and emotional control that afflicted Ms. LeBaron at the time of the crimes and trial, making the life sentences unreasonably long and excessive.**

This Court imposed sentence in May 1993. At that time, the Court received, as part of the Objections to the PSR, an evaluation from Dr. Larry M. Nahmias, dated May 21, 1993, in which he opined that Ms. LeBaron's childhood and young adult experiences in the context of the LeBaron church and family were such as to deprive her of any choice in her actions. Dr. Nahmias stated that it was "entirely understandable and consistent with her background and upbringing" to participate in the killing of others and that "she would do so without any hesitation or questioning." Dr. Nahmias cited no scientific studies or basis for his opinion.

In those thirty years there has been a revolution of development in the neuroscience, psychology and behavioral sciences, a revolution that the federal courts, including the Supreme Court, have applied to change sentencing in the most extreme settings, such as the death penalty, and to review and revise sentences previously imposed. In this case, Dr. Adeyinka Akinsulure-Smith, a professor of psychology at the City University of New York, and senior supervising psychologist at the Bellevue Program for Survivors of Torture, has applied her more than thirty years of experience in this field to examine Ms. LeBaron and her case. *See* Exhibit H (expert CV). She reports to the Court the key ways in which newly-developed

scientific models show the limitations of cognition, perception, thought-processing and emotional control that would have affected Ms. LeBaron's abilities to take a different path, whether at the time of commission of the offense or at trial. *See* Exhibit I (expert report). These scientific developments provide a new perspective to assess Ms. LeBaron's culpability, a perspective grounded in scientific method rather than speculation and sympathy. Since they occurred within the past thirty years, none of these scientific developments would have been available to the Court or to the United States. As Dr. Akinsulure-Smith states in her report:

> At the time of Ms. LeBaron's sentencing in 1993 for the commission of crimes committed in 1988 when she was 23 years of age, empirical data from the fields of neuroscience and psychology regarding brain development, the effects of cults, the impact of adverse childhood experiences had not been established, and as such were not available for consideration.

Exhibit I at 2. Considering those developments now, this Court should find such developments, as applied to the individual case of Ms. LeBaron, to be "extraordinary and compelling circumstances" that justify the reduction in sentence.

1.  <u>What the scientific developments of the last thirty years establish about cases like Ms. LeBaron's.</u>

Dr. Akinsulure-Smith identifies five primary areas of "emerging research" important to Ms. LeBaron's case: new studies in neuroscience of brain development from childhood through early adulthood; studies of the impact of early childhood adverse experiences (ACEs); recent studies of the impact of participation in

religious cults, especially to children raised in such environments; studies of "polyvictimization" as applied to youth; and the development of a new diagnosis of Complex PTSD. The most important point in Ms. LeBaron's case is that it is the complex interaction between these ways of analyzing her experience that demonstrate why her individual case is now so compelling.

Youth and brain development. The Supreme Court has long recognized that youth is characterized by specific limitations in knowledge and understanding, reducing culpability and the appropriateness of certain punishments. *See Thompson v. Oklahoma*, 487 U.S. 815, 818-38 (1988) (prohibiting execution of persons who commit the crime under the age of 16). After Ms. LeBaron's conviction, the Supreme Court gave great weight to scientific and sociological studies confirming that immaturity and continuing psychological and social development meant that juveniles were less deserving of the most drastic punishments, such as the death penalty or life imprisonment. *See Roper v. Simmons*, 543 U.S. 551, 569-72, 578-79 (2005) (citing such studies in holding that death penalty for persons under 18 at the time of offense is unconstitutional); *Graham v. Florida*, 560 U.S. 48, 68-69, 79 (2010) (citing development in psychology and brain science in holding life without parole unconstitutional for those younger than 18 who did not commit homicide); *Miller v. Alabama*, 567 U.S. 460, 471, 479 (2012) (extending *Graham* to mandatory life without parole schemes for juvenile murder).

The expert report highlights new research that establishes that the limitations of "youth" is a misnomer and that "that a significant portion of brain growth and development occurs from 18-25," exactly the ages during which Ms. LeBaron participated in these crimes, and that these developmental processes in the structure affect "problem solving, spontaneity, memory, language, initiation, judgment, impulse control, and social and sexual behavior," the exact processes of judgment at issue in Ms. LeBaron's ability to understand and react differently in the circumstances leading up to the 1988 murders. Exhibit I at 12-13. Moreover, the new research reveals that the brain remains in a stage of "profound changes" in the areas of the brain involved in "social information processing and cognitive control systems," into one's twenties and that the experiences one has during this period can themselves affect the structure and function of basic functions, like judgment and understanding. "Because the areas of the brain involved in understanding people and navigating our social world are still developing into the early twenties, the kinds of social contexts and experiences we are exposed to at this time can have an impact on the resulting neural architecture of the mature brain." Exhibit I at 14. In other words, this new scientific research establishes that the extraordinary level of traumatic events that Ms. LeBaron experienced in her teenage years and even into her early twenties, as she lived among the remnants of Ervil LeBaron's church and family, continued to affect her judgment and behavior because it continued to affect

the physical structure of her brain and the functional processes dependent on that development.

### Impact of Adverse Childhood Experiences

The continuing interaction between experience and structural/functional development of the brain's key regions in cognition and control systems now, as opposed to thirty years ago at sentencing, provides a scientific basis for the intuitive understanding of Ms. LeBaron's circumstances at the time she participated in the murders in relation to the lifetime she spent growing up in Ervil LeBaron's church and family. Research developed in this millennium, reviewed in the expert report, shows that "early adversity can impact the brain's development, its structure and functioning, predisposing some individuals to maladaptive functioning in certain domains." Exhibit I at 16. In particular, "[a]dverse experiences that can be characterized as threatening or causing harm, such as physical and sexual abuse, are associated with alterations in neural systems involved in threat detection and learning, salience processing, and emotion regulation." Exhibit I at 16. As summarized in the journal *Pediatrics* in 2010,

> Studies in the last decade have begun to elucidate the effects of adverse childhood experiences on dysfunctional developmental trajectories and life lost. There is an increasing body of evidence that documents the association of youth interpersonal experience and witness of abuse on increasing risk for violence perpetration in adolescence and adulthood. The literature offers plausible pathways implicating abusive environments in facilitating alteration of normal development and potentiating development of psychopathology. An ecological

perspective identifies a transactional relationship between youth and context in which the overall balance between potentiating and compensatory mechanisms is linked to the probability of a young person displaying behavioral competence or failure of child adaptation. Evidence exists for the contribution of genetic influence on susceptibility to environmental stressors and a propensity to poor mental health or abnormal behavior in the context of child maltreatment. Biophysical pathways postulate a common denominator of stress physiology yielding damage to cognitive development, manifesting as global and stable attributions of negative life events to aspects of future physical and mental health function. Alternate pathways for brain development and corresponding behavioral trajectories are postulated to result from the stress of adverse experiences that originally served to facilitate survival of physical and/or emotional threats but, later, do not provide for optimal development that makes possible continued existence and success from a general, life course perspective.[48]

When combined with newer research showing continued brain development into one's twenties, the scientific understanding of the effects of a lifetime of childhood abuse in Ms. LeBaron's case show a clearer explanation of her actions that, in 1993, could only have been felt sympathetically rather than understood of the basis of scientific study. "Because development is cumulative, with each developmental stage and the achievement of its competencies (or lack thereof) building on previous attainments, ACEs can interfere with the normative developmental process and set the stage for a variety of functional impairments and

---

[48] Duke, N. N., Pettingell, S. L., McMorris, B. J., & Borowsky, I. W, *Adolescent violence perpetration: associations with multiple types of adverse childhood experiences*, 125 Pediatrics 4 at e778-e779 (2010) (internal footnotes and citations omitted).

health issues that can persist and evolve across the lifespan."[49] As the expert states,

Exhibit I at 15-16,

> Since early childhood, Ms. LeBaron, had experienced the type of trauma that would prevent adequate development of the frontal areas of the brain involved in cognitive control and social information processing. . . .

> Furthermore, in Ms. LeBaron's case, the entire period of true malleability and plasticity coincided with the trauma that would prevent appropriate development of key brain functions. By the age of 23, therefore, when the developmental processes would be coming to their concluding stages, the trauma would have formed her brain connections in ways that could be expected to have influenced these outcomes: poor independent decision making, lack of social information processing, lack of cognitive control.

Religious Cults

While cults were a widely-discussed phenomenon through the 1970's and onward, and even widely studied,[50] "the empirical data on the influence of cults experiences on individual is still in its very beginnings," and, in particular, "there are only a few studies focused on children raised in cults." Exhibit I at 18. Those studies, however, prove up what many in the public commonly intuited: that adults who

---

[49] Grasso, D. J., Dierkhising, C. B., Branson, C. E., Ford, J. D., & Lee, R., *Developmental patterns of adverse childhood experiences and current symptoms and impairment in youth referred for trauma-specific services*. 44 Journal of Abnormal Child Psychology 5, 871–886 (2016).

[50] *See* Furnari, L., *Born or raised in high-demand groups: developmental considerations*, ICSA E-newsletter, 4(3) (2005), summarizing research from prior decades; *see also* Matthews, C. H., & Salazar, C. F., *Second-generation adult former cult group members' recovery experiences: Implications for counseling*. International Journal for the Advancement of Counselling, 36(2), 188–203 (2014).

join cults are greatly affected but nevertheless more capable of reestablishing independence based on their previously-developed personality, while children raised in cults fare much worse because of exactly the characteristics of the cult so prominent in the LeBaron family/church, such as the "rigid structures" of control within the group, "extensive control of relationships and contact to the outside world," "physical separation of the children from their parents," and "mental, physical, and sexual abuse." Exhibit I at 18.

The effects of being raised in the extreme control of a "cult' like the Ervil LeBaron church are only now being understood. As one clinical counsel reports,

> In contrast to the first-generation cult member, the child who is born or raised in a cult has neither the previous personality nor a cohesively formed personality on which the new cultic personality is imposed. Aside from inherent temperament, basic character becomes affected and shaped by the child's reaction to the cult experience. The cult personality is not superimposed but becomes an aspect of the original personality.[51]

Growing up in that environment leads to exactly the type of behaviors seen in Ms. LeBaron and many of her siblings: "the growing child (to survive) often learns to be passive in response to the harsh, controlling nature of the cult leader;" "the developing child copes by taking in the cult leader's prohibitions and

---

[51] Goldberg, L., *Raised in cultic groups: The impact on the development of certain aspects of character*, Cultic Studies Review 5(1), 4 (2006).

severe attitudes;" "the child may adopt a submissive, masochistic attitude as a response to the leader's authority and, therefore, develop an internal experience of being insignificant or bad," leading to "the internalization of a harsh, critical conscience and a tendency toward self-blame;" and the adult emerging from that environment may "lack of mastery of [basic] coping skills … exacerbated by the former cult member's impoverished sense of identity, poor self-esteem, and fear of the outside world," with their dependence on the leader leaving them dependent on others to guide them.[52] As another researcher stated, the "tendency toward totalism is especially significant for children raised in the cult," because the "cultic world pervades a child's experience and perception during critical times in brain growth and development, when neural pathways are being formed, identity developed, and a view of the world established as a safe or hostile environment," leading to development deficits such as "cognitive suppression' (i.e., suppression of independent thought) as well as suppression of emotions and creativity, resulting in deficits in the development of self-control and internal regulation of emotions and behavior.[53] Quoting another researcher to explain how this affects children like the LeBaron siblings: "Repeated trauma in adult life erodes the structure of the

---

[52] *Id.*

[53] Allen, A., *Impact on children of being born into/raised in a cultic group*, ICSA Today, *7*(1), 17-22 (2016).

personality already formed, but repeated trauma in childhood forms and deforms the personality."[54]

Recent developments in "attachment theory" in psychology enlighten how Patricia LeBaron reacted, even as an adult once arrested. In particular, that theory shows how the LeBaron children were essentially trapped cognitively at a time when the brain development previously discussed was entering crucial phases:

> Stein's research indicates that the closed, fearful world within a cult is designed to promote a relationship of disorganized attachment to the leader or group: a combination of terror and 'love' that is used to emotionally trap and cognitively disable followers. All such groups arouse fear by employing a variety of threats – dangers in the outside world, predictions of apocalyptic events, harsh criticism, or the threat of exclusion. Fear can also be aroused through emotional and physical means, such as guilt, exhaustion, and physical punishment.
>
> According to Bowlby: 'Most people think of fear as running away from something. But there is another side to it. We run *TO* someone, usually a person.' The cult leader makes sure he or she, and the group, is the only attachment, and thus the only source of relief from this fear.[55]

This type of dependence in attachment continues even after reaching adulthood and even after leaving the group.

> Two things stand out here. First is that if, after leaving, the former member does not get to discuss and analyze their cultic experience as such, they can remain confused and disoriented in relation to the group,

---

[54] *Id.* (quoting Herman, J., TRAUMA AND RECOVERY: THE AFTERMATH OF VIOLENCE FROM DOMESTIC ABUSE TO POLITICAL TERROR 96 (Basic Books 1997).

[55] Stein, A., & Russell, M., *Attachment theory and post-cult recovery*, Therapy Today, 27(7), 18–21 (2016) (internal citations omitted).

even many years after leaving. Second, the ongoing loyalty to the group or leader . . . is a continuation of the trauma/disorganized bond created in the isolating context of the cult. Until a clear, coherent narrative is developed, this loyalty remains a coercive and confusing influence.[56]

This new research, combined with the previously discussed research on brain development and childhood trauma, helps answer the question that Court asked Ms. LeBaron at sentencing – why she did not continue to cooperate with authorities as some of her siblings did. *See* Docket No. 293-1 (Transcript of Sentencing) at 24. Her answer, reflecting the fear of outsiders like the Government agents and her inability to trust anyone outside the family, generated by the family lore surrounding the killing of her brothers, reflects exactly what the foregoing, new research would have predicted: the cognitive suppression of her own ability to organize reality and facts, and the continuing coercive and confusing attachment to what was both her family and her faith.

<u>Polyvictimization and Complex PTSD</u>

Even more recent research now provides a scientific basis to understand the multiplier effect of multiple forms of victimization or trauma experienced within the LeBaron group. The study of polyvictimization, referring to being the victim of multiple forms of traumatic treatment or experience at the hands of others, among children and adolescents only began within the past twenty years. *See* Exhibit I at

---

[56] *Id.*

19-21. The key conclusion of these studies is that polyvictimization at an early age and continuing through later stages results in "severe and persistent biopsychosocial impairment" that can be lifelong. *Id.* at 20. One study summarizing the state of research listed a panoply of "co-occurring" impairments characterizing children exposed to multiple forms of trauma, including dysregulation of behavior (e.g., aggression), disturbances of attention and consciousness (e.g., impaired executive functioning), interpersonal difficulties (e.g., paranoia of others), and corresponding physiological symptoms reflected in the brain structure that may persist into adulthood.[57] Depending on the specific stage of a child's development when such polyvictimization occurs, and the specific types of victimization experienced,

> some polyvictimized adolescents may have become, essentially, stuck on a trajectory of persistent polyvictimization that began early in childhood, and the developmental timing of these experiences may either increase or decrease the risk of persistent polyvictimization and psychopathology, with the potential for cascading effects across the lifespan.[58]

> One of those cascading effects is Complex PTSD.[59] As described by the

---

[57] D'Andrea, W., Ford, J. D., Stolbach, B., Spinazzola, J., & van der Kolk, B. A., *Understanding interpersonal trauma in children: Why we need a developmentally appropriate trauma diagnosis*, American Journal of Orthopsychiatry 82(2), 187–200 (2012).

[58] Dierkhising, C. B., Ford, J. D., Branson, C., Grasso, D. J., & Lee, R., *Developmental timing of polyvictimization: Continuity, change, and association with adverse outcomes in adolescence*, Child Abuse & Neglect 87, 40-50 (2019) (internal quotation marks and citations omitted).

[59] Ford, J. D., & Delker, B. C., *Polyvictimization in childhood and its adverse impacts across the lifespan: Introduction to the special issue*, Journal of Trauma & Dissociation 19(3),

expert, Complex PTSD, only recently recognized as a diagnosis in some official designations, is characterized first by its genesis "in exposure to a stressor typically of an extreme or prolonged nature and from which escape is difficult or impossible," and next by its symptoms, including "classic" PTSD symptoms of "re-experiencing, avoidance, and alterations in arousal," as well as "Disturbances in Self-Organization" that affect emotional control and integration into society generally. Exhibit I at 22. One of the earliest theories of this heightened level of PTSD specifically located the experience in settings of coercive control similar to the LeBaron family/church, where "the victim is rendered captive primarily by physical force (as in the case of prisoners and hostages), or by a combination of physical, economic, social, and psychological means (as in the case of religious cult members, battered women, and abused children)."[60] In a later analysis, a researcher described how the adult who has experienced early trauma, such as that experienced by the LeBaron siblings, could result in complex PTSD where the adult "may regress to their younger developmental stage and coping modality in stressful situations. The adult, then, is again in a state in which he or she cannot think his or her way out of the situation."[61]

---

275, 282 (2018). ("Polyvictimization thus may place individuals at risk for complex post-traumatic dysregulation in multiple biological, affective, cognitive, and behavioral domains.")

[60] Herman, J. L., *Complex PTSD: A syndrome in survivors of prolonged and repeated trauma*. Journal of Traumatic Stress, 5(3), 377-391 (1992).

[61] Furnari, *supra* n.50.

In the more precise language of a later study of studies,

> PTSD comprises three symptom clusters: reexperiencing of the traumatic event in the present, avoidance of traumatic reminders, and a sense of current threat. The CPTSD criteria comprises six clusters, including the three PTSD clusters and three additional clusters related to disturbances in self-organization (DSO): affect dysregulation, negative self-concept, and disturbances in relationships. Symptoms of CPTSD represent a broader spectrum of problems that acknowledge not only the role of traumatic stressors in generating horror and fear but also the consequences to self-organization that can arise from exposure to multiple types of traumatic stressors or those that are sustained or repeated. These latter symptoms have been conceptualized within a general model of psychosocial or developmental losses in which repeated or chronic trauma leads to the deterioration of emotional and relational capacities and sense of self and, in the case of children and adolescents, in the loss of opportunities for healthy psychosocial development in these domains.[62]

As emphasized in the studies concerning the cumulative and long-lasting effect of ACEs on brain development, in Complex PTSD, "the effect of childhood cumulative trauma is stronger," because it creates "strong risk factors for negative outcomes in later life due to the substantial adverse effects [such repeated childhood trauma experiences] have on the healthy development of socioemotional competencies and a coherent and positive sense of self."[63] The symptoms of Complex PTSD are particularly pronounced in the family context as a form of

---

[62] Cloitre, M., Hyland, P., Bisson, J. I., Brewin, C. R., Roberts, N. P., Karatzias, T., & Shevlin, M., *ICD-11 posttraumatic stress disorder and complex posttraumatic stress disorder in the United States: A population-based study*, Journal of Traumatic Stress, 32(6), 833, 834 (2019).

[63] *Id.*

"betrayal trauma," "a circumstance whereby individuals or institutions upon which a person depends for survival violate that person's trust and sense of well-being."[64]

<u>Why this development of scientific understanding is an "extraordinary and compelling circumstance" in Ms. LeBaron's case.</u>

Over thirty years ago – when Ms. LeBaron was arrested for this offense, when the United States was formulating the charges or discussing possible pleas, when her defense attorneys were trying to render effective assistance to her, when Dr. Nahmias authored an expert report on her condition – none of the scientific developments cited in the expert report could have informed anyone's decisions or anyone's views of the appropriate punishment for Ms. LeBaron's participation in these murders. The issue of Ms. LeBaron's mental health was debated in preparation for trial, with motions for an expert examination on the issue of insanity. Docket Nos. 220, 221, 223. Undoubtedly one of the events raising such concerns was Ms. LeBaron's letter to this Court dated April 8, 1992, reflecting her father's same grandiose and paranoid style of thinking, looking to the government and the LDS church as conspirators against the LeBaron family and portraying herself as a powerful force against them. Docket Entry No. 248. Those involved in this case may have intuited the problem and its genesis in Ms. LeBaron's lifelong submission to her father's church and the mental and physical abuse she suffered throughout, yet no one could have understood the real underlying problem in a scientific manner

---

[64] *Id.* at 840.

because that research had not been done until these recent times. This was never an issue of insanity or competence, but instead, as the recent scientific research shows, it was an issue of cognition and brain functioning, created in a physiological way and manifesting in a behavioral way. Dr. Nahmias' report in 1993 could do no more than indicate the outlines of a mental health problem associated with indoctrination and abuse, but he could not give this Court the scientific basis to understand the physiological and functional mental prison in which Ms. LeBaron still lived at the time of trial and from which she only could slowly emerge with appropriate treatment, if any had been provided to her at that time.

What we know now from the scientific research could have made a difference if it had been in existence at the time. The research shows that Ms. LeBaron's mental state, although not an issue of insanity or incompetence, was also not just a moral failing, a stubborn refusal to see and do what was right. The research now available shows that the lifelong accumulation of these forms of trauma created a profound issue of brain function, of understanding and judgment, and that it was not something that could be turned off like a switch. At the very least her defense team could have taken a very different approach in addressing the issues related to trial versus a plea of guilty, whether with or without cooperation. They could have retained experts who would be effective at working with people experiencing the effects of polyvictimization and complex PTSD in the context of a religious cult in

order to help Ms. LeBaron have a more realistic and rational understanding of the facts and her options at that time.

Informed by that research now, this Court should find that the sentence of life in prison is unreasonably long. As will be addressed more fully in the following sections, while participation in four murders is among the most serious of crimes, the scientific understanding now available of Ms. LeBaron's background and how it would have affected her in a physiological and functional way to lead her to participate in the crimes shows that there are now substantial mitigating factors which, while not absolving her in any way, reduce the appropriate punishment she should receive. A thirty-year sentence is sufficient but not greater than necessary in the very specific circumstances of this case. This new research and new scientific basis for understanding both the crime and Ms. LeBaron's behavior through trial and sentencing are "extraordinary and compelling."

2. Other courts have found similar constellations of circumstances to constitute "extraordinary and compelling" reasons to justify a reduction under this statute in similar cases.

Granting Ms. LeBaron's motion would be consistent with the decisions of other district courts that have reduced sentences in similar circumstances of participation in the irremediable crime of murder.

The most extensive analysis is found in Judge Rakoff's opinion in *United States v. Ramsay*, 538 F.Supp.3d 407 (S.D.N.Y. 2021). In that case, Ramsay

was sentenced to life imprisonment for his participation, at eighteen years old in 1992, in shooting into a crowded party, killing two people, one of whom was pregnant, as part of a hit ordered by the leader of a gang in which Ramsay was a member. *Id.* at 409, 424. After reviewing the Supreme Court's decisions involving sentencing of youth, Judge Rakoff looked at the type of scientific research Ms. LeBaron offers, the "more refined and tested evidence concerning development of the adolescent brain provided by recent research and studies in neuroscience, psychology, and sociology." *Id.* at 417. Given the specific context of Ramsay's case, Judge Rakoff focused more on neuroscience research describing a "maturity gap" between cognitive abilities and psychosexual maturity, a difference in activation of brain centers responsible for deliberation, and the continued processes of formation of personality through early adulthood. *Id.* at 417-22. His conclusion is still congruent with the conclusion Ms. LeBaron urges to this Court: that Ramsay's youth at the time of the offense, in light of those scientific studies and Supreme Court precedent, as well as the impact of his traumatic upbringing, count as "extraordinary and compelling" reasons, in that case, combined with Ramsay's rehabilitation and the mandatory nature of the sentence life sentence imposed. *Id.* at 424-27. Judge Rakoff ultimately reduced the sentence from mandatory life to 360 months in prison. *Id.* at 429.

In *United States v. Cruz*, No. 3:94-cr-112 (JCH), 2021 WL 1326851 (D. Conn.

Apr. 9, 2021), Judge Janet C. Hall reduced the life sentence imposed under the then-mandatory Sentencing Guidelines for crimes in which Cruz, then eighteen years old in 1994 and a member of the Latin Kings street gang, understanding that he would be killed if he did not kill, carried out orders to kill a suspected informant. *Id.* at *1. Cruz actually pulled the trigger, killing a friend who had accompanied the target, and helping a fellow gang member chase down and kill the targeted informant, holding the target down while the accomplice delivered the fatal shots. *Id.* In considering Cruz's § 3582 motion, Judge Hall relied on expert testimony given in a previous post-conviction hearing that focused on how the Supreme Court's precedent concerning sentencing of minors should be extended to those who commit crimes at eighteen years old because of the same continued brain development concerns. *Id.* at *3, *6. As in *Ramsay*, the neuroscience discussed in connection with Cruz applies to all young adults – the continued development of the brain and differences in cognition generally versus emotional control, and the applicability of those theories to people older than eighteen. *Id.* at *6-*7. The court granted a reduction of sentence to a sentence of time served (approximately 31 years), relying both on Cruz's youth at the time of the offense as well as his current family circumstances, his rehabilitation and COVID-19 pandemic. *Id.* at *8-*10, *15,

In *United States v. Lara*, ___ F.Supp.3d ___, 2023 WL 2305938 (D.R.I. Mar. 1, 2023), the district court reduced the life sentence imposed in 1997 based on

Lara's participation as the accomplice of his fellow gang member in a carjacking and murder to the equivalent of time-served. The district court looked to a number of "extraordinary and compelling circumstances," including Lara's youth (he was eighteen at the time of the offense) and that he was sentenced based on the felony-murder doctrine when he did not actually pull the trigger. *Id.* at \*5-\*13; *see also id.* at \*13 ("Mr. Lara was a teenager when he committed the crime, he was not the trigger person, his sentence was not proportional to others who were more culpable [he received the same sentence as the man who pulled the trigger], his sentence was unusually long, and he has shown commendable rehabilitation since being incarcerated.") The court relied heavily on the Supreme Court's analysis of the research cited in this motion as well as new research on brain development and youth. *Id.* at \*5-\*6; *see also id.* at \*7 ("In these cases, the Supreme Court relied on multidisciplinary scholarship to conclude that juveniles who commit even the most serious and violent crimes can change their behaviors.") In reaching its decision, the court opined, *id.* at \*8,

> In the past two decades, science, medicine, and legal thought have all underscored that youthful offenders are less culpable than older adults because their brains are less developed in critical areas. This new professional consensus and all the reasons for which courts impose sentences for criminal behavior support a less-than-life-sentence when it involves a youthful offender. Mr. Lara's youth at the time he committed the crime is an extraordinary and compelling reason to consider a sentence reduction.

In *United States v. Sims*, No. 3:98-cr-45, 2021 WL 1603959 (E.D. Va.

Apr. 23, 2021), the court reduced life sentences imposed in 1997 for Sims's participation in a bank robbery resulting in death where he provided the guns used to sentences of time served. Among the many reasons for reaching that decision, the court cited Sims's relative youth at twenty-one years old when he committed the crime as well as the government's offer of a plea deal of a three-year sentence before Sims exercised his right to go to trial and the disparity in culpability for receiving the same sentence as the defendants who actually shot and killed the victims. *Id.* at *6-*7. On youth, the court cited the same context of new research on brain development, stating, *id.* at *7,

> While the <u>Miller</u> [<u>v. Alabama</u>] categorical ban on mandatory sentences for life without parole for juveniles does not technically apply to defendants in their low to mid-twenties, research demonstrates that such individuals still experience many of the same behavioral, psychological, and neurological development factors that affect the ability to understand risks and consequences and to make informed, mature decisions. . . . Sims was 21 years old at the time of the incident which, according to the scientifically established and verified research, means the regions of his brain that govern impulse control, planning, and risk avoidance were underdeveloped. That manifested itself, most obviously, by his willingness to risk a life sentence to prove the point of his innocence, even though he knew he had sold the guns used in the robbery.

Other district courts have treated as "extraordinary and compelling" reasons this same scientific research regarding brain development and the effects of experiences while young, even in cases involving murder. *See United States v. Espino*, No. 03-20051-08-JWL, 2022 WL 4465096 (D. Kan. Sept. 26, 2022)

41

(reducing life sentence for drug offense determined by reference to murder Sentencing Guideline to 360 months, finding a "unique combination of defendant's young age at the time of the offense, the length of sentence he received, and overwhelming evidence of defendant's outstanding rehabilitation and reformation while in custody," and discussing "sound, recent scholarship" relating to adolescent brain development as well as Supreme Court cases relating to youth at sentencing); *United States v. Morris*, No. 3:99-cr-264-17 (VAB), 2022 WL 3703201, *5-*6, *8 (D. Conn. Aug. 26, 2022) (granting reduction of sentence to time served for multiple life sentences, one mandated by statute under 18 U.S.C. § 1959(a)(1), for murder in connection with his participation in a violent drug gang, citing his youth (eighteen at time of offense) and trauma in his upbringing as extraordinary and compelling reasons).[65]

Ms. LeBaron's case is more compelling than these cases. While most of the foregoing cases look to the new scientific developments as applicable to young adults generally, Ms. LeBaron relies on that type of evidence as just part of the justification. From there, she refers the Court to all the scientific literature on the intersection of youth brain development with the added impact of ACEs,

---

[65] Counsel acknowledges that at least the Sixth Circuit has held that neither youth, even when discussed in connection with recent scientific breakthroughs, nor disparity between defendants at sentencing, can be considered "extraordinary and compelling" because they are arguments grounded in the facts established at the original sentencing. *See United States v. Hunter*, 12 F.4th 555, 570-72 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 2771 (2022).

polyvictimization and complex PTSD, all in the context of a religious cult, as they further affect the development of cognition and other brain functions. In that regard, her case is truly unique and justifies treating the new scientific evidence discussed above, applied in the context of her individual circumstances, as constituting "extraordinary and compelling" circumstances.

## C. Extraordinary and compelling reason: Over the past thirty years the Supreme Court has interpreted the Constitution and the statute of conviction in ways that call into question whether mandatory life sentences were ever required in this case.

A second extraordinary and compelling circumstance is the change in law found in Supreme Court opinions over the last thirty years. Ms. LeBaron sets out what those changes are in the following subsections and then explains why this Court should still be able to take these changes into account even in light of *United States v. Escajeda*, 58 F.4th 184, 187-88 (5th Cir. 2023).

1. Under *Apprendi*, *Alleyne* and *Booker*, the Court was not required to impose a mandatory life sentence.

The district court imposed four life sentences in this case. The sentence for Count 6, for the killing of a witness in violation of 18 U.S.C. § 1512(a)(1)(C), was the only count for which life was statutorily mandated. PSR ¶ 187. The three other life sentences imposed under 18 U.S.C. § 247 permitted a sentence of any term of years, and the Sentencing Guideline range for those sentences was life. PSR ¶¶ 188, 192. At sentencing the Court considered Ms. LeBaron's request for a downward departure under USSG 5K2.12 (duress or coercion), but the Court noted that there

was "no discretion to departure downward . . ., even were I to find that such a departure would be authorized in this case" because of the life sentence mandated by statute for Count 6. Docket No. 293-1 (Transcript of Sentencing) at 5.

Over the past thirty years, however, the Supreme Court has changed the law governing indictment, jury verdicts, and sentencing as a Constitutional matter so that, in the facts of this case, the Court should not have been bound to impose a life sentence. These Supreme Court cases are now well-known.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Court reiterated the principles it had already set out in *Jones v. United States*, 526 U.S. 227, 243, n.6 (1999), that "under the Due Process Clause of the Fifth Amendment and the notice and jury guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi*, 530 U.S. at 476 (quoting *Jones* and applying same principles to states through Fourteenth Amendment). The Court described these principles as "constitutional protections of surpassing importance," tracing the importance of these protections to fundamental principles established at the founding of the United States. *Id.* at 477-78.

The Supreme Court extended the Sixth Amendment principles underlying *Apprendi* to the federal Sentencing Guidelines, finding that the mandatory nature imposition of the sentence calculated under them violated the same Sixth

Amendment guarantees. *United States v. Booker*, 543 U.S. 220, 230-32, 243-44 (2005). The Court remedied that problem, which it found not to be ameliorated by the possibility of departures, *id.* at 234, by making the Guidelines system advisory. *Id.* at 246-47.

Finally, as most relevant to this case, the Supreme Court extended its reasoning in *Jones* and *Apprendi* to findings used to establish a mandatory minimum sentence in *Alleyne v. United States*, 570 U.S. 99, 102 (2013). Justice Thomas grounded the ruling in the Sixth Amendment as originally drafted at the founding of the nation, looking to the historical connection between the longstanding right to a jury trial to every fact "essential to the punishment sought to be inflicted" and the historical "well-established practice of including in the indictment, and submitting to the jury, every fact that was a basis for imposing or increasing punishment." *Id.* at 109-10 (internal citations omitted). The Supreme Court insisted on this principle even if the defendant could have received the same sentence without that specific fact proven.

> As noted, the essential Sixth Amendment inquiry is whether a fact is an element of the crime. When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury. It is no answer to say that the defendant could have received the same sentence with or without that fact. . . . .
>
> . . . Indeed, if a judge were to find a fact that increased the statutory maximum sentence, such a finding would violate the Sixth Amendment, even if the defendant ultimately received a sentence

falling within the original sentencing range (*i.e.,* the range applicable without that aggravating fact). . . . The essential point is that the aggravating fact produced a higher range, which, in turn, conclusively indicates that the fact is an element of a distinct and aggravated crime. It must, therefore, be submitted to the jury and found beyond a reasonable doubt.

*Alleyne*, 570 U.S. at 114-16 (internal citations omitted).

In Ms. LeBaron's case, those cases now establish that Ms. LeBaron's conviction and mandatory life sentence under § 1512(a)(1)(C) (1988) is an unjust sentence because it was imposed in a manner now understood to violate fundamental rights under the Constitution. That is because the statute had two possible punishments – "in the case of a killing, the punishment provided in sections 1111 and 1112 of this title." Section 1111 of Title 18, the federal murder statute, in turn, set out two different offenses, first-degree and second-degree murder. 18 U.S.C. § 1111(a) (1988). The distinction between the two required a determination of fact: was the killing committed in one of the circumstances set out in the statute to define first-degree murder, or was it committed in other, non-specified circumstances, and therefore qualifying as second-degree murder. Only first-degree murder mandated either death or life imprisonment as the sentence, while second-degree murder could be punished "for any term of years or for life." 18 U.S.C. § 1111(b) (1988). Therefore, under *Alleyne*, in order to impose the mandatory life sentence, the government would have had to charge in the indictment the facts that would make the killing of the child first-degree murder and the jury would have had to find those

facts beyond a reasonable doubt.

None of that occurred. The superseding indictment on which she was tried alleged in Count 6 only that Patricia LeBaron aided and abetted in the intentional and willful killing of the child. Docket No. 104-1 at 12. That formulation does not reflect the elements of § 1111(a), which required the conjunctive formulation of a "willful, deliberate, malicious, and premeditated killing," which the courts had described as requiring premeditation. *See United States v. Shaw*, 701 F.2d 367, 392-94, n.20 (5th Cir. 1983) (discussing elements of first-degree murder offense), *abrogated on other grounds as recognized in United States v. Gurrola*, 898 F.3d 524, 537 n.31 (5th Cir. 2018). The jury instructions contained no reference to any of the factual situations that would constitute first-degree murder. Docket No. 178 at 28-29. The verdict rendered on this count contained no reference to which of the first-degree murder facts would have justified the mandatory life sentence. Docket No. 200 at 2. Imposing the mandatory statutory life sentence on Ms. LeBaron, therefore, now would be understood to have violated due process and the Sixth Amendment. The same is true under *Booker* for the Sentencing Guidelines life sentence imposed for the other counts.

Of course, none of this was clear until decades later when the Supreme Court decided *Alleyne*. The inability to know how these principles should have applied is exactly why § 3582(c)(1)(A) should now serve as the safety-valve Congress

intended it to be to permit the Court to reduce the sentence now when subsequent developments in the law cannot otherwise provide a remedy. Some district courts have applied these same Supreme Court cases to find an "extraordinary and compelling" reason to reduce sentence when the defendant was sentenced, in retrospect, in violation of the Constitutional principles they vindicated. *See United States v. Williams*, No. CR 91-559-6 (TFH), 2021 WL 5206206, at *4-*5 (D.D.C. Nov. 9, 2021) (reducing mandatory life sentence under 21 U.S.C. § 848 and finding intervening case of *Alleyne* to be an extraordinary and compelling reason); *United States v. Sterling*, No. 2:05-CR-20061-01, 2021 WL 865227 (W.D. La. Mar. 5, 2021) (reducing sentences under 18 U.S.C. § 924(c) in part because facts raising mandatory minimum were not charged as now required under *Alleyne*); *United States v. Cano*, No. 95-00481-CR, 2020 WL 7415833, at *4-*6, (S.D. Fla. Dec. 16, 2020) (same); *see also United States v. Ingram*, No. 3:00-783-JFA, 2022 WL 3030748, at *3 (D.S.C. Aug. 1, 2022) (considering *Alleyne* as one factor justifying extraordinary and compelling reasons to reduce sentence when facts not submitted to jury); *United States v. Fenner*, No. CR RDB-05-095, 2022 WL 1062021, at *4 (D. Md. Apr. 8, 2022) (granting motion in light of *Booker* as one extraordinary and compelling reason, where 55-year sentence determined by mandatory Guideline cross reference to murder).

2. <u>This Court should have authority to consider these changes in the Supreme Court's interpretation of the Constitution as "extraordinary and compelling" even after *Escajeda* because Ms. LeBaron could not pursue post-conviction relief on the basis of these decisions.</u>

In *Escajeda*, the Fifth Circuit "[held] that a prisoner cannot use § 3582(c) to challenge the legality or the duration of his sentence; such arguments can, and hence *must*, be raised under Chapter 153. . . . Because Escajeda's claims would have been cognizable under § 2255, they are not cognizable under § 3582(c)." *Escajeda*, 58 F.4th at 187–88.

Ms. LeBaron's claims under *Alleyne* and *Booker* do not fall within this prohibition. The Fifth Circuit clearly ruled that *Alleyne* and *Booker* do not apply retroactively to cases for purposes of review under § 2255. *See United States v. Olvera*, 775 .2d 726, 729-31 (5th Cir. 2015); *United States v. Gentry*, 432 F.3d 600, 605-06 (5th Cir 2005). Consequently, she never could have raised her claim under § 2255. At least one district court has granted a § 3582 motion based on changes in the law when the procedural rules of § 2255 barred any form of relief. *See United States v. Weissinger*, 542 F.Supp.32 882 (E.D. Mo. 2021) ("This passage of time and the procedural rules regarding successive motions to vacate under 28 U.S.C. § 2255 have resulted in an unwarranted sentencing disparity when Weissinger is compared to persons with much more serious prior histories who are sentenced today for the same crime.") Other district courts have found that the movant's reliance on changes in the law subsequent to sentencing, rather than identification of errors occurring at

the original sentencing, means that the motion for reduced sentence is not an

improper successive § 2255 motion but rather a proper request for leniency.

> As accurately noted in his reply brief, Defendant's compassionate
> release motion does not assert that his original sentence was
> unconstitutional, that it was based on a misapplication of the
> Guidelines, or that it was otherwise improper. . . . . Rather, he relies on
> factual and legal developments occurring subsequent to sentencing and
> asks this Court to reduce his sentence based on those developments.
> This request is wholly consistent with the Fourth Circuit's recent
> acknowledgment that, absent a controlling policy statement governing
> inmate-initiated compassionate release motions, the amended
> compassionate release statute provides district courts with broad
> authority "to consider leniency" when other avenues of sentencing
> relief are not available.

*See United States v. Morris*, 602 F.Supp.3d 881, 884 (E.D. Va. 2022); *see also*

*United States v. Hall*, No. CR 06-20162-01-KHV, 2023 WL 2140154, at *6 (D. Kan.

Feb. 21, 2023) ("Indeed, even though such circumstances will undoubtedly be rare,

it seems that one of the most compelling and extraordinary reasons to reduce a

defendant's sentence would be that his conviction or sentence is invalid but he can

no longer obtain relief under Section 2255.") (citation omitted), *appeal docketed*,

No. 23-3061 (10th Cir. Apr. 19, 2023)

Counsel, however, recognizes that other courts of appeal have held that

*Alleyne* claims, in particular, are "cognizable" under § 2255 even if barred by other

limitations on such proceedings. *See Garcia v. United States*, 588 Fed. Appx. 851,

852-53 (11th Cir. 2014) (holding claims that sentence imposed in violation of Sixth

Amendment rights following *Alleyne* is "of the type cognizable" under § 2255);

*Jackman v. Shartle*, 535 Fed. Appx. 87, 89 (3d Cir. 2013) (holding that *Alleyne* claims must be brought under § 2255). Even though not addressing the issue of what makes a claims "cognizable," the Fifth Circuit has also stated that an *Alleyne* claim cannot serve as the basis for a motion for reduction under the adjacent provisions of 18 U.S.C. § 3582(c)(2) (change in Sentencing Guidelines) because such challenge must be brought in § 2255 proceedings. *United States v. Hicks*, 663 Fed. Appx. 299, 302 (5th Cir. 2016). More recently, other courts of appeal have also ruled that the fact that a sentence is now unconstitutional based on intervening changes in law cannot serve as a basis for a § 3582(c)(1)(A) motion, even if no other remedy is available. *See*, *e.g.*, *United States v. Fine*, 982 F.3d 1117, 1118-19 (8th Cir. 2020). Still, one district court within the Fifth Circuit has recently decided that *Escajeda* does not bar a claim based on an intervening Supreme Court case even though such a claim would be cognizable under § 2255 because the movant is not claiming that the sentence is unconstitutional (or illegal), but rather unjust in light of the intervening Supreme Court case law. *See United States v. Solomon*, No. 3:14-cr-00340-K-5, 2023 WL 2920945, at *4 (N.D. Tex. Apr. 11, 2023) (granting motion to reduce sentence imposed under 18 U.S.C. § 924(c) in light of Supreme Court decision in *United States v. Davis*, 139 S. Ct. 2319 (2019) and finding *McMaryion* not applicable because change in sentencing law was jurisprudential and not legislative).

If the Court finds this argument not cognizable under § 3582 on the basis of *Escajeda*, Ms. LeBaron asserts that *Escajeda* was wrongly decided to preserve the argument for further appellate review.

3. <u>The Supreme Court's decision in *Fowler* calls into question whether there was an error at trial in the jury instruction and in the sufficiency of the evidence that would invalidate Ms. LeBaron's conviction (foreclosed issue).</u>

Ms. LeBaron recognizes that the argument asserted in this section is foreclosed by *Escajeda*. However, she asserts it here for further appellate review because at least one circuit court of appeals has held that an error in sentencing the defendant (in that case, applying a life sentence that, at the time, could only be imposed by the jury) can be considered, along with other proposed "extraordinary and compelling" reasons, in determining whether to grant a § 3582(c)(1)(A) motion, and that such errors in the case are not limited to post-conviction proceedings under 28 U.S.C. § 2255. *See United States v. Trenkler*, 47 F.4th 42, 45-46, 49-50 (1st Cir. 2022); *see also United States v. Trenkler*, No. 92-10369, Opinion and Order (Feb. 28, 2023), Docket No. 837 (affirming decision to grant motion, citing "the first and most heavily weighted reason [of] Trenkler's unlawful original life sentence, the illegality of which the Court has explained in detail, and, relatedly, that this motion is his only remaining avenue for relief, absent a presidential pardon," as well as "the significantly changed landscape in sentencing law since imposition of the original unlawful sentence; namely, the sentence was pre-<u>Apprendi</u> and pre-<u>Booker</u>.") (internal citations omitted)).

In *Fowler v. United States*, 563 U.S. 668 (2011), the Supreme Court held that the offense of which Ms. LeBaron was convicted in Count 6 required that the government's proof must show a reasonable likelihood that "(in the absence of the killing) at least one of the relevant communications would have been made to a federal officer." *Id.* at 678. The Court rejected the government's argument, and the standard of the Eleventh Circuit, that the appropriate criterion was whether it was *possible* that the communication that the defendant intended the killing to prevent was with a federal officer. *Id.* at 676-77. The Court also held that, because the statute specifically addresses communications with *federal* officials, "the Government must show more than the broad intent . . . to prevent communications to law enforcement officers in general." *Id.* at 674. The *Fowler* decision clarified the Fifth Circuit's decision in *United States v. Causey*, 185 F.3d 407 (5th Cir. 1999), where the court found evidence insufficient under this same statute when evidence showed the defendant's intent to prevent communications with state agencies investigating the offenses he committed, but where there was "no evidence that the likelihood or possibility that the murder might impact a future federal investigation played a part in [the] crime." *Id.* at 422-23. *Fowler* made it clear that the government's burden of proof was a reasonable likelihood.

In this case, the government failed to meet that burden. Counsel's review of the transcripts of trial that are currently available show no testimony from any federal agent and no involvement of federal officials when the murders were investigated in

1988. The transcripts contain testimony showing the federal officials became involved only in the investigation of the case, years later.[66] Ms. LeBaron's case is similar to *Causey*, where there was "no evidence that the likelihood or possibility that the murder might impact a future federal investigation played a part in this crime." *Causey*, 185 F.3d at 422-23. While Ms. LeBaron and her co-conspirators were clearly intending to prevent any witness from communicating with law officers generally, there was "nothing in this record which would support a jury finding that [the child] had any intention of communicating with any federal law enforcement" and "no evidence in the record that would support an inference that [Ms. LeBaron] intended to prevent [the child] from . . . communicating with authorities who were in fact federal officers." *Id.* at 423.

Nor was the jury instructed that it had to find such a connection to communications to *federal* officials, as *Fowler* requires. Instead, the jury was instructed only that it had to find that the communication sought to be prevented by the killing was "to a law enforcement officer or judge." Docket No. 179 at 28.

These errors at trial, of course, could have been raised in petitions under 28 U.S.C. § 2255. *See e.g.*, *United States v. Smith*, 723 F.3d 510, 515 (4th Cir. 2013) (holding *Fowler* to be retroactively applicable for purposes of § 2255(f)(3)).

---

[66] *See* Docket No. 192-3 at 18 (FBI provided money to relocate in another proceeding); No. 192-4 at 97 (discussing FBI providing witness protection in 1992); No. 192-6 at 185 (discussing FBI interviews in preparation for 1993 trial); No. 193-2 (local police officer traveled to Phoenix in 1992 as part of investigation in this case).

That path is no longer available to Ms. LeBaron because she has already filed one motion for relief under that provision which was dismissed with prejudice, *see* Docket No. 729, and *Fowler* is not a decision based on the Constitution which would satisfy the criteria for filing a second, successive petition. *See* 28 U.S.C. § 2255(h)(2) (requiring new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court). Moreover, the Fifth Circuit has already rejected the petition of Ms. LeBaron's codefendant seeking to address *Fowler* under the "savings clause" of 28 U.S.C. § 2255(e) for reasons that would apply equally in her case. *See Barlow v. Daniels*, 765 Fed. Appx. 72, 73 (5th Cir. 2019). As the district court found in *Trenkler* with respect to that petition, this motion is the "only remaining avenue for relief, absent a presidential pardon."

Also as in *Trenkler*, this Court should find that the trial errors constitute an "extraordinary and compelling" reason justifying a reduction in sentence. Counsel, however, recognizes that this relief is foreclosed by *Escajeda* until further review by the Supreme Court. *Escajeda*, 58 F.4th at 187–88 (holding that claims that would have been cognizable under § 2255 cannot serve as extraordinary and compelling reasons for sentence reduction under § 3582(c).)

## D. Section 3553(a) factors favor reduction.

Ms. LeBaron asks the Court to reduce the four life sentences imposed in 1993 to a sentence of 360 months on each count, to run concurrently. That sentence

satisfies the sentencing purposes reflected in Section 3553(a).

1. The proposed 30-year sentence reflects the nature and circumstances of the offense and the history and characteristics of this defendant under 18 U.S.C. § 3553(a)(1) and reflects the seriousness of the offense, promotes respect for the law and provides just punishment for the offense, as required under Section 3553(a)(2)(A).

A thirty-year sentence reflects the nature of the offense, but also the nature and circumstances of Ms. LeBaron's background and what we know now, thanks to developments in various scientific fields. Ms. LeBaron's relative youth at the time of the offense is only the smallest part of that consideration, because, as detailed in the Expert Report and in the previous sections of this motion, her circumstances encompass a unique combination of lifelong indoctrination in a religious cult focused on her father as the divine prophet of God, physical, sexual and mental abuse from childhood until the time of the commission of the murders, and a paranoia-induced isolation from all other society, all of which, as the science now tells us, would have fundamentally warped her physiological brain development and its functioning, thereby affecting her cognition, judgment and behavior. There is no denying the severity of the crimes of murder, but there is also no denying the severity of Ms. LeBaron's circumstances leading up to that time and the effect that scientific studies demonstrate that such circumstances have on people in similar situations.

Other courts have re-evaluated murders after passage of such a great time and found sentences similar to the thirty-year sentence proposed here to be consistent

with 3553(a), even considering the egregious nature of the offense.

The defendant in *Cruz*, eighteen years old in 1994, in order to comply with his gang leader's orders and, like Ms. LeBaron in her circumstances, avoid being killed himself, worked with a fellow gang member to lure two other men into a car ride where Cruz shot one man to death, then chased the other victim down and held him while his accomplice shot him to death. *Cruz*, 2021 WL 1326851, at *1, *5. The district court reduced his sentences for various crimes related to the murders to a time-served sentence of approximately 31 years. *Id.* at *2, *15. The district court relied heavily on Cruz's youth at the time of the killings and the same genre of scientific evidence Ms. LeBaron presents to this court, but without the additional evidence from her background of the specific impact of religious-familial indoctrination and the multiple forms of abuse she suffered. *Id.* at *5-*7 ("This court finds the evidence just discussed to be persuasive and well-founded and concludes that, because 18-year olds are still developing in terms of maturity, impulse control, ability to resist peer pressure and character, they are less than fully blameworthy for criminal conduct.") While the court found that the nature and circumstances of the murders he committed "weigh[ed] very heavily in favor of a substantial sentence," *id.* at *12, the court nevertheless granted the sentence reduction in light of Cruz's extraordinary rehabilitation while in prison, the consistency of the reduced sentence with murder sentences imposed in other federal murder cases, and instances of

violence and abuse in Cruz's childhood. *Id.* *13-*15.

Similarly, in *United States v. Espino*, No. 03-20051-08-JWL, 2022 WL 4465096 (D. Kan. Sept. 26, 2022), the court reduced a life sentence imposed by a Sentencing Guideline determined by reference to Espino's participation in the murder of an informant who had stolen drugs from Espino's gang to a sentence of thirty years. *Id.* *1, *5. Espino, an "enforcer" for a gang, had helped lure the informant to where he was killed, watched the killing in which an accomplice used an assault weapon, cleaned the car after the murder and took the car to be burned. *Id.*at *2. Citing similar evidence on emerging adults and brain development and Espino's rehabilitation since committing the crime in 2004 at age 20, *2-*4, the court found extraordinary and compelling reasons for release, and justified the thirty-year sentence under the § 3553(a) factors in part by reference to Espino's subordinate status to the gang member who directed the murder an actually pulled the trigger (similar to Ms. LeBaron's subordinate status to her brothers and others in the LeBaron group), and Espino's rehabilitation, finding these factors in balance with Espino's role in an "extremely serious offense that warrants a very substantial sentence." *Id.* at *4-*5; *see also Ramsay*, 538 F.Supp.3d at 427-29 (finding thirty year sentence to balance appropriately the substantial rehabilitation of the defendant, and his youth and adverse upbringing at time of the murders, with the "very substantial term of imprisonment" warranted by the gang killing of two innocent

people and the child one was expecting); *Rodriguez*, 492 F.Supp.3d at 316 (finding thirty-year sentence sufficient to reflect the seriousness of the offense, promote respect for the law and provide just punishment for defendant's willing participation in killing by torture of drug informant approximately twenty years before in light of, among other factors, extraordinary rehabilitation).

The passage of time, when combined with rehabilitation, is an important factor. In *United States v. Rios*, No. 3:94CR112 (JBA), 2020 WL 7246440 (D. Conn. Dec. 8, 2020), the court described Rio's 1991 participation in the murder of another in gang-related killing, as a "cold-blooded murder" and "a most serious crime" that continued to cause profound suffering for the victim's family. *Id*. at *3. However, the court noted that "Mr. Rios appears to have matured significantly," and that in "his twenty-six years of imprisonment, he has matured from a rash young man pursuing a lawless, violent lifestyle, to a reflective, empathetic middle-aged adult," who "has spent nearly half his life so far behind bars," and that this "is significant punishment for his violent crime, depriving him of the family he life he cherished more than anything." *Id.* at *3-*4 (cleaned up). Placing great weight on the length of imprisonment already served, his age and health concerns, remorse, release plan and rehabilitation, the court ultimately reduced his life sentence to a sentence of thirty years. *Id*. at *4, *6.

Even when youth is not involved courts have found similar sentence

reductions to be warranted notwithstanding the egregious nature of the crimes. In *Russo*, the district court reduced life sentences for crimes involving murders. In *United States v. Russo*, Russo was serving life sentences plus five years for his role in mafia-related murder conspiracies. *United States v. Russo*, __ F.Supp.3d __, 2022 WL 17247005, at *4 (E.D.N.Y. Nov. 28, 2022). Russo, seventy years old at the time of his motion for a reduced sentence, had participated in the 1992 murders of two members of a rival mafia faction as part of a "bloody civil war." *Id.* at *4. Finding age and health, along with rehabilitation in over thirty years in prison, the changes rendered by *Booker*, and, as in Ms. LeBaron's case, substantially lesser sentences imposed on co-defendants who pleaded guilty rather than proceed to trial, gave the court extraordinary and compelling circumstances. *Id.* at *5-*7. In terms of the § 3553(a) factors, the court recognized that the "argument can plausibly be made that no one convicted of murder should ever have their sentence reduced," but, while "troubled by the fact that Russo orchestrated two murders, [the court] do[es] not subscribe to that unyielding punitive concept in this case for a number of reasons," which included the disparity in sentencing equally culpable co-defendants to lesser time through plea deals, the correlation of the thirty-five year sentence imposed with national averages for federal murder convictions, and Russo's extraordinary rehabilitation. *Id.* at *7-*9. In the companion case, the court similarly reduced a life sentence calculated by reference to murders committed before conviction in

1991 by Paul Moore, an "enforcer" for a drug gang who participated in at least one murder of a rival drug dealer, who committed his crime when twenty-two years old. *Id.* at *9. The court again cited the discrepancy between co-defendants who also participated in first-degree murders, but received substantially lower sentences in plea deals, as well as Moore's rehabilitation. *Id.* at *10. In finding the thirty-five year sentence imposed to meet the § 3553(a) factors, the court acknowledged the careful balancing required with the nature of the crime:

> Still, the Court does not intend to understate the seriousness of Moore's criminal history. The Vassell Enterprise was a brutal operation exacting violence across state lines and damaging communities with its distribution of narcotics.

*Id.* at *11. Yet the Court found the sentence justified by reason of Moore's rehabilitation, the passage of time since the crimes, and Moore's likely deportation as some of the reasons why the thirty-five-year sentence imposed satisfied all § 3553(a) considerations. *Id.*

This Court should conclude like the court in *Ramsay*:

> Finally, how much of a reduction these circumstances warrant is, as sentencing always should be, a holistic inquiry, not subject to an prescribed calculation. Weighing all the evidence and arguments offered by both sides, the Court concludes that the extraordinary and compelling circumstances in this case warrant a reduction of sentence to a term of 360 months, i.e., 30 years. The Court also concludes such sentence is consistent with the § 3553(a) factors: in other words, if the Court had been able to make an individualized sentencing determination in 1998, but with the benefit of modern scientific understanding and with full foresight of Ramsay's rehabilitation, the

Court would have found that a sentence of 360 month's imprisonment was sufficient to comply with the purposes of criminal sentencing.

*Id.* at 428-29.

2.  <u>A 30-year sentence provides just punishment for the offense, as required under Section 3553(a)(2)(A), serves as an adequate deterrent to criminal conduct, as required under Section 3553(a)(2)(B) and protects the public, in accordance with Section 3553(a)(2)(C).</u>

In considering the sentence necessary for just punishment and adequacy of the sentence as a deterrent and for protection of the public generally, the Court may look to average sentences imposed in the federal courts for the crime of murder. Other courts have cited to these statistics to find that a reduction from life sentences accords with § 3553. *See Russo,* 2022 WL 17247005, at *8 (citing *Graham v. Florida*, 560 U.S. 48, 93, 130 S. Ct. 2011, 176 L.Ed.2d 825 (Roberts, J., concurring) (noting that a life-without-parole sentence was "far more severe than the average sentence imposed on those convicted of murder or manslaughter, who typically receive under 25 years in prison"); *United States v. Qadar*, No. 00-CR-603, 2021 WL 3087956, at *12 (E.D.N.Y. July 22, 2021) (noting that the average federal murder sentence in fiscal year 2020 was approximately 21 years); *United States v. Tellier*, No. 92-CR-869, 2022 WL 1468381, at *4 (S.D.N.Y. May 10, 2022) (noting that according to U.S. Sentencing Commission statistics, for fiscal years 2015-2021, the median sentence and length of imprisonment for murder was 240 months, and the mean sentence and length of imprisonment for murder was 262 and 263 months, respectively)); *Cruz*, 2021 WL 1326851, at *7 (citing

Sentencing Commission statistics on average murder sentences and stating, "[t]he effect is that Cruz, who was less than fully blameworthy for his crimes given his age when he committed them, will end up serving significantly more time than adults who, fully blameworthy for their conduct, have committed the same crimes."); *Rios*, 2020 WL 7246440, at \*4 (D. Conn. Dec. 8, 2020) (citing Sentencing Commission statistics for average sentence of 255 months for murder, reducing sentence to 360 months.)

The proposed 30-year sentence exceeds the sentences that most courts have found to constitute just punishment and adequate deterrence for murders. For FY2022, the most recent data available shows that federal murder sentences nationally had a mean average of 261 months (median of 240 months). *See* U.S. Sentencing Commission, *Sourcebook of Federal Sentencing Statistics*, tbl.15 (2022). In the Fifth Circuit, the average sentence for murder was slightly less, 235 (mean) and 250 (median). *See* U.S. Sentencing Commission, *Statistical Information Packet*, Fiscal Year 2021, Fifth Circuit, tbl. 7 (2021).

There are unique circumstances in this case that justify a thirty-year sentence in this case. In terms of just punishment, the families of the victims have come forward in support of Ms. LeBaron's request, citing to the court in many cases the same highly unusual circumstances that they all lived through as members of Ervil LeBaron's church and family. *See* Exhibits B, D, F & J (Letters of

Rena Chynoweth, Celia LeBaron, Jared LeBaron, Anna LeBaron). While the family cannot be the unique criterion for establishing just punishment, their first-hand understanding of these murders reflects on the unique considerations for justice in this case.

In the same letters, the family members show the court why the thirty-year sentence is more than an adequate deterrent and why Ms. LeBaron represents no threat to public safety. First, the very peculiar and specific context of the Ervil LeBaron cult is long dead. *See* Exhibit D (Letter of Celia LeBaron) (sister of one of victims, stating, "What's important to know, is that the cult completely disintegrated in the early 1990's and it no longer exists – at all."); Exhibit J (Letter of Anna LeBaron) ("Eventually, the cult disbanded (around 1991-92) and it's been over 30 years now of each of us, on our own path. . . .") Second, the family members who have not been imprisoned, some of whom also participated in the violence engulfing their father's cult, have rehabilitated themselves through years of therapeutic assistance. *See* Exhibit J (Letter of Anna LeBaron) (describing recovery process, stating "None of my siblings are a threat to society because none of us are brainwashed anymore."); Exhibit E (Letter of Jennifer LeBaron, describing years of counseling that have helped her and committing to providing similar help for her sister, Patricia, if she is released); Exhibit B (Letter of Rena Chynoweth, describing how family members have overcome their experiences). These letters and the

attached Release Plan, Appendix, establish that similar resources will be made available to Ms. LeBaron upon her release. *See* Exhibit K (Letter of Troy Papanicolau, husband of Esthephania LeBaron).

Finally, Ms. LeBaron's own record in prison shows that the more than thirty years that she has already served in prison is more than an adequate for these purposes. BOP records show that she has furthered her education, obtaining her GED and English proficiency certificates in 1996, and that, over all these years, she has engaged in college coursework as well as numerous BOP courses aimed at rehabilitation, such as self-esteem for adults (2019), basic cognitive skills (2018-19), habits of effective people (2016, 2019), and personal adjustment (1996). Exhibit L (Individual Needs Plan – Program Review); Exhibit M (Certificates). In a Summary Reentry Plan – Progress Report, BOP personnel describe Ms. LeBaron as having a "Minimum recidivism risk level," while noting that she has "needs" in "Anger/Hostility and Antisocial Peers;" that she has continued to work in prison industries with "satisfactory work performance evaluation in the following areas: relationship with supervisor and co-workers, attitude, punctuality and willingness to accept and complete assignments;" and that she "has completed numerous Educational/Vocational Training courses while incarcerated in the Federal Bureau of Prisons, which have increased her general knowledge and helped prepare her for release." Exhibit N. Another progress report indicates she had completed 300 hours

of college correspondence courses. Exhibit O. Her risk assessment shows only one disciplinary incident report, not of a serious nature, in the past 120 months, which involved being in an unauthorized area. Exhibit P. Finally, several of Ms. LeBaron's fellow prisoners have written on her behalf, describing how she serves as role model for them and assists them in their adjustment to prison life and their future. Exhibit Q; *see Perez*, 2021 WL 837425, at *4 (citing mentoring of fellow inmates as part of rehabilitation); *Rodriguez*, 492 F.Supp.3d at 312 (same among other positive aspects of BOP record).

3. <u>The proposed sentence would better meet the need to provide Ms. LeBaron with appropriate correctional treatment, as required under Sections 3553(a)(2)(D).</u>

The Expert Report analyzes the likelihood that Ms. LeBaron continues to suffer the effects of the traumatic experiences prior to her incarceration, including Complex PTSD. Exhibit I at 23-26. The Expert Report provides recommendation for further forms of treatment. Exhibit I at 26-27. However, as the expert notes, "[d]espite the documented knowledge that Ms. LeBaron had endured a multitude of traumatic events throughout her formative years, no efforts were made to provide her with mental health services after she was incarcerated." Exhibit I at 22.

BOP records confirm the Expert Report's statement that there has been no sustained mental health treatment for Ms. LeBaron over more than thirty years in prison. Her Inmate Profile shows that she was placed in Mental Health Care

Category 1 in 2010. Exhibit R. Ms. LeBaron confirms that she received no counseling or treatment to address Complex PTSD nor received any form of psychological counseling specifically for the trauma she experienced and its effects on her reasoning and emotions. At the same time her needs assessment shows a need not just for "Anger/Hostility" and "Antisocial Peers" programming, but also for Trauma programming. Exhibit N at 1.

Ms. LeBaron's family can do better by her. The attached Release Plan shows that her family members with whom she will be living have benefited from decades of such treatment and are prepared to provide her with that same opportunity.

4. The 30-year sentence that Ms. LeBaron seeks would "avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct," as required under Section 3553(a)(6).

In reducing life sentences for crimes involving murder, district courts have emphasized the unwarranted disparity with co-defendants. In *Ramsay*, the court there noted that Ramsay, prosecuted in federal court, received a life sentence from which he could never be paroled, while both of the other men with him that night who also shot into the crowd were prosecuted in the state, which had since released them on parole, even though for the same conduct. *Ramsay*, 538 F.Supp.3d at 428. In *Russo*, the court noted Russo received a life sentence while other co-defendants received sentences from time-served (four years) up to 270 months, and that Paul Moore was sentenced to life, while the leader of the crime ring, who "murdered

two people and ordered the murders of several others" received a sentence that was soon to permit his release after twenty-five years in prison because he accepted a plea. *Russo*, 2022 WL 17247005, at *7, *10. The court summed up its view with regard to Russo's case:

> The offense conduct of these defendants, although ultimately charged differently by the government than those defendants who proceeded to trial, was no less violent or destructive than those who received life sentences. . . . This disparity does not reflect the goals of sentencing. And, while the government's argument that accepting responsibility for one's crimes should result in a lower sentence is well taken, it is often disproportionately reflected in how co-defendants are charged and sentenced. Thus, this disparity in sentencing also weighs toward a finding of extraordinary and compelling circumstances.

*Id*. at *7. In granting a reduction in sentence for Russo, the court noted that the sentences received by many codefendants who accepted plea deals were consistent with statistics on average sentences imposed for federal murder, and, in that context, "[i]f the Government in offering its plea deals did not believe that all those indicted on murder charged should be sentenced to life, why should the court?" *Id.* at *8; *see also Morris*, 2022 WL 3703201, at *11-*12 (granting reduction in sentence involving a drug gang related murder based on defendant's subordinate role in the gang and murder to the co-defendant, who received a sentencing reduction); *United States v. Chen*, No. 02-CR-271 (LAP), 2022 WLO 2533287 at *7 (S.D.N.Y. July 7, 2022) (considering discrepancy of over fifty years between defendants who exercised right to trial and co-defendants who pleaded guilty even with more culpable, violent conduct).

Here, as in *Russo*, Ms. LeBaron faced a significant penalty for exercising her right to a trial and not cooperating with the government. Her brother, Richard, the person who had the ultimate choice about whether to pull the trigger or not, but who decided to kill both the father and the daughter, received a five-year sentence in light of his cooperation. *See United States v. White*, No. 96-cr-1123 (SHS), 2022 WL 18276933, at *4 (S.D.N.Y. Dec. 8, 2022) (reducing life sentence for 30-year-old's participation in robbery and murder of postal worker to time served (28 years) as appropriate sentence to avoid disparity with the life sentence for the "person who actually pulled the trigger that killed" the victim). This is an extraordinary disparity. While some disparity between defendants who plead guilty and cooperate and those who proceed to trial is justified, the thirty-year sentence Ms. LeBaron now proposes far exceeds that imposed on the cooperating witness who was the person who pulled the trigger. If the Court grants this reduction, that twenty-five year difference is enough, particularly in light of the support of the families of the victims for this sentence reduction and in light of the cognitive and emotional limitations under which Ms. LeBaron continued to operate when she made the decision to exercise her right to trial. Only now, years later and with the recent scientific research discussed about, can one understand the erratic thinking and behavior that Ms. LeBaron exhibited in trial, as the thinking and acts of one still caught in the cumulative effects of the religiously-inspired, family-inculcated indoctrination and abuse that had been her whole life.

### E. The reduction in sentence is consistent with the newly-proposed USSG § 1B1.13.

On April 5, 2023, the United States Sentencing Commission published its preliminary proposals for changes to the United States Sentencing Guidelines, including USSG § 1B1.13. *See supra* n.46. If those amendments are permitted by Congress to become effective in November 2023, the policy statements would include two grounds with which the reduction sought by Ms. LeBaron would be consistent.

The first such ground would be USSG § 1B1.13(b)(5), which would define as an "extraordinary and compelling reason" "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in" the previous sections of that same section, "are similar in gravity" to those same reasons, which include terminal or serious medical conditions of the defendant, advanced age of the defendant, family circumstances (such as the absence of a caregiver for an immediate family member), and sexual or physical abuse occurring while in custody. Ms. LeBaron's proffered reason, the scientific revolution over the past thirty years in the understanding of the brain and its development, as that scientific discovery relates to Ms. LeBaron's lifelong trauma leading up to the murders and trial, has at least the same gravity as the reasons cited in the new proposed Guideline. Ms. LeBaron's circumstances may present a case of even greater gravity because the reasons referenced in the Guideline afflict the

prisoner only later in life or, in the case of abuse, may occur only on few occasions. Ms. LeBaron's proffered reason, on the other hand, is a science-based tearing-away of the veil of misunderstanding that has clouded her case for decades, revealing the true depth of trauma and disfunction that brought Ms. LeBaron to be before the Court and to behave as she did during trial and sentencing.

Second, the new USSG § 1B1.13(b)(6) would apply to "unusually long sentences," which must capture life sentences such as Ms. LeBaron's. This subsection would permit a reduction if the defendant has served at least 10 years, while Ms. LeBaron has served more than 30 years. In these circumstances, the new subsection would permit courts to take into account changes in the law (other than non-retroactive Sentencing Guideline amendments) if "such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances." This subsection would permit the Court to consider Ms. LeBaron's arguments with regard to *Alleyne*, *Booker*, and *Fowler*, in conjunction with her arguments concerning the new science and what it reveals about her youth at the time of the crimes and trial and the effects her uniquely traumatic life up to that point would have had on her cognition, judgment and ability to function and exercise control independently and logically.

Although these proposed Guidelines are not yet in place, the reduction in sentence Ms. LeBaron seeks would be consistent with the anticipated new rules.

## CONCLUSION

Patricia LeBaron's case is truly unique, perhaps one of the only federal murder cases involving crimes committed by the children raised in the psychologically-blinding atmosphere of a religious cult that operated as a part of the family. Scientific development over the past thirty years now gives a better understanding of the fundamental limitations Patricia LeBaron suffered in her basic cognitive functions given the effect her life experience would have had on the very structure of her brain. The "safety-valve" of § 3582(c)(1)(A) would function exactly as intended if the Court considered this unforeseeable development in scientific understanding to be an "extraordinary and compelling" reason to reduce Ms. LeBaron's life sentences to sentences of thirty year (360 months). Even with the consecutive five-year sentence imposed under 18 U.S.C. § 924(c), counsel anticipates that Ms. LeBaron would be eligible for immediate release, to rejoin those members of the LeBaron family who have worked through treatment to overcome that same background and to establish high-functioning, productive, and peaceful lives, lives that they all wish to share with Patricia LeBaron, even those family members who lost their closest family members in the crimes punished in this case.

Respectfully submitted,

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas No. 3233
Texas State Bar No. 14003750


By /s/ Michael Herman
MICHAEL HERMAN
First Assistant Federal Public Defender
Attorney in Charge
Texas State Bar No. 24015128
Southern District of Texas No. 25087
Attorneys for Defendant
440 Louisiana, Suite 1350
Houston, TX 77002
Telephone: (713) 718-4600
Facsimile: (713) 718-4610

## <u>CERTIFICATE OF CONFERENCE</u>

I, Michael Herman, certify that Assistant United States Attorney Richard Hanes, has advised that the government opposes Ms. LeBaron's motion for a sentence reduction as supplemented by this filing.

/s/ Michael Herman
MICHAEL HERMAN

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 18, 2023, a copy of the foregoing Supplement to Motion to Reduce Sentence was served a paper copy by hand delivery to Assistant United States Attorney Richard Hanes at United States Attorney's Office, 1000 Louisiana Street, Suite 2300, Houston, Texas 77002.

/s/ Michael Herman
MICHAEL HERMAN