UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CRIMINAL NO. H-92-177 |
| | § | |
| vs. | § | |
| | § | JUDGE SIM LAKE |
| PATRICIA LeBARON, | § | |
| Defendant. | § | |

RESPONSE OF UNITED STATES IN OPPOSITION
TO SUPPLEMENT TO MOTION FOR REDUCTION IN SENETENCE UNDER 18
U.S.C. § 3582(c)(1)(A)(i)

Now comes the United States of America and in response to Defendant's Supplement to Motion for Reduction in Sentence (Dkt. #758) does respectfully state that defendant has failed to establish the extraordinary and compelling reasons necessary to support it's claim for reduction in sentence pursuant to Title 18 United States Code, § 3582(c)(1)(A)(i). Moreover, defendant has failed to establish entitlement to the relief requested pursuant to Title 18 United States Code, § 3553(a) factors. As a result, defendant's motion for "Extraordinary or Compelling Reasons" Under the Compassionate Release Statute 18 U.S.C. 3582(c)(1)(A) (Dkt. #743) and its supplement should be overruled.

**Response to Compassionate-Release Motion – Page 1**

I.   Facts

The facts governing this controversy are rewritten herein as set forth in the Response of United States In Opposition to Motion For "Extraordinary Or Compelling Reasons" Under The Compassionate Release Statute 18 U.S.C. 3582(C)(1)(A)(Dkt. #738), the whole of which response is incorporated herein by reference.

The facts as cited by the Fifth Circuit Court of Appeals in its decision denying Defendant's appeal in this case, *United States v. Barlow, 41 F.3d 935* (1994), are as follows:

Patricia and Defendant-Appellants Douglas Barlow ("Barlow") and William Heber LeBaron ("Heber"), were convicted on various charges stemming from the assassination-style killings of Mark Chynoweth ("Mark"), Edward Marston ("Ed"), Duane Chynoweth ("Duane"), and Duane's eight-year old daughter, Jenny Chynoweth ("Jenny"), which were carried out simultaneously on June 27, 1988. At the time of the slayings, the Defendants were all members of the Church. The adult victims, all former members of the Church, were killed for the sole reason that they had chosen to disassociate themselves and their families from the Church's teachings and membership.

A. THE CHURCH OF THE LAMB OF GOD

In the early 1950s-60s, Joel LeBaron ("Joel") founded a religious sect which he named the "Church of the First Born of

the Fullness of Time." The religion practiced by Joel's organization was based on various distortions of early Mormon teachings and, according to Joel, "revelations from God." Joel's brother, Ervil, was a member of Joel's church, but in 1971, the theological differences which had developed between the two brothers led Ervil to leave Joel's sect and form his own, which Ervil named the "Church of the First Born of the Lamb of God." After that schism, Ervil and Joel engaged in a protracted power struggle to control the members and property of Joel's church; and in 1972, Ervil had Joel killed. Ervil died in Utah State Prison in 1981, by which time various members of his sect—the Church—had been associated with nine murders in Mexico, California, and Utah.

The beliefs of the Church are set out in several publications, the most notable of which—the *Book of the New Covenant*—Ervil wrote while incarcerated in Utah State Prison. According to these teachings, the leader of the Church, known as the "Great Grand Patriarch" or "Patriarch," is empowered to brand disobedient members of the organization as "Sons or Daughters of Perdition," *i.e.,* those who are "unredeemable." Being marked unredeemable is tantamount to a death sentence, for the Church practices "blood atonement," an archaic religious doctrine which is purported to teach that unredeemable members

of a religion can obtain eternal salvation only through the shedding of their own blood.

Once the Patriarch pronounces a punishment, other members of the Church are required to carry it out. The reward for carrying out the Patriarch's directives is to share in the leadership in the Kingdom of God; those who fail to do so, however, themselves become children of perdition.

B. THE ORDER TO KILL ED, MARK, AND DUANE

While Ervil was still in prison, Mark left Utah for Texas and then relocated in California, during which time, according to Ervil, Mark was living in "rebellion." Mark had begun to question some of Ervil's teachings, which led Ervil to pronounce:

There is a great controversy being caused by my servants Mark Chynoweth ... with the support of Ed Marston, and it is my will, that if these ... men will not repent immediately, that they should be destroyed immediately; because they are advantageous, and are seeking to destroy my little children, even the little children of my great and beloved Prophet, Seer, and Revelator.... [I]f they will not repent ... I now declare them to be outlaws, and I will require any man who loves me, and who will have a crown at my right hand, to kill them upon sight...

Apparently neither Ed nor Mark "repented," so Ervil continued to proclaim that the two were Sons of Perdition, to be killed on sight. At some point, Ervil's wrath turned to Duane, prompting Ervil to decree that Ed could "be forgiven, only if he now shall kill king cobra [Duane] and Mark Chynoweth." After Ed, Mark, and Duane learned of Ervil's various pronouncements, in particular the one ordering Ed to kill Duane and Mark, these three decided to reject the teachings of both Ervil and the Church in toto.

Ervil's successor, Aaron, also denounced Ed, Mark, and Duane as "Sons of Perdition" because the three had chosen to disassociate themselves from the Church. Although at various times Church members openly discussed carrying out the Patriarchs' death sentences, Ervil's dictates remained unfulfilled until 1988. At that time, however, Aaron commanded that Ervil's prior edicts be enforced, and he ordered members to execute Ed, Mark, and Duane.

C. THE KILLING OF ED, MARK, DUANE, AND JENNY

In May 1988, Heber masterminded an elaborate scheme to carry out Ervil's and Aaron's directives. Heber planned to have the three Sons of Perdition slain simultaneously; no small feat given that Ed lived in Dallas, and Mark and Duane in Houston. The plan included surveillance, disguises, communication equipment, and stolen vehicles. Four Church members were assigned the task of killing the three former members: Heber

would kill Mark; Patricia and Richard would kill Duane; and Barlow would kill Ed. Other Church members, such as Natacia LeBaron ("Natacia") and Cynthia would assist. Heber had anticipated that one or more of the targeted former members might be accompanied, so he instructed the assassins to kill all witnesses "over four years old."

Ed, Mark, and Duane were all in the appliance repair business, each with his own company. Ed's and Duane's standard operating procedures were to go personally to their clients' homes to pick up appliances that needed servicing. Knowing this, Heber planned to telephone Ed and Duane and arrange for each intended victim to go to a different vacant house ostensibly to pick up an appliance needing repair. At each such location, a Church member would be waiting to kill the victim upon his arrival. In contrast, Mark had his employees pick up his clients' appliances, so Heber elected personally to kill Mark inside his own store.

Heber's plan was set in motion on the morning of June 27, 1988. Equipped with binoculars, Cynthia and Natacia parked in front of Mark's place of business in Houston. When they saw Mark arrive, they radioed Heber who was waiting by a telephone. Heber, who was in Houston, then called Duane (also in Houston) and Ed (in Dallas). Heber arranged for each of them to pick up

an appliance at a different vacant house at the same time later that same day.

At that appointed time, Heber positioned himself outside Mark's business in Houston, made sure that Mark was there, then radioed Cynthia (who was waiting in a car nearby) to "go for it." Heber, dressed in a business suit, then walked into Mark's store and shot him as he sat at his desk.

After receiving Heber's signal to "go for it," Cynthia called Barlow (who was waiting at a pay telephone in Dallas) and told him to execute the plan. Barlow proceeded to the vacant house in Dallas where Ed was scheduled to pick up an appliance, waited for Ed to arrive, and shot him when he did. A person who lived across the street from that vacant house saw the assailant, whom she later described as a young male in a "business-looking outfit."

Meanwhile, Patricia and Richard were in a black Silverado truck ("Silverado"), cruising around the Houston neighborhood in which was located the vacant house where Duane was to pick up an appliance. When Patricia and Richard spotted Duane's pickup truck in the driveway of that vacant house, they parked behind his truck. Richard then walked up to the cab of the truck and shot Duane several times. Observing that Jenny was in the cab of Duane's truck, Richard shot her too, in compliance with Heber's instructions. A person who lived directly across the street

**Response to Compassionate-Release Motion – Page 7**

heard a gunshot, turned toward the sound, and saw Richard firing into Duane's truck. That person described the killer as "well dressed in a business suit and tie," later confirming that the shooter's vehicle was similar to the Silverado pictured in one of the government's photographic exhibits.

After committing the four homicides, the perpetrators dismantled their firearms and disposed of them. The four active participants then reunited in Fort Worth, where they discussed the killings among themselves.

D. THE APPREHENSION, ARREST, AND PROSECUTION OF THE DEFENDANTS

On July 1, 1988 (four days after killing Ed, Mark, Jenny, and Duane), Heber, Patricia, and Barlow were arrested in Phoenix, Arizona at the King's Inn Motel ("Motel") and charged with automobile theft. A Phoenix officer had noticed the Silverado parked at the Motel and discovered that the number on its license plate matched the number of the license of a truck reported as stolen in Texas. The police checked with the clerk at the Motel to determine if anyone with Texas identification had registered at the Motel and learned that a "Christina Adams" (later identified as Cynthia) had registered for rooms 151 and 153 using a Texas driver's license. The police ran a check of that license and determined that it had not been issued to a Christina Adams.

The police watched rooms 151 and 153 and the stolen Silverado for the remainder of the day, developing information that constituted probable cause to arrest several of the Defendants, including Richard and Patricia, as suspects in the theft of the Silverado. The police subsequently arrested the Defendants in room 150 of the Motel after chasing Patricia, who by then was already one of the suspects in the automobile theft, to the vicinity of room 150. Observing suspicious activity in that room, the police knocked on the door to ascertain whether Patricia had hidden there to avoid capture. Remaining outside the threshold of the room when the occupants opened the door to room 150, the police first observed Richard, whom the police previously had linked to the stolen Silverado. As Richard was a suspect in the automobile theft, the police thought that they also might find Patricia—who had just evaded apprehension and who also was linked to the stolen vehicle—in the same room as Richard. The police therefore entered room 150 without a warrant to look for Patricia, a fleeing suspected felon, whereupon they saw her emerge from the restroom.

After some preliminary questioning of the Defendants by the police and a brief search of the rooms and automobiles in which the Defendants had been observed by the police at various times, the Defendants were arrested and transported to the police

station to be charged with automobile theft. When the police tried to question Patricia, she requested a lawyer.

The next morning, the police executed search warrants on rooms 150, 151, and 153 from which several items of physical evidence were obtained, including: three duplicate copies of the June 29, 1988 edition of the Dallas Times Herald in which the June 27, 1988 killings of Ed, Mark, Duane, and Jenny were reported; silicone sealant (similar to that used in the stolen Silverado); disguises; a list of scanner radio frequencies for the Dallas/Ft. Worth area; a listing of specific radio monitor frequencies for the Houston Police Department; a cache of weapons, including a holstered TARS .38 special revolver loaded with five rounds of ammunition; additional ammunition; speed loaders; shoulder holsters; gun pouches; and a cleaning kit for a rifle.

Later that same morning, Patricia, Cynthia, and Jacqueline were released from custody. Five days later, while still unaware of any connection between the persons that they arrested at the Motel and the homicides in Texas, the police released Heber and Barlow from custody.

It was not until almost a week after the release of Heber and Barlow that the police connected the suspects in the Arizona automobile theft with the Houston homicides. That occurred when a Houston homicide detective called the Phoenix police

department asking if they knew whether a "Mary June Whitt" had been seen in the area. The Houston detective explained that Ms. Whitt was a suspect in some homicides in Houston and that the Houston police had reason to believe that she might then be in Phoenix.

One of the Phoenix detectives happened to recall the name "Mary June Whitt" from an automobile theft investigation that he had conducted the previous December. He remembered that two women, "Pamela Monique Newman" and "Mary June Whitt," had been arrested in a stolen vehicle in Colorado and were subsequently extradited to Phoenix for prosecution. He had noticed that "Valerie Davis," one of the women arrested at the Motel, resembled Pamela Monique Newman. In a comparison of their fingerprints, the police confirmed that "Pamela Monique Newman" was in fact "Valerie Davis," one of Patricia's aliases.

Shortly thereafter the Defendants were charged by sealed federal indictment with nine counts, including murder for hire, witness tampering, and illegal use of a firearm in a violent crime. The indictment was unsealed about a week later, a short while after which the Defendants were transferred to federal custody. They appeared before a magistrate judge in connection with the instant offenses, and a few days later the magistrate judge denied pretrial release for all Defendants.

Approximately one month later a superseding indictment issued, charging all Defendants with fourteen counts. This indictment added counts charging obstruction of free exercise of religion and RICO violations.

A joint suppression hearing was held several weeks later, during which all evidence proffered by the government was determined to be admissible, with the exception of some spiral notebooks that had been obtained without a warrant from room 150 at the time the Defendants were arrested at the Motel. In addition, the district court found admissible an oral confession made by Patricia to Houston Homicide Detective John Burmester (the scene investigator for the murders of Duane and Jenny) at Arizona's Perryville State Prison ("Perryville"). At the time of their interview, Patricia was incarcerated at Perryville serving a nine-year sentence for automobile theft as a result of her arrest at the Motel.

The Defendants were tried before a district court jury early in January 1993. During that trial, Cynthia testified for the prosecution in exchange for the government's grant of immunity. At the close of the government's case, the Defendants made a motion for judgments of acquittal, which the trial court denied. The Defendants re-urged their motion at the close of all of the evidence. Ultimately, the jury returned guilty verdicts against all Defendants on all counts except Count 7 (aiding and

abetting Patricia in her use and carrying of a firearm). The court then granted Defendants' motion for judgment of acquittal on the murder for hire counts (Counts 1-4), concluding that the Defendants obtained no pecuniary remuneration in consideration for the killings. Each Defendant was sentenced to, inter alia, two 5-year terms, two 20-year terms, and four life-terms, all to run concurrently, plus five years supervised release. *United States v. Barlow*, 41 F.3d 937-941 (5th Cir. 1994).

## II.  Controlling Precedent

### a. Compassionate Release

The First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), allows a prisoner to move for a sentence reduction under certain circumstances. One such circumstance is when "extraordinary and compelling reasons warrant" a sentence reduction. *See* 18 U.S.C. § 3582(c)(1)(A)(i). This is often referred to as "compassionate release" because courts generally use it for prisoners with severe medical exigencies or infirmities. *See United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020) (describing § 3582(c)(1)(A)(i) motions as "compassionate release claims" and suggesting terminal illness may qualify); *United States v. Shkambi*, 993 F.3d 388, 390-92 (5th. Cir. 2021) (detailing the statutory history of compassionate release); as cited in *United States v. Escajeda*, 58 F.4th 184, 186 (5th Cir. 2023).

A prisoner can move for compassionate release when "extraordinary and compelling reasons warrant" a reduction of her sentence. *See* 18 U.S.C. § 3582(c)(1)(A)(i). As recently explained, this statutory phrase requires a prisoner to show she "face[s] some extraordinarily severe exigency, not foreseeable at the time of sentencing, and unique to the life of the prisoner" that leads "irresistibly" to the conclusion that this prisoner has a "singular" and "remarkable" need for early release. *See Escajeda*, 58 F.4th at 186.

The Fifth Circuit Court of Appeals has found "extraordinary" to mean "beyond or out of the common order," "remarkable," and synonymous with "singular." *Extraordinary*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 903 (2d. ed. 1934; 1950) ("WEBSTER'S SECOND"); *see also United States v. Jenkins*, 50 F.4th 1185, 1197 (D.C. Cir. 2022) (Katsas, J.) (defining "extraordinary" as "most unusual," "far from common," and "having little or no precedent" (quotation omitted)). "Compelling" is a participle of "compel," which means "to drive or urge with force, or irresistibly," "to force," and "to subjugate." *Compel*, WEBSTER'S SECOND, *supra*, at 544. These terms explain why prisoners can seek relief under § 3582(c)(1) only when they face some extraordinarily severe exigency, not foreseeable at the time of sentencing, and unique to the life of

the prisoner. *See Chambliss*, 948 F.3d at 693 (discussing terminal illness). *United States v. Escajeda*, 58 F.4th at 186.

In *United States v. McMaryion* No. 21-50450, 2023 WL 4118015, at *2 (5th Cir. June 22, 2023), the defendant argued that he should get a sentence reduction because the First Step Act reduced the statutory minimums applicable to his offenses. Rejecting this argument, the court ruled that, "Congress did not make those reductions retroactive. And a prisoner may not leverage non-retroactive changes in criminal law to support a compassionate release motion, because such changes are neither extraordinary nor compelling." *See, e.g., United States v. Jenkins*, 50 F.4th 1185, 1198–1200 (D.C. Cir. 2022) (so holding); *United States v. McCall*, 56 F.4th 1048, 1065–66 (6th Cir. 2022) (en banc) (same). Rather, "in federal sentencing the *ordinary* practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Dorsey v. United States*, 567 U.S. 260, 280 (2012) (emphasis added). This ordinary practice reflects a "presumption against retroactive legislation" that is "deeply rooted in our jurisprudence" and that "embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). "We may not usurp the legislative prerogative and use 18 U.S.C. § 3582(c)(1) to create retroactivity that Congress did not." *See United States v. Wiltberger*, 18 U.S. (5

Wheat.) 76, 95 (1820) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment."). *United States v. McMaryion*, No. 21-50450, 2023 WL 4118015, at *2 (5th Cir. June 22, 2023).

While recognizing that United States Sentencing Guideline § 1B1.13, Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)(Policy Statement), and the commentary thereto, are no longer binding on the court, courts have not entirely abandoned the commentary. Instead, courts have viewed the application notes in the commentary as providing guidance regarding the types of reasons that may be deemed sufficiently "extraordinary and compelling" to warrant compassionate release. See *United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021) ("Although not dispositive, the commentary to § 1B1.13 informs [the court's] analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release."), cert. denied, 141 S. Ct. 2688 (2021). The application note 1 of the commentary to Section 1B1.13 describes extraordinary and compelling reasons as follows:

**(A) Medical Condition of the Defendant.--**

**(i)** The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples

include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

**(ii)** The defendant is--

**(I)** suffering from a serious physical or medical condition,

**(II)** suffering from a serious functional or cognitive impairment, or

**(III)** experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

**(B) Age of the Defendant.**--The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

**(C) Family Circumstances.**--

**(i)** The death or incapacitation of the caregiver of the defendant's minor child or minor children.

**(ii)** The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

U.S.S.G. 1B1.13 Application Notes, 1.

**Response to Compassionate-Release Motion – Page 17**

b. 3553(a) Factors

Beyond demonstrating extraordinary and compelling grounds supporting a reduction, prisoners must also convince the district judge to exercise discretion to grant the motion after considering the § 3553(a) factors. *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021).

The statutory factors to be considered in imposing sentence are set forth in Title 18 United States Code, § 3553(a). Under the "parsimony clause," § 3553(a), the sentencing court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Title 18 United States Code, § 3553(a)(2). Section 3553(a)(2) provides that the court, in determining the particular sentence to be imposed, must consider the need for the sentence imposed to (1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

III. Argument

In its effort to convince the court that defendant is entitled to compassionate release in this case defense counsel has cited approximately sixty cases. The vast majority of those

**Response to Compassionate-Release Motion – Page 18**

cases are from outside of the Fifth Circuit and are thus not controlling. However, a review of those cases will demonstrate exactly why defendant is not entitled to the relief sought.

While defendant was 29 years of age at the time she committed the crimes for which she is incarcerated, four of the six Supreme Court cases cited in her brief have as an integral issue the fact that the defendants were juveniles at the time of the commission of the offenses for which they had been convicted. *Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012); *Roper v. Simmons*, 543 U.S. 551 (2005); *Thompson v. Oklahoma*, 487 U.S. 815 (1988). That consideration clearly does not apply to defendant LeBaron.

At least eight of the out of circuit cases cited in defendant's brief involve drug convictions, not multiple homicides. *United States v. Ruvalcaba*, 26 F.4th 14 (1st 2022)(drug conviction); *United States v. Halvan*, 26 F4th 566(2nd 2022)(drug conviction); *United States v. McMaryion*, 2023 WL 4118015 (5th 2023)(drug conviction); *United States v. Piggott*, 2022 WL 118632 (SDNY 2022)(drug conviction); *United States v. Lii*, 528 F.Supp.3d 1155 (Hawaii 2021)(drug conviction); *United States v. Perez*, 2021 WL 837425 (Conn. 2021)(drug conviction); *United States v. Hope*, 2020 WL 2477523 (SDFL 2020)(drug conviction); *United States v. Millan*, 2020 WL 1674058(SDNY 2020)(drug conviction). As such, these precedents are not persuasive.

**Response to Compassionate-Release Motion – Page 19**

Of the remaining out of circuit cases cited by defendant, 6 of them involved convictions for offenses dissimilar to defendant's convictions, *United States v. Chen*, 48 F.4th 1092 (9th 2022)(924(c) conviction); *United States v. McCoy*, 981 F.3d 271 (4th 2020)(924(c) conviction); *United States v. Lugo*, 2022 WL 732153 (EDNY 2022)(disparate treatment among defendants); *United States v. Cano*, 2020 WL 7415833(SDFL 2020)(CCE sentencing error); *United States v. Hope*, 2020 WL 2477523 (SDFL 2020)(drug conviction); *United States v. Millan*, 2020 WL 1674058 (SDNY 2020)(drug conviction). The remaining cases involve only one homicide, or none at all. *United States v. Morris*, 2022 WL 3703201 (Conn. 2022)(sentenced to 4 life sentences from only one death); *United States v. Williams*, 2021 WL 5206206 (D.C. 2021)(1 murder); *United States v. Sims*, 2021 WL 1603959 (EDVA 2021)(bank robbery resulting in 1 death); *United States v. Rodriguez*, 492 F.Supp. 3d 306 (SDNY 2020)(illness of defendant). As such, these precedents are unpersuasive as well.

The advisory commentary to USSG § 1B1.13 does not support defendant's prayer for relief. The defendant is not suffering any, "serious and advanced illness with an end of life trajectory." Application Note 1.(A)(i). The defendant is not, "suffering from any serious physical or medical condition." Application Note 1.(A)(ii)(I). The defendant is not, "suffering from a serious functional or cognitive impairment. Application

Note 1.(A)(ii)(III). The defendant is not, "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Application Note 1.(A)(ii)(III). Defendant's is not over 65 years of age and in any event she is not, "experiencing a serious deterioration in physical or mental health because of the aging process." Application Note 1.(B). The defendant has no minor children. Application Note (C)(i). The defendant has no spouse. Application Note (C)(ii). As such, under the advisory Commentary to § 1B1.13 defendant is not entitled to the relief requested.

Most chilling in this case is the defendant's demonstrated lack of compassion for her victims. Defendant has submitted a brief approximately two inches thick dedicated to offering excuses for her activities of June 27, 1988 and blaming others for those actions. The relief requested by defendant fails to reflect the seriousness of the offenses which she has committed, fails to promote respect for the law, does not provide just punishment for the offenses which involved the violent taking of four lives, does not afford adequate deterrence to criminal conduct and completely fails to protect the public from further crimes.

**Response to Compassionate-Release Motion – Page 21**

## <u>CONCLUSION</u>

Defendant Patricia LeBaron is not entitled to a reduction in sentence under either the United States Code, case precedent or the United States Sentencing Guidelines.

WHEREFORE, the United States respectfully requests that this court deny defendant's motion for sentence reduction.


Respectfully submitted,

ALAMDAR S. HAMDANI
United States Attorney

*Richard D. Hanes*
_____
RICHARD D. HANES
Assistant United States Attorney
713/817-4642
richard.hanes@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on or before the date of filing, a copy of the foregoing was sent to counsel for defendant by electronic service.

*Richard D. Hanes*
RICHARD D. HANES
Assistant United States Attorney