IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NUMBER H-92-177-05 |
| | § | |
| PATRICIA LEBARON | § | |

## MEMORANDUM OPINION AND ORDER

The defendant, Patricia LeBaron (BOP #60090-079), is presently
serving a life sentence in the United States Bureau of Prisons as
the result of a conviction entered against her in 1993. After she
filed a handwritten Motion for "Extraordinary or Compelling
Reasons" Under the Compassionate Release Statute 18 U.S.C.
[§] 3582(c)(1)(A) ("Defendant's Motion for Compassionate Release")
(Docket Entry No. 734) and the government submitted its Response of
United States in Opposition to Motion for "Extraordinary or
Compelling Reasons" Under the Compassionate Release Statute 18
U.S.C. [§] 3582(c)(1)(A) ("Government's Response") (Docket Entry
No. 738), the court appointed the Federal Public Defender in
Houston to represent her (Order, Docket Entry No. 739). With the
assistance of counsel, the defendant has now filed a Supplement to
Motion for Reduction in Sentence Under 18 U.S.C. § 3582(c)(1)(A)(i)
("Defendant's Supplemental Motion") (Docket Entry No. 758), asking
the court to reduce her sentence of life imprisonment to a term of
360 months (30 years). The government has filed a Response of
United States in Opposition to Supplement to Motion for Reduction
in Sentence Under 18 U.S.C. § 3582(c)(1)(A)(i) ("Government's

Supplemental Response") (Docket Entry No. 765), and the defendant has filed a Reply to Government Response ("Defendant's Reply") (Docket Entry No. 767).  After carefully considering the entire record and the applicable law, the court will grant the defendant's request for a reduction in sentence for the reasons explained below.

## I.  Background

In 1992 the defendant was charged in a Superseding Indictment with several serious offenses stemming from the murders of three men and a child, all of which occurred on June 27, 1988.[1]  The murders were committed by followers of a polygamist sect known as the Church of the First Born of the Lamb of God (the "Church"), of which the defendant was a member.[2]  The specific facts underlying the offenses have been set forth at length in the defendant's Presentence Investigation Report ("PSR"),[3] the appellate opinion affirming her conviction,[4] and the Defendant's Supplemental Motion.[5] The following summary details the defendant's involvement with the Church and the offenses that were committed under the direction of its patriarch, Ervil LeBaron.

---

[1]Superseding Indictment, Docket Entry No. 104, p. 8 ¶¶ 13Y, 13Z, 13AA, 13BB.

[2]See id. at 2 ¶ 2(a).

[3]PSR, Docket Entry No. 239-1, pp. 6-35 ¶¶ 28-130.

[4]See United States v. Barlow, 41 F.3d 935, 937-41 (5th Cir. 1994) (per curiam).

[5]See Defendant's Supplemental Motion, Docket Entry No. 758, pp. 18-29.

The Church led by Ervil LeBaron was a splinter group of the Church of Jesus Christ of Latter-day Saints, better known as the Mormons, who formerly practiced polygamy as one of the tenets of their faith.[6] Although the Mormons formally renounced polygamy in 1890, fundamentalist sects that included the LeBaron family defied that proclamation and continued the controversial practice of polygamy by having multiple wives.[7]

Ervil LeBaron had as many as 13 wives and fathered approximately 50 children, including the defendant.[8] As its patriarch, Ervil controlled the Church and its members through a strict system of civil law that featured the following rules, which were maintained by threats of death:

(1)  Children who did not obey and could not be corrected by the community were put to death.

(2)  Traitors to Ervil's teachings (Sons of Perdition) were to be put to death.

(3)  False prophets (leaders of other churches) who could not be converted into Ervil's fold and pay him tithing were to be put to death.

(4)  Any others who did not obey the strict orders of the church leadership were also to be put to death.[9]

---

[6]PSR, Docket Entry No. 239-1, p. 7 ¶¶ 31-32.  The history of the Church of the Lamb of God and Ervil LeBaron's violent rule is detailed in the Defendant's Supplemental Motion, Docket Entry No. 758, pp. 20-29, which references several books about the cult, including Prophet of Blood (1981) by Ben Bradlee, Jr. and Dale Van Atta, The LeBaron Story (1981) by Verlan M. LeBaron, and The Blood Covenant (1990) by Rena Chynoweth and Dean M. Shapiro.

[7]PSR, Docket Entry No. 239-1, p. 7 ¶ 33.

[8]Id. at 8 ¶ 37, Chart at p. 9.

[9]Id. at 8 and 10 ¶ 37.

At Ervil's direction members of the Church murdered numerous people for their failure to abide by his rigid teachings.[10]

Church members believed that Ervil LeBaron's teachings, which were memorialized in many different writings, including a document entitled The Covenant of the New Millennial Church of the Lamb of God, were divine in origin and represented the word of God.[11] While in Utah State Prison in 1981, Ervil published another treatise, known as the Book of the New Covenant, that mandated the death penalty for disobedience to his teachings through the practice of "blood atonement," which is described as follows:

> According to these teachings, the leader of the Church, known as the "Great Grand Patriarch" or "Patriarch," is empowered to brand disobedient members of the organization as "Sons or Daughters of Perdition," i.e., those who are "unredeemable." Being marked unredeemable is tantamount to a death sentence, for the Church practices "blood atonement," an archaic religious doctrine which is purported to teach that unredeemable members of a religion can obtain eternal salvation only through the shedding of their own blood.[12]

Once a patriarch pronounced a punishment for disobedience, members of the Church were required to carry it out, and those who failed to do so were themselves deemed "children of Perdition."[13]

---

[10]Id. at 8 ¶ 36, pp. 10-11 ¶¶ 38-44.

[11]Superseding Indictment, Docket Entry No. 104, p. 2 ¶ 2.c; see also Letter from Estephania LeBaron-Papanicolaou, Exhibit A to Defendant's Supplemental Motion, Docket Entry No. 758-1, pp. 4-9.

[12]Barlow, 41 F.3d at 937.

[13]Id. at 937-38; see also Letter from Celia LeBaron, Exhibit D to Defendant's Supplemental Motion, Docket Entry No. 758-1, p. 17 (describing the practice of blood atonement).

Ervil's wives and children lived in poverty most of the time because of the tithing that Ervil required from all of his followers.[14] The defendant's mother died from cervical cancer when the defendant was eleven,[15] leaving her to work in the family's appliance-repair business while caring for her younger brothers and sisters, who were also orphaned.[16] The children were separated and divided up among extended family, who were also followers of Ervil's Church.[17] The defendant was uprooted repeatedly, moving from place to place with various family members who forced her to work for them while living in abject poverty.[18]

The defendant and her siblings were brainwashed by Ervil LeBaron's fanatical teachings, isolated from society, uneducated, and deprived of their most basic needs.[19] Beginning at a young age the defendant began to experience emotional, physical, verbal, and

---

[14]PSR, Docket Entry No. 239-1, p. 10 ¶ 39.

[15]Psychological Evaluation of Patricia LeBaron by Dr. Adeyinka M. Akinsulure-Smith, dated May 5, 2023 ("Akinsulure-Smith Report"), Exhibit I to Defendant's Supplemental Motion, Docket Entry No. 759, p. 13.

[16]See Letter from Jennifer LeBaron, Exhibit E to Defendant's Supplemental Motion, Docket Entry No. 758-1, p. 20; see also Letter from Leland Jared LeBaron, Exhibit F to Defendant's Supplemental Motion, Docket Entry No. 758-1, pp. 25, 26.

[17]Akinsulure-Smith Report, Exhibit I to Defendant's Supplemental Motion, Docket Entry No. 759, p. 13.

[18]Id.

[19]See Letter from Celia LeBaron, Exhibit D to Defendant's Supplemental Motion, Docket Entry No. 758-1, p. 17; Letter from Leland Jared LeBaron, Exhibit F, pp. 25-26; Letter from Anna LeBaron, Exhibit J, p. 2.

-5-

sexual abuse.[20]  Girls were groomed for polygamy and forced to marry
other Church members, who were often family.[21]  After Ervil LeBaron
"willed" the defendant and her sisters to a pair of his followers
(the Rios brothers), the defendant instead married her half-
brother, William Heber LeBaron ("Heber"), and bore a child from
that incestuous relationship in 1986.[22]  The child was born with
numerous birth defects and died in 1987.[23]  According to Richard
LeBaron, Heber suffocated the baby with plastic because the baby
was going to die anyway and was "holding back" the Kingdom of God.[24]

While Ervil was in prison, he pronounced three of his
followers (Mark Chynoweth, Duane Chynoweth, and Ed Marston) as Sons
of Perdition and ordered Church members to kill them on sight.[25]
The three men had rejected Ervil LeBaron's teachings and
disassociated themselves from the Church.[26]  After Ervil died, his
successor, Aaron Morel LeBaron, also denounced the men and ordered

---

[20]Akinsulure-Smith Report, Exhibit I to Defendant's Supplemental
Motion, Docket Entry No. 759, p. 13.

[21]Letter from Estephania LeBaron-Papanicolaou, Exhibit A to
Defendant's Supplemental Motion, Docket Entry No. 758-1, pp. 5-6;
Exhibit B, Letter from Rena Chynoweth Mortenson, Docket Entry
No. 758-1, p. 11.

[22]PSR, Docket Entry No. 239-1, p. 41 ¶ 180.

[23]Id.

[24]Id.

[25]Barlow, 41 F.3d at 938.

[26]PSR, Docket Entry No. 239-1, p. 7 ¶ 31.

members of the Church to carry out Ervil's previous directive to kill all three.[27]

The defendant was among several members of the Church who were ordered to kill Mark Chynoweth, Duane Chynoweth, Ed Marston, and any witness to the killing who was over four years old.[28] According to a plot devised by Heber to kill all three men on the same day, the defendant and Richard LeBaron, who was also the defendant's brother, were assigned to kill Duane Chynoweth.[29] The defendant accompanied Richard when he shot Duane Chynoweth numerous times, killing him in front of his eight-year-old daughter, Jenny Chynoweth, who Richard also shot to death because she witnessed the murder.[30] Meanwhile, Heber shot and killed Mark Chynoweth; and another Church member, Douglas Lee Barlow, similarly dispatched Ed Marston.[31]

The defendant stood trial with Heber and Barlow, while Richard LeBaron elected to cooperate under the terms of a plea agreement.[32] After hearing all the evidence of their gruesome crimes, a jury found the defendant guilty along with Heber and Barlow of the following offenses: conspiracy to tamper with a witness by killing

---

[27]Barlow, 41 F.3d at 938.

[28]Id.

[29]Id.

[30]PSR, Docket Entry No. 239-1, p. 6 ¶ 29, p. 27 ¶ 105.

[31]Id. at 24 ¶ 94.

[32]Plea Agreement, Docket Entry No. 112.

Jenny Chynoweth (Count Five); tampering with a witness by killing Jenny Chynoweth (Count Six); carrying and using a firearm during a crime of violence (Count Eight); conspiracy to obstruct religious beliefs (Count Nine); obstruction of the free exercise of religious beliefs held by Mark Chynoweth, Duane Chynoweth, and Ed Marston, resulting in their deaths (Counts Ten through Twelve); conspiracy to violate the Racketeer Influenced and Corrupt Organization Act ("RICO") (Count Thirteen); and violating RICO (Count Fourteen).[33]

The Probation Officer who prepared the defendant's PSR observed that she was "born into a religious cult and was subjected to the indoctrination methods and perverted teachings of Ervil LeBaron for the duration of her formative years."[34]  In support of this statement, the PSR summarized evidence showing that the defendant endured extensive psychological and physical abuse during her upbringing, which left her with little choice but to follow orders or face blood atonement herself:

> [T]hroughout the course of gathering information regarding the offense and the LeBaron cult for this investigation, a clear pattern and manner of indoctrination became apparent.  From the time that Ervil founded his church, interaction with and information from the outside world was controlled.  The LeBaron family members typically lived in poverty conditions, whether in Mexico or in the

---

[33]Judgment in a Criminal Case, Docket Entry No. 255, pp. 1, 6; see also Superseding Indictment, Docket Entry No. 104-1 (describing the counts).  The defendants were also convicted of murder for consideration (Counts One through Four), but the court granted a motion for judgment of acquittal on those charges.  See Oral Order, Docket Entry dated January 21, 1993.

[34]PSR, Docket Entry No. 239-1, p. 44 ¶ 206.

-8-

United States.  In Mexico, family members described having lived in camper shells, camping trailers and trailer houses in deserted areas, oftentimes with no electricity or running water.  In the United States, one house would be rented to house 10-20 women and children.  Television and radio were forbidden.  Anyone not part of the cult was considered evil.  Law enforcement officers or other officials normally portrayed as protectors in the community were represented to be evil.  Children were either home taught or only allowed to attend public school to a certain age; lest they become too "worldly" and "evil."  Members were constantly schooled in the doctrine of the church and drilled on scriptures.  They were required to study numerous religious publications, as well as the writings of Ervil LeBaron.  After Ervil's death, they were specifically required to study the Book of the New Covenant.  Particular attention was to be given to study of the principles of blood atonement, polygamy and sacrifice.  The children were taught that everything, including their own power of choice, was to be sacrificed for the Kingdom of God, if necessary.  The spiritual penalty for failure to conform to the teachings and comply with the rules taught by Ervil was eternal damnation of the soul; with the physical penalty being death.[35]

For her role in the offenses perpetrated at the direction of Ervil and Aaron LeBaron, the defendant faced a sentence of life imprisonment under the United States Sentencing Guidelines ("U.S.S.G.").[36]  Count Six also required a mandatory term of life imprisonment under 18 U.S.C. §§ 1512(a)(1)(C) and 1512(a)(2)(A).[37]

The defendant's trial counsel requested a downward departure under U.S.S.G. § 5K2.12 on the grounds that her involvement was the product of coercion and duress, noting that she:  (1) was born into

---

[35] Id. at 34-35 ¶ 130.

[36] Id. at 43 ¶ 192.

[37] Id. at 42 ¶ 187.

-9-

and indoctrinated by a religious cult; (2) endured sexual, emotional, and physical abuse; and (3) followed directions without question because she lived constantly under threat of death.[38] The court noted, however, that a departure was not authorized because the life sentence in Count Six was mandatory.[39] Consistent with the Sentencing Guidelines, which were then mandatory, the defendant received four life sentences for Counts Ten through Twelve of the Superseding Indictment.[40] The defendant also received a mandatory life sentence for Count Six along with concurrent 20-year sentences on Counts Thirteen and Fourteen, concurrent five-year sentences on Counts Five and Nine, followed by a consecutive five-year sentence on Count Eight.[41] Heber and Barlow, who committed the killings of Mark Chynoweth and Ed Marston, received the same sentence.[42] Richard LeBaron, who killed Duane and Jenny Chynoweth, received concurrent terms of five years' imprisonment.[43] In 1997 Aaron Morel

[38]Defendant Patricia LeBaron's Objections to Presentence Report, Docket Entry No. 241, pp. 3-4.

[39]See Sentencing Transcript dated May 26, 1993, Docket Entry No. 293-1, pp. 4-5 (noting that a life sentence was required and that the availability of a downward departure had no effect on the sentence for Count Six, from which the court had no discretion to depart).

[40]Id. at 27-28.

[41]Id.

[42]Id. at 28-30.

[43]See Judgment in a Criminal Case, Docket Entry No. 311, p. 2.

LeBaron was tried, convicted, and sentenced to 540 months (45 years) in prison for his role in the killings.[44]

The defendant, who was 23 years old when the offenses were committed in 1988, is now 58 years old.[45] She has filed a Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A), noting that she has been imprisoned since 1989 for the crimes she committed while under the influence of a "brainwashing, mind controlling cult."[46] She expresses remorse for her actions and seeks compassionate release, noting that she has completed many rehabilitative programs and college correspondence courses, and that she has maintained good conduct during her 33 years of imprisonment.[47] The defendant's counsel has supplemented her hand-written request for compassionate release with numerous letters of support from family members;[48] a recent psychological evaluation that provides information about the impact of the defendant's

---

[44]See Judgment in a Criminal Case, Docket Entry No. 528, p. 2.

[45]See PSR, Docket Entry No. 239-1, p. 40 ¶ 177 (noting the defendant's date of birth in 1965).

[46]Defendant's Motion for Compassionate Release, Docket Entry No. 734, p. 1.

[47]Id. at 1-2, 4; see also Letter dated Oct. 30, 2018, Docket Entry No. 730, pp. 8-10.

[48]See Letter from Estephania LeBaron-Papanicolaou, Exhibit A to Defendant's Supplemental Motion, Docket Entry No. 758-1, pp. 4-9; Letter from Rena Chynoweth Mortenson, Exhibit B, pp. 11-12; Letter from Joshua Chynoweth, Exhibit C, pp. 14-15; Letter from Celia LeBaron, Exhibit D, pp. 17-18; Letter from Jennifer LeBaron, Exhibit E, pp. 20-23; Letter from Leland Jared LeBaron, Exhibit F, pp. 25-27; Letter from Anna LeBaron, Exhibit J, pp. 2-3; Letter from Troy E. Papanicolaou, Exhibit K, p. 5.

family, social environment, and repeated victimization on her development from early childhood to young adulthood;[49] prison records of her rehabilitative programming and good conduct while incarcerated;[50] letters of support from several fellow prisoners;[51] and a detailed reentry plan that includes additional letters of support for the defendant's release.[52] The government opposes the defendant's release, focusing mainly on the seriousness of the offenses.[53]

## II.  Discussion

### A.  Motions for Reduction in Sentence

A district court is authorized to reduce or modify a term of imprisonment for compassionate reasons under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018, Pub. L. 115-391, Title VI, § 603(b), 132 Stat. 5194, 5239-41 (Dec. 21,

---

[49]See Akinsulure-Smith Report, Exhibit I to Defendant's Supplemental Motion, Docket Entry No. 759, pp. 10-36.

[50]See Individualized Needs Plan - Program Review, Exhibit L to Defendant's Supplemental Motion, Docket Entry No. 758-3, pp. 7-11; BOP Certificates of Completion, Exhibit M, pp. 13-22; Summary Reentry Plan - Progress Report, Exhibit N, pp. 2-6; Individualized Needs Plan - Program Review, Exhibit O, p. 8; FSA Recidivism Risk Assessment, Exhibit P, pp. 10-11.

[51]See Fellow Inmate Support Letters, Exhibit Q to Defendant's Supplemental Motion, Docket Entry No. 758-4, pp. 13-21 (letters from Marcia S. Pestano, Saundra Ann Ferrell, Felicia Jackson, and S. Nabi).

[52]See Defendant's Supplemental Motion, Appendix - Reentry Plan for Patricia LeBaron ("Reentry Plan"), Docket Entry No. 758-5.

[53]Government's Supplemental Response, Docket Entry No. 765, pp. 2-11.

2018), "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier," if the court finds that "extraordinary and compelling reasons" warrant a reduction.[54] 18 U.S.C. § 3582(c)(1)(A)(i).

The Sentencing Guidelines under which the defendant was sentenced are no longer mandatory.[55] See United States v. Booker, 125 S. Ct. 738, 757-58 (2005). Although the defendant also received a mandatory life sentence for her conviction on Count Six,[56] courts are authorized to reduce a statutory mandatory minimum sentence under § 3582(c)(1)(A). See, e.g., United States v. Halvon, 26 F.4th 566, 570 (2d Cir. 2022) (per curiam) (holding that "a mandatory minimum sentence does not preclude a district court from reducing a term of imprisonment on a motion for compassionate release").

Any reduction under § 3582(c)(1)(A) must comply with the applicable policy statement articulated by the United States

----

[54]The government has agreed that the defendant has satisfied the exhaustion requirement. See Defendant's Supplemental Motion, Docket Entry No. 758, p. 30 and Request to Staff [for Compassionate Release], Exhibit G to Defendant's Supplemental Motion, Docket Entry No. 758-2, pp. 2-3.

[55]PSR, Docket Entry No. 239-1, p. 43 ¶ 192.

[56]Id. at 42 ¶ 187.

Sentencing Commission.  Section 1B1.13 of the Sentencing Guidelines authorizes early release for extraordinary and compelling reasons related to the defendant's medical condition, age, family circumstances, or "other reasons" that warrant a reduction in sentence.  <u>See</u> U.S.S.G. § 1B1.13(b)(1)-(3),(5) (U.S. Sentencing Commission 2023).  Recent amendments to U.S.S.G. § 1B1.13 also allow a sentence reduction, subject to certain limitations, where there has been a change in the law benefitting a defendant who has received an unusually long sentence and has served at least ten years of imprisonment.  <u>See</u> U.S.S.G. § 1B1.13(b)(6) (U.S. Sentencing Commission 2023).

If the court finds that extraordinary and compelling reasons warrant a sentence reduction, U.S.S.G. § 1B1.13(a)(2) authorizes a reduction if the court also finds that the defendant "is not a danger to the safety of any other person or the community, as provided in 18 U.S.C. § 3142(g)."  Decisions about whether to grant or deny a request for compassionate release under § 3582(c)(1)(A) are discretionary, depending on the court's consideration of the applicable policy statement and other factors found in 18 U.S.C. § 3553(a).  <u>See</u> <u>United States v. Chambliss</u>, 948 F.3d 691, 693 (5th Cir. 2020).

## B.   Extraordinary and Compelling Reasons Exist

While the defendant does not meet the criteria for relief based on her medical condition, age, or family circumstance, the

-14-

court concludes that extraordinary and compelling reasons warrant a reduction in her sentence under U.S.S.G. § 1B1.13(b)(5) for "other" reasons that are "similar in gravity to those described in [§ 1B1.13(b)(1) through (4)]."   As detailed in the PSR, the defendant and other children who were born into Ervil LeBaron's religious cult were isolated from society, had little education, and were instructed to view non-Church members as enemies.[57]   The defendant has presented numerous letters from other family members describing the experiences they shared as cult members who were brainwashed, abused, and traumatized from the time they were born.[58] The children were taught from a young age that they would be subject to blood atonement for their sins if they strayed, and they entered into a covenant in which they asked to be killed if they became a son or daughter of perdition.[59]

The record includes a report from Dr. Larry M. Nahmias ("Nahmias Report"), who interviewed the defendant in 1993 and made the following assessment about the effect of her psychologically toxic upbringing:

---

[57]PSR, Docket Entry No. 239-1, pp. 34-35 ¶ 130.

[58]Letter from Estephania LeBaron-Papanicolaou, Exhibit A to Defendant's Supplemental Motion, Docket Entry No. 758-1, pp. 4-9; Letter from Rena Chynoweth Mortenson, Exhibit B, pp. 11-12; Letter from Joshua Chynoweth, Exhibit C, pp. 14-15; Letter from Celia LeBaron, Exhibit D, pp. 17-18; Letter from Jennifer LeBaron, Exhibit E, pp. 20-23; Letter from Leland Jared LeBaron, Exhibit F, pp. 25-27.

[59]Letter from Estephania LeBaron-Papanicolaou, Exhibit A to Defendant's Supplemental Motion, Docket Entry No. 758-1, p. 6; Letter from Jennifer LeBaron, Exhibit E, p. 21.

> I would like to start my report by saying this is the
> most thorough and complete indoctrination of an
> individual by a cult that I have come across in my almost
> 20 years of practicing medicine.  As you know, I have
> worked with many persons who were members of Satanic
> cults and who have been victimized in all sorts of ways.
> Sadly, Patricia LeBaron[] was born into the most bizarre
> and violent family situation that I have encountered.[60]

The report by Dr. Nahmias described extensive emotional, physical,
verbal, and sexual abuse, as well as the murder of siblings who
spoke out.[61]  He concluded that the defendant "truly had no choice
in the decisions she was able to make concerning the destiny of her
own life," which explained her unquestioning participation in the
charged offenses that were dictated by those abusing her.[62]
Although this report was available at the time of sentencing as
evidence of the coercion and duress experienced by the defendant,
the court lacked discretion to depart downward for those reasons
due to the mandatory life sentence required by Count Six.[63]

The defendant has also presented a more recent psychological
evaluation by Dr. Adeyinka M. Akinsulure-Smith — who considered
scientific research that has developed over the past 30 years while
the defendant has been incarcerated — about the effect of numerous

---

[60]The Nahmias Report, which was submitted in connection with
the defendant's objections to the PSR and considered during the
sentencing proceeding, is filed under seal with the court.  See
Sentencing Transcript, Docket Entry No. 293, p. 3 line 8
(referencing the letter from Dr. Nahmias).

[61]Nahmias Report, pp. 1-4.

[62]Id. at 4.

[63]See Sentencing Transcript dated May 26, 1993, Docket Entry
No. 293-1, pp. 4-5.

adverse childhood experiences and trauma on the adolescent brain.[64] According to Dr. Akinsulure-Smith, the defendant's test scores and responses yielded "evidence of the toxic environment she was raised in during her childhood and adolescent years" and "highlighted the types of adverse experiences she repeatedly endured (e.g., verbal, physical, and sexual abuse, witnessing abuse of siblings, fear and terror experienced, slave labor, starvation, living in filth, and being trafficked around internationally and nationally)."[65] Dr. Akinsulure-Smith observed that the defendant was 23 at the time of the events that led to her conviction and concluded that, based on emerging research on adolescent brain development that occurs between the ages of 18-25, the defendant experienced the "type of trauma that would prevent adequate development of the frontal areas of the brain involved in cognitive control and social information processing."[66]   Dr. Akinsulure-Smith noted in particular the defendant's traumatic history as a child raised in a cult, which featured isolation and control among other significant factors, as highly influential over her personality.[67]   Dr. Akinsulure-Smith concluded that due to the defendant's exposure to multiple types of

---

[64]Akinsulure-Smith Report, Exhibit I to Defendant's Supplemental Motion, Docket Entry No. 759, pp. 18-19.

[65]Id. at 20.

[66]Id. at 21-24.

[67]Id. at 27.

-17-

victimization, which is known as polyvictimization, the defendant was likely suffering from a condition known as Complex Posttraumatic Stress Disorder ("Complex PTSD").[68]

Since the defendant was sentenced in 1993, the Supreme Court has recognized that youthful offenders are less deserving of harsh punishment because, in comparison to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility[.]'" Roper v. Simmons, 125 S. Ct. 1183, 1195 (2005) (quoting Johnson v. Texas, 113 S. Ct. 2658, 2668-69 (1993)). They are also "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." Id. (citing Eddings v. Oklahoma, 102 S. Ct. 869, 877 (1982) ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage."). A defendant's youth at the time of the offense is thus a factor that mitigates against the imposition of a sentence of life without parole. See Graham v. Florida, 130 S. Ct. 2011, 2034 (2010) (holding that the Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide); Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012) (holding that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders).

---

[68]Id. at 28-30, 32.

Other district courts have granted reductions in sentence for extraordinary and compelling reasons where, in circumstances similar to the defendant, a statutory mandatory sentence of life imprisonment was imposed in a case involving a young offender. See United States v. Ramsay, 538 F. Supp. 3d 407, 424-29 (S.D.N.Y. 2021) (reducing a mandatory sentence of life imprisonment for an 18-year old offender after considering scientific research on adolescent development and the impact of a traumatic upbringing; United States v. Cruz, Criminal Case No. 3:94-CR-112 (JCH), 2021 WL 1326851, at *15 (D. Conn. April 9, 2021) (reducing a life sentence for an 18-year-old offender who was ordered to commit two murders by members of a violent street gang); United States v. Lara, — F. Supp. 3d —, 2023 WL 2305938, at *16-17 (D.R.I. March 1, 2023) (reducing a mandatory life sentence for an 18-year-old youth who participated in a car jacking that resulted in death, but did not pull the trigger, to a sentence of time served); United States v. Cheng, — F. Supp. 3d —, 90-CR-1019-11 (RJD), 2023 WL 5522102, at *3-4 (E.D.N.Y. June 20, 2023) (reducing five sentences of life imprisonment to time served for three murders committed when the defendant was 21 and 22 years old); United States v. Sims, Case No. 3:98-cr-45, 2021 WL 1603959, at *7 (E.D. Va. April 23, 2021) (reducing a mandatory life sentence to time served for a defendant who was 21 at the time he participated in a bank robbery that resulted in the death of a teller); United States v. Espino, Case No. 03-20051-08-JWL, 2022 WL 4465096, at *5 (D. Kan. Sept. 26,

2022) (reducing a sentence of life imprisonment to a term of 360 months for a defendant who was 20 years of age when he committed a murder as part of a drug-trafficking conspiracy); United States v. Birkett, Case No. 90-CR-1063-24, 2023 WL 4274683, at *8 (E.D.N.Y. June 29, 2023) (reducing life sentences for offenses involving two murders for a defendant who was 18 at the time of the killings and abused as a child); United States v. Taylor, Criminal Case No. CCB-02-0410-3, 2023 WL 4407593, at *7 (D. Md. July 7, 2023) (reducing life sentences imposed by a jury on a youthful offender, as an alternative to the death penalty, to a sentence of 35 years); United States v. Moses, Criminal Case No. CCB-02-0410-2, 2023 WL 4421569, at *6-7 (D. Md. July 10, 2023) (reducing life sentences imposed by a jury on an 18-year old offender who faced the death penalty for drug-trafficking crimes that resulted in death).

While the defendant was slightly older than the defendants in these cases when she committed her offenses, these opinions nevertheless confirm that a defendant's youth at the time of the offense and the impact of a traumatic upbringing can serve as extraordinary and compelling reasons to reduce a mandatory life sentence when considered in light of emerging scientific research. See, e.g., Ramsey, 538 F. Supp. 3d at 417-20, 424-27 (referencing scientific research concerning the development of the adolescent brain).

When evaluated with the advances in scientific research on the development of the adolescent brain, the defendant's age at the

time of the offenses, and her extensive indoctrination in a violent, patriarchal cult, the court concludes that the defendant has presented extraordinary and compelling reasons to reduce the life sentence that she received for actions that she committed while under extreme duress from the threat of death posed by the cult's practice of blood atonement.

The defendant has made commendable efforts to rehabilitate herself while incarcerated. The record reflects that she has been an exemplary prisoner, having completed numerous rehabilitative programs and 300 hours of college correspondence courses with only one minor disciplinary infraction during the past ten years of her incarceration.[69] Although the court may not consider the defendant's rehabilitation, by itself, as sufficient to constitute an extraordinary and compelling reason for a reduction in sentence, see 28 U.S.C. § 994(t), the court may consider rehabilitation in combination with the other factors listed in U.S.S.G. § 1B1.13 to constitute, in their entirety, the requisite extraordinary and compelling reasons. See Pepper v. United States, 131 S. Ct. 1229, 1242 (2011) ("[E]vidence of post sentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at

---

[69]See Individualized Needs Plan - Program Review, Exhibit L to Defendant's Supplemental Motion, Docket Entry No. 758-3, pp. 7-11; BOP Certificates of Completion, Exhibit M, pp. 13-22; Summary Reentry Plan - Progress Report, Exhibit N, pp. 2-6; Individualized Needs Plan - Program Review, Exhibit O, p. 8; FSA Recidivism Risk Assessment, Exhibit P, pp. 10-11.

sentencing."). Having considered the defendant's efforts to rehabilitate herself over the thirty years she has been imprisoned, the defendant's relatively young age at the time of the offenses, and the difficult circumstances of her upbringing, the court concludes that defendant has demonstrated extraordinary and compelling reasons to reduce her sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and U.S.S.G. § 1B1.13(b)(5).

## C.   Safety and Sentencing Factors Support Compassionate Release

The defendant, who has expressed regret and remorse for her offenses,[70] does not present a "danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(a)(2).   The cult formed by Ervil LeBaron was dissolved in the early 1990s and no longer exists.[71] Letters from several of the defendant's fellow prisoners, describing how she has served as a role model, demonstrate that the defendant has been successfully de-programmed and is no longer a threat to anyone.[72] The defendant is 58 years old and, despite the length of her imprisonment, has maintained extensive ties to her family members,

---

[70]Defendant's Motion for Compassionate Release, Docket Entry No. 734, pp. 1-2; see also Letter dated Oct. 30, 2018, Docket Entry No. 730, pp. 8-10.

[71]Letter from Joshua Chynoweth, Exhibit C to Defendant's Supplemental Motion, Docket Entry No. 758-1, p. 14; Letter from Celia LeBaron, Exhibit D, p. 17; Letter from Jennifer LeBaron, Exhibit E, p. 22.

[72]See Fellow Inmate Support Letters, Exhibit Q to Defendant's Supplemental Motion, Docket Entry No. 758-4, pp. 13-21 (letters from Marcia S. Pestano, Saundra Ann Ferrell, Felicia Jackson, and S. Nabi).

who have become productive members of society after disassociating themselves from the cult of Ervil LeBaron and who support the defendant's release.[73]   The defendant has provided a detailed reentry plan showing that her siblings have expressed willingness for her to live with them while she reintegrates into society.[74] Although the defendant was convicted of very serious offenses, the evidence of rehabilitation during the 30-year period of her incarceration, the close ties that she has maintained with family, and the defendant's advanced age, all persuade the court that she presents no danger to others upon release.

The court has also considered the factors set out in 18 U.S.C. § 3553(a).  The court concludes that, in light of the circumstances set forth above, a sentence of 360 months, representing 30 years' imprisonment, adequately reflects the seriousness of the defendant's involvement in the underlying offenses, promotes respect for the law, and provides just punishment.   18 U.S.C.

---

[73]Letter from Estephania LeBaron-Papanicolaou, Exhibit A to Defendant's Supplemental Motion, Docket Entry No. 758-1, p. 9; Letter from Rena Chynoweth Mortenson, Exhibit B, pp. 11-12; Letter from Joshua Chynoweth, Exhibit C, p. 15; Letter from Celia LeBaron, Exhibit D, p. 18; Letter from Jennifer LeBaron, Exhibit E, p. 23; Letter from Leland Jared LeBaron, Exhibit F, p. 27.

[74]See Letter from Troy E. Papanicolaou, Exhibit K to Defendant's Supplemental Motion, Docket Entry No. 758-3, p. 5 (offering the defendant a stable residence to help her reintegrate if released and expressing eagerness to help); Appendix - Reentry Plan, Docket Entry No. 758-5 (detailing plans for housing with family, eligibility for insurance, access to psychotherapist who is familiar with the cult, prospects for employment, plans to address her immigration status, access to education and vocational training, interest in community support and spiritual development at a Christian-based Presbyterian church).

§ 3553(a)(2)(A).   This sentence will also avoid unwarranted disparities among her co-defendants, in particular, Richard LeBaron, who fatally shot Duane Chynoweth and his daughter Jenny, but received a sentence of only 60 months in prison.[75]   18 U.S.C. § 3553(a)(6).   Consistent with the conclusion that the defendant does not represent a danger to any person or the community, the court concludes that this sentence has served and continues to serve as adequate deterrence and to protect the public from further crimes by this defendant, which, given the defendant's age and rehabilitation, this court concludes is not likely to occur.   18 U.S.C. § 3553(a)(2)(B), (C).   Therefore, the court will grant the defendant's motion under 18 U.S.C. § 3582(c)(1)(A)(i) and will reduce her sentence of life imprisonment to a total term of 360 months as to all counts.   Because the defendant has already served more than 360 months, the effective sentence will be a sentence of time served.[76]

### III.   Conclusion and Order

Accordingly, the court **ORDERS** as follows:

1.   The Motion for "Extraordinary or Compelling Reasons" Under the Compassionate Release Statute 18 U.S.C. [§] 3582(c)(1)(A) (Docket Entry No. 734) and the Supplement to Motion for Reduction in Sentence Under 18 U.S.C. § 3582(c)(1)(A)(i) (Docket Entry No. 758) filed by Patricia LeBaron are **GRANTED**.

---

[75]See Judgment in a Criminal Case, Docket Entry No. 311, p. 2.

[76]Although the defendant has also sought relief under § 1B1.13(b)(6), the court need not decide whether to grant relief on this basis since relief will be granted under § 1B1.13(b)(5).

-24-

2.   The term of imprisonment is hereby **REDUCED** to THREE
     HUNDRED (300) MONTHS as to Counts 6, 10, 11, and
     12; TWO HUNDRED AND FORTY (240) MONTHS as to
     Counts 13 and 14; SIXTY (60) MONTHS as to Counts 5
     and 9; with the terms imposed as to Counts 5, 6, 9,
     10, 11, 12, 13, and 14 to be served concurrently
     with each other.  A term of SIXTY (60) MONTHS as to
     Count 8 is imposed, to be served consecutively to
     the terms imposed in each of Counts 5, 6, 9, 10,
     11, 12, 13, and 14, for a total term of THREE
     HUNDRED AND SIXTY (360) MONTHS' imprisonment.

3.   The defendant having already served more than 360
     months, the effective term of imprisonment is **TIME
     SERVED**.

The Clerk will provide a copy of this Memorandum Opinion and
Order to the parties.

**SIGNED** at Houston, Texas, on this 6th day of November, 2023.


                              _____
                                        SIM LAKE
                         SENIOR UNITED STATES DISTRICT JUDGE